BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
LINDSAY BATTLES, SBN 262862
Email: lbattles@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiffs
AARON NGUYEN, NGOC LE THI PHAN, AND HOANG MINH NGUYEN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON NGUYEN, NGOC LE THI PHAN, AND HOANG MINH NGUYEN <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF GARDEN GROVE, MARK LORD, MICHAEL REYNOLDS, SERGEANT MIKE MARTIN, AND DOES 1-10, INCLUSIVE, <br><br> Defendants. | **Case No.: 21-cv-01775-JVS-ADS** <br><br> **Hon. James V. Selna** <br><br> **SECOND AMENDED COMPLAINT FOR DAMAGES** <br><br> 1) 42 U.S.C. §1983 (VIOLATION 14th AMENDMENT DUE PROCESS) <br> 2) §1983 *MONELL* CLAIM <br><br> **DEMAND FOR JURY TRIAL** |

SECOND AMENDED COMPLAINT

# I.  <u>INTRODUCTION</u>

1.      This civil rights action pursuant to 42 U.S.C. § 1983 seeks compensatory damages from all Defendants, and punitive damages from the individual Defendants for causing Plaintiffs to be deprived of rights, privileges, and immunities secured by the Constitution and laws of the United States.

2.      Plaintiff Aaron Nguyen was wrongfully incarcerated for nine years for his alleged involvement in a gang shooting. Mr. Nguyen's prosecution and conviction hinged almost entirely on coerced inculpatory statements made by his (then) girlfriend, a juvenile at the time of her police interview one month after the shooting. During her interrogation, she drew a diagram showing Aaron's car's position in a car chase. The diagram became the centerpiece of the prosecution's case against Aaron, despite the fact that it was heavily contradicted by other evidence and extracted using highly abusive and coercive interrogation methods that detectives knew or should have known would produce false and unreliable evidence, particularly when used against a vulnerable juvenile witness.

3.      In May 2020, a state appellate court reversed Mr. Nguyen's conviction for insufficient evidence. Throughout the time from his arrest to his ultimate appellate vindication, Mr. Nguyen unwaveringly maintained his innocence. He was not (and could not be as double jeopardy attached once the evidence was found insufficient) re-prosecuted. Nonetheless, as a result of Defendants' unlawful actions in abusively and coercively extracting false evidence from Mr. Nguyen's girlfriend, Mr. Nguyen spent approximately nine years in jail and prison before being found not guilty as a matter of law by the California Court of Appeal.

4.      Plaintiff's parents, Ngoc Le Thi Phan (mother) and Hoang Minh Nguyen (father) were deprived of their constitutionally protected familial relationship with their adult son during the entirety of his wrongful incarceration.

1

Plaintiffs Ngoc Le Thi Phan and Hoang Minh Nguyen seek compensation of the wrongful denial of the society and comfort of, and companionship and familial relationship with, their son, as a result of Aaron's wrongful incarceration.

## II.    **JURISDICTION AND VENUE**

4.    This action is brought by Plaintiffs AARON NGUYEN, NGOC LE THI PHAN, and HOANG MINH NGUYEN, pursuant to 42 U.S.C. §1983.

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §1343 (civil rights jurisdiction) and 28 U.S.C. § 1367 (supplemental jurisdiction).

6.    The acts and omissions complained of commenced on April 21, 2011, within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## III.    **PARTIES**

7.    Plaintiffs AARON NGUYEN, NGOC LE THI PHAN, and HOANG MINH NGUYEN, resided in the state of California at all times alleged herein. NGOC LE THI PHAN is AARON NGUYEN'S mother. HOANG MINH NGUYEN is AARON NGUYEN's father.

8.    Defendant CITY OF GARDEN GROVE ("GARDEN GROVE" or "CITY") is, and at all times relevant hereto was, a duly authorized public entity or political subdivision, organized and existing under the laws of the State of California. The City of Garden Grove Police Department (hereinafter "GGPD") is, and at all relevant times was, an agency or subdivision of the CITY OF GARDEN GROVE. GARDEN GROVE and GGPD are located within the State of California. At all relevant times, GARDEN GROVE possessed the power and authority to adopt policies and prescribe rules, regulations, and practices affecting the operation of the GGPD, the actions of employees of GGPD, including customs, policies and/or practices relating to police tactics, methods, investigations, arrests,

evidence, and discovery; as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance, and/or retention.

9.     Upon information and belief, at all relevant times, Defendants MARK LORD (hereinafter "Lord" or "Detective Lord"), MICHAEL REYNOLDS, SGT. MIKE MARTIN, [1] and DOES 1 through 10 were GGPD personnel (including, e.g., deputies, detectives, sergeants, captains, commanders, chiefs of police, civilian employees, agents, policy makers, and/or representatives of the GGPD), as well as other employees, agents, policy makers and representatives of Defendant GARDEN GROVE.

10.    MICHAEL REYNOLDS, Sgt. MIKE MARTIN, and DOES 1 through 10 held supervisory positions at the time of the homicide investigation and were responsible for overseeing the investigatory activities of LORD and other GGPD personnel. REYNOLDS was the lead GGPD detective responsible for the investigation. At all relevant times, said Defendants were acting under color of law and within the course and scope of their employment with the CITY and/or the GGPD. These Defendants are natural persons and are sued individually. Upon information and belief, at all relevant times these Defendants were residents of the State of California.

11.    At the present time, the true names and capacities of Defendants sued herein as DOES 1 through 10 are unknown to Plaintiffs. Upon information and belief, the true names and capacities of DOE Defendants are contained in records, documents, and other discovery that is unavailable to Plaintiffs and can only be ascertained through the discovery process. Upon information and belief, each of the DOE Defendants was in some manner responsible for the acts and omissions

---

[1] At the time of the 2011 investigation, Sgt. Martin was assigned to the Crimes Against Persons Unit. He had retired by April 2017.

alleged herein, and Plaintiffs will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

12.  Plaintiffs are informed and believe and thereon allege that Defendants sued herein as DOES 1 through 10, inclusive, were employees of GARDEN GROVE. Each Defendant is the agent of the other. Plaintiffs allege that each of the Defendants named as a "DOE" was in some manner responsible for the acts and omissions alleged herein, and Plaintiffs will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## IV.  GENERAL ALLEGATIONS

13.  Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

14.  Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

15.  The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiffs Aaron NguyenNgoc Le Thi Phan, and Hoang Minh Nguyen.

## V.  FACTUAL ALLEGATIONS

### A.  Phi Hong Shooting and GGPD Investigation

16.  This case arises from a gang shooting that occurred in the early morning hours of March 20, 2011, in Garden Grove, California. At around 2:00 a.m., members of two allied street gangs – TRG and Hellside – converged in the parking lot of a pool hall, the Phi Hong billiards club, where they verbally

---

4

confronted rival gang members associated with P.O.V., V.T., and A.F. No physical confrontation took place.

17.     After the parking lot confrontation, a Silver Lexus S.U.V., driven by a member of TRG, Andrew Tran ("Puffy"), chased a car out of the parking lot and onto Westminster Avenue. Less than a quarter of a mile away, a Hellside member riding in the front passenger seat, rolled down his window and fired five shots, killing one person and striking another in the neck.

18.     Aaron and his girlfriend, Nina Nguyen, were among the many individuals identified in some manner in connection with the incident. The night before the shooting, March 19, 2011, Puffy hosted a party in his garage. Some of the guests were affiliated with TRG and Hellside. Non-gang members attended as well, including Aaron and Nina. The party ended around midnight. The guests piled into different cars and dispersed to various locations. After leaving the party, Aaron and Nina followed some of the other cars, hoping to find the next party. They did not, however, accompany the group of cars that went to the pool hall.

19.     Police prosecuted at least 15 individuals in connection with the shooting. Unlike most of his co-defendants, Plaintiff Aaron Nguyen[2] did *not* belong to any gang and had no affiliation with the involved gangs. In March 2011, Aaron was 27 years old and had been dating Nina, a high school student, for about a year. Neither Aaron nor Nina were gang members, but they attended parties every weekend, including parties with gang members. Because they had no gang affiliation and were entirely removed from gang activities, they could, and did, hang out with people from rival gangs. Aaron and Nina had no previous arrests and no experience with law enforcement. Aaron had graduated high school, completed two years of college, and had held the same electronics manufacturing job for several years.

---

[2] Because many of individuals in this case share similar surnames, we refer to them using first names and sometimes monikers.

20.   On April 20, 2011, at 7:00 a.m., the Garden Grove Police Department executed a search warrant at Aaron Nguyen's parents' home. They found both Aaron and Nina sleeping in bed. Defendant Homicide Detective Mark Lord brought them to the Garden Grove Police Department for questioning. They were not placed under arrest. Detective Lord issued no *Miranda* warnings to either of them.

21.   Lord brought Nina to a room in the Juvenile Justice Center where she was subjected to a several-hours-long, highly coercive interview. A the time of her interview, Nina was just three days past her 17th birthday (4/16/11). Although investigators never succeeded in extracting a complete confession, they browbeat Nina until she yielded inconsistent inculpatory statements about the possibility Aaron had driven to the pool hall while she was passed out, the inculpatory parts of which were then used by Defendants as their critical evidence to pursue charges against Aaron for aiding and abetting murder and attempted murder. Nina's statements supplied the only meaningful evidence against Aaron at trial.

### 1.    *Nina's First Interrogation*

22.    The first portion of Nina's interview was recorded. During this portion, Detective Lord and another detective relentlessly questioned her about whether she and Aaron went to the Phi Hong pool hall. Detective Lord and his partner relied on coercive interview techniques that would have compelled most adults, and certainly most 17-year-old juveniles, to confess to being at the scene of the crime, regardless of guilt or innocence. These techniques included: repeated and persistent accusations that Nina was present at the pool hall including continuous representations that Nina had already been caught based on other evidence; exaggerative and false representations about other witnesses statements; false representations about inculpatory cell phone data; the use of physical props purporting to supply incontrovertible evidence of guilt (e.g. a red book purporting to contain cell phone data irrefutably establishing their presence at the pool hall);

suggesting facts and/or putting words in her mouth; and, promises of leniency and threats of punishment, both implicit and implied. These assertions by the detectives were made in a highly bullying, threatening, accusatory and intimidating manner. When used in the interrogation of a juvenile witness, these techniques are objectively unreasonable and widely recognized to yield false information.

23.    Lord started the interview advising Nina that she and Aaron were not in trouble and wouldn't be in trouble for anything they say. He claimed that he had already talked to numerous witnesses who told him what happened. He then showed Nina a "red book" purporting to contain cell phone data, claiming "this is all the proof. I'll show you certain things, dear. But this is the proof. [the proof that Aaron wants] is all in this red book, that's written." Nina asked to see inside of the book, but Lord refused. Throughout the interview, he continued to represent that the book contained cell phone data conclusively establishing their whereabouts.

24.    Despite unrelenting pressure, Nina maintained throughout the first portion of the interview that Aaron did not drive to Phi Hong on the night of the shooting. During the first segment of the interview alone, Nina unequivocally stated, at least nine times, that she had no recollection of being at the pool hall. She admitted to attending the party and likewise admitted to going to a park later (Stonecress Park). She also admitted to following a car from the park until they lost it, at which point Aaron stopped at a Vietnamese restaurant and waited for a phone call. They waited at the Vietnamese restaurant for a long time, perhaps as long as an hour. She maintained this timeline throughout the first part of the interrogation.

25.    The detectives persistently rejected her description, accusing her of lying and/or concealing information to try to protect Aaron. During the first portion of the interview alone, they insisted, directly or indirectly, at least **35** times, that she was not being truthful, including directly accusing her of lying numerous times. By continuously rejecting her answers as lies, they made clear to Nina that they did not intend to let her go until she supplied their version of the truth. Lord insisted "we know what the truth sounds like." Detectives repeatedly and

SECOND AMENDED COMPLAINT

persistently told Nina that they had cell phone evidence and video footage establishing she was at the pool hall. They also told her Aaron had already confessed to having brought her to the pool hall. ("Well, Aaron was there… He's already told us that. That was already discussed.")

26.    Detectives repeatedly claimed that Nina could go home immediately if she would only tell the truth about being at the pool hall (and would be in greater trouble if she continued to deny being present). At one point, Lord specifically claimed she could go home in 5 minutes if she would just tell the truth about being at the pool hall.

27.    The effect of these tactics on Nina was apparent. Throughout the interview, she expressed the concern that detectives refused to believe her even though she was being honest, fear that she might get in trouble for saying something they perceived to be untruthful (e.g. explaining that she felt "nervous" because she didn't "want to tell you guys the wrong…tell you guys something and you don't believe me and you're blaming me for lying to you."), and even began to distrust her memory asking the detectives if they would just tell her "the truth" so she could see if she remembered.

28.    Detectives ultimately ended the interview, openly lamenting that they had questioned her for well over an hour[3] and had learned nothing more than they already knew. They joked that they had just been "babysit[ting]."

### 2.    *Intermission & Aaron's Interrogation*

29.    After the first portion concluded, Lord left Nina to interview Aaron. Aaron's interview lasted 55 minutes. Lord employed much of the same trickery and coercive tactics against Aaron that he had used against Nina, including flagrantly false representations about inculpatory evidence. Aaron did not confess to being at the pool hall. Aaron repeatedly denied being at Phi Hong. He admitted taking Nina to Puffy's party in his car. Aaron said they went to Puffy's party and

---

[3] On information and belief, the interview is significantly longer than one hour.

SECOND AMENDED COMPLAINT

afterwards followed some cars around looking for another party. After initially denying it, he admitted to hanging out at Stonecress Park with several people from the party. He said he saw 5-7 cars at the park from the party. When he left the park, he was following a car but lost it. After he got lost, he parked in front of a restaurant located at Bolsa and Bushard where he remained for a long time waiting for others. He encouraged officers to look for camera footage outside of the restaurant. He explained that he was not a gang member and was not involved in gang business. Nguyen told detectives that the gang members "only talk to [their] little clique about what they're gonna do" and they would not tell him.

30.    While Lord interviewed Aaron, Sergeant Mike Martin entered the room where Nina was waiting. Sergeant Martin initiated a forceful, hostile, and intimidating confrontation during which he shouted at Nina, accused her of lying and pointed his finger in her face. Nina eventually broke down in tears, sobbing for more than 15 minutes. Her sobbing was so loud that Aaron could hear her in the adjacent interrogation room. This portion of the interview was *not* recorded.

### 3.    Nina's Second Interrogation

31.    After Sergeant Martin exited, Detective Lord resumed his recorded interrogation with Nina. At the beginning of the second tape, Nina can still be heard sobbing. The detectives ridiculed her for crying, accused her of crying because she was caught lying, then proceeded to again use the same highly coercive techniques employed in the first part of the interrogation.

32.    Nina offered that maybe she did not remember being at the pool hall because she was sleeping. The detectives responded by berating her, calling her "ridiculous" and a "liar." Lord told her she could not have been asleep because people saw her sitting in the car with Aaron at the pool hall, awake, not sleeping.

33.    Nina eventually capitulated, stating "okay, okay, I was there, *but I don't remember*…I don't remember seeing in the parking lot where McDonald's was." (emphasis supplied) Lord took the admission and ran with it, asking a series

of questions about why they were at the pool hall, who was in the car, who left the car, what street they used in exiting the parking lot and where they went afterwards. Nina supplied mostly confused or vague answers such as "Uh huh" or "yeah," but seemingly admitted to having been at the pool hall.

34.    By the time Nina gave these statements, detectives had falsely claimed, at least 12 times, that they had irrefutable proof that Nina had been at the pool hall in the form of video surveillance, cell phone data, and statements from other witnesses. Nina expressly acknowledged that she was confused by these representations and could not help but doubt her own memory.

35.    Nina also told detectives that she thought they were chasing another car at some point in the evening. At detectives' request, she drew a diagram of cars surrounding another vehicle on a street. She labeled the street "Westminster" at the detectives' direction. The diagram was heavily contradicted by other evidence generated in the investigation. After providing the diagram, she tried to clarify that it did not depict events leaving the pool hall as she had no memory of being at the pool hall.

36.    After Nina insisted again that she had no memory of the pool hall parking lot, Sgt. Martin returned and aggressively insisted she was lying. Martin then falsely represented that Nina, Alex, Julie and Tony already admitted they were at the pool hall. This was a lie. He showed Nina the word "Westminster" on the drawing: You [told] the officer this is where you were, this is Westminster. *You wrote it….you can't go sideways on me.*" (emphasis supplied) Nina then asked permission to explain the drawing, stating that the drawing referred to the Miles Square Park area, not Westminster. She tried to explain that the officers kept putting words in her mouth "Because it seems like that what all you guys wanted to hear. And I tell you guys…over and over…I was never there. I don't remember being there."

37.    Martin again insisted that they have video and cell phone evidence

irrefutably establishing that Aaron and Nina were at the pool hall:

> Martin: … we know that he's phone pings at Harbor and Westminster. We can put him, the phone, his car. You saw pictures of his car, right? ... That's all Westminster. We know actually where that is. So, we don't need a lot… *We don't need people to tell us that you and your boyfriend were there. Because, we have technology, we have video.*
>
> Nina: You have proof.
>
> SGT. MARTIN: And a phone, yes… *Absolutely proof.*
>
> Nina: Yes, we know that, but we, I, I'm telling You Okay, you guys have proof but I don't remember being there?

(Emphasis supplied)

38.     Martin continued to threaten, shame, and prod Nina until it became clear she would not provide the statement they wanted. They eventually terminated the interview.

39.     Detective Lord drafted an 18-page summary of the interview in a supplemental police report, which was forwarded to prosecutors. ("I request this supplemental report be used for the prosecution of Aaron Nguyen"). On information and belief, the prosecutors relied on the premise that the summary was a complete and accurate statement of the relevant circumstances in proceeding to charge Aaron, particularly since Nina was the critical witness to inculpate Aaron. The report omits significant material details concerning the detectives' interrogation tactics and Nina's responses, including that it makes no reference to Sgt. Martin's questioning without recording, the threat that she could not leave until she told the "truth" (i.e., statements inculpating Aaron), their threatening and coercive tone and manner, and other facts undermining the reliability and truthfulness of Nina's allegedly inculpating statements. The report indicated that Nina had admitted to having been at the Phi Hong pool hall without indicating the numerous occasions in which she tried to clarify that she had been confused about

the dates and pool hall in question and had no memory whatsoever of being at the pool hall.

### 4.   Failure to Disclose Exculpatory Witness Statements

40.     On information and belief, during the course of their investigation, GGPD investigators failed to memorialize and relay to prosecutors and the defense one or more witness interviews in which material witnesses supplied information exculpatory to Aaron Nguyen. On information and belief, the undisclosed, exculpatory witness statements included the interview of Julie Nguyen, a passenger in Aaron Nguyen's car on the night of the incident, whose statements were directly relevant to the question of whether Aaron's car was present in the pool hall parking lot. On information and belief, GGPD investigators failed to disclose to prosecutors and the defense other similarly exculpatory witness statements.

### B.   Trial

41.     Aaron's case went to trial in February 2017, almost six years after he was arrested. He had remained continuously in custody for the entirety of his prosecution.

42.     By the time his case went to trial, many of the co-defendants had reached plea agreements. Charges had not yet been resolved against Aaron, Alexander Tran (a passenger in Aaron's car), and Anthony Le (a confirmed TRG member whose presence at the pool hall was undisputed). Anthony Le had no connection to Aaron's car. Alexander Tran's case was severed before trial, leaving Aaron and Anthony Le as remaining defendants for trial. Aaron and Anthony Le were tried by a single jury.

43.     The disputed issues at trial were: (1) whether Aaron was present in the pool hall parking lot at the time of the gang confrontation and subsequently on Westminster Boulevard when the shooting occurred; and, (2) whether he was liable for the uncharged target offense of disturbing the peace, including whether he was

liable for aiding or abetting in disturbing the peace and/or conspiring to disturb the peace (by aiding and abetting in the initial confrontation in the parking lot) and was therefore culpable for the murder and attempted murder that occurred as a natural and probable consequence of that confrontation.

44.     The prosecution presented evidence that Aaron was aware that TRG members intended to confront their rivals that night. It was undisputed, however, that Aaron was not a gang member, had never been a gang member, and was friends with members of the victim gangs as well as TRG. The prosecution's gang expert testified that Aaron was not a gang member, as did two accomplices who testified under grants of immunity.

45.     The prosecution also presented testimony from Jimmy Nguyen, one of the shooting victims (one of the individuals who was riding in the car that was shot at). Jimmy Nguyen was riding in the back of the victim SUV with his cousin Thai. Thai was a member of A.F., a rival of TRG. Jimmy testified that he and Thai knew Aaron. Jimmy had met Aaron at Thai's house. Jimmy hung out with both Thai and Aaron together on various occasions and had met Nina with Aaron at least once. According to Jimmy, Thai was friends with Aaron and had hung out on many occasions, including shooting pool and getting coffee. Jimmy and Thai knew Aaron had no gang affiliation. If Aaron had been affiliated with TRG or Hellside, Thai would not have hung out with him as A.F. members do not hang out with gang rivals.

46.     The case against Aaron was predicated on his participation in the confrontation in the parking lot, despite the absence of any significant evidence to establish he was present. Though Aaron had attended a party earlier in the evening with many of the people who later showed up at the pool hall, several prosecution witnesses – including Jimmy Nguyen – confirmed that he was *not* present in the pool hall parking lot. Two additional prosecution witnesses, both of whom were

directly involved in the incident, said they did not see Aaron at the pool hall parking lot. No cell phone evidence established his presence in the parking lot; to the contrary, cell phone data indicated he was several miles away shortly before the time the shooting occurred.

47.    Aaron's conviction hinged almost entirely on Nina's testimony, which she gave under a grant of immunity. Nina acknowledged that she had made inculpatory statements about being at the pool hall parking lot, yet maintained she had no memory of being at the pool hall, and firmly denied that they had been present at the time of the shooting. She unequivocally stated that Aaron never participated in any plan to trap a car. The defense questioned her about her interrogation, but did not play the complete interrogation, depriving the jury of the opportunity to understand the context in which she made inculpatory statements and the tactics by which the statements were extracted. No motion was made not to allow her testimony as coerced or unreliable, and neither the trial court nor the Court of Appeal ever ruled on that issue. The Court of Appeal did characterize her "statements as to whether they were at the pool hall that night …[as] consistently inconsistent." *People v. Nguyen*, No. G055296, 2020 WL 2507679, at *13 (Cal. Ct. App. May 15, 2020), reh'g denied (June 3, 2020).

48.    At trial, Nina attempted to explain what she said during the interview. She testified that during the first portion of her interview, she never said anything about Phi Hong pool hall. She talked about Puffy's party, going to Stonecress Park, losing C.J. and ending up at a restaurant. She also stated that Tony told Aaron to follow C.J. She had no idea there was going to be a shooting and she never saw any weapons. She never heard any shots and did not know anyone was shot until the next day. She tried to explain that her references to a pool hall during the first portion of the interview were references to a different pool hall, the 2000 Pool hall, on a different day, and that she had gotten her days mixed up as she had told

SECOND AMENDED COMPLAINT

detectives during the interview. When confronted about leaving the parking lot and turning onto Westminster, Nina stated, we didn't pull onto Westminster leaving the pool hall.

49.     Notwithstanding Nina's repeated insistence that they never went to the pool hall, her diagram became the centerpiece of the prosecution's case. At closing, the prosecution conceded that Nina's testimony was highly inconsistent, yet emphasized that the jury simply could not ignore the map she drew or her description of how they executed the plan.

> "She goes back and forth about a million things, but it would be a shortcut for you to just discredit her testimony because she went back and forth on other things…You just can't ignore that young woman when she says, 'Here's the map and the way in which we executed this plan.' You just can't write that off."

50.     Aaron's defense attorney made essentially the same point, arguing in closing:

> "In fact, I think you understand, and [the prosecutor] agrees with this, the only reason we're here today, the only reason we're here today is because of that diagram that Nina drew, and we'll talk a lot about that."

51.     In rebuttal, the prosecutor flatly acknowledged that *no one* saw Aaron's car in the parking lot but speculated that perhaps he was not noticed due to poor lighting and the number of cars in the parking lot. The prosecution also acknowledged there was no cell phone data to establish that Aaron was at the pool hall. Rather, Aaron's cell phone placed him several miles away – a 10-15 minute drive – at approximately 2:00 a.m., with no evidence that he drove to Phi Hong during that time. This was in contrast to cell evidence placing Anthony Le (and others) at the pool hall during the critical time period. Anthony Le's cell map showed him at the pool hall at 2:17 a.m.

SECOND AMENDED COMPLAINT

52.     Aaron was convicted of murder, attempted murder and shooting at an occupied motor vehicle on the theory that he aided and abetted or conspired in disturbing the peace (i.e. that he aided and abetted or conspired in the initial confrontation in the parking lot) and was therefore culpable for the murder, attempted murder and shooting that occurred as a natural and probable consequence of that confrontation. He was sentenced to 40 years to life. He remained in custody continuously until his conviction was reversed.

### C.     Reversal

53.     On May 15, 2020, Plaintiff's conviction was reversed on appeal. The decision found that there was insufficient evidence that Plaintiff Aaron Nguyen aided and abetted the target crime of disturbing the peace due to a lack of evidence that he intended to commit, encourage, or facilitate the commission of the offense of disturbing the peace. The majority observed that the prosecution presented "no evidence, circumstantial or otherwise, that Nguyen intended to be involved in any confrontation or fight between TRG and its rivals." The decision emphasized that "[i]t was undisputed that Nguyen was not a gang member nor affiliated with any gang. Nguyen had no personal interest in TRG's rivalry with POV or others." And it noted that "[t]he evidence at trial did not show that Nguyen was involved in efforts to box in or trap the victims cars – there was little evidence his car was in the parking lot." Aaron was not re-prosecuted (nor could he have been since the insufficient evidence as a matter of law determination is the equivalent of an acquittal. See *People v. Anderson* (2009) 47 cal.4th 92, 104[97 cal.rptr.3d 77, 211 p.3d 584] (" 'the constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.' [citation.] The same is true when a conviction is reversed or set aside because of insufficient evidence. [citations.]").

54.     Aaron is in fact innocent of the charges brought against him.

### D.     Damages

54.   Aaron was incarcerated for nine years before his conviction was reversed, during which time he lost precious years with his parents, both of whom were in their 70's at the time of his arrest. During those years, Aaron was denied the society and companionship of his parents, and his parents were denied the society and companionship of their son.

55.   Aaron has always maintained an exceptionally close relationship with his family. Aaron was born in a rural village in Vietnam. He spent most of his very early childhood separated from his father who served eight years in a prisoner of war (POW) camp after serving on the American side of the Vietnam war. When he was ten years old, his family immigrated to the United States as war refugees with the sponsorship of a church. Throughout Aaron's childhood, his family remained very connected to their church community, which supported them as they struggled to make a life in the United States.

56.   Aaron and his family learned English after moving to the United States. Both of his parents worked multiple jobs to provide for basic needs. Aaron's parents encouraged his education and ensured that he graduated high school and enrolled in college.

57.   Aaron's parents, sisters, and their children were profoundly traumatized by his arrest. His parents visited him weekly during his six-year pretrial incarceration. Aaron's father, who suffered serious health issues, was so shocked and traumatized by Aaron's conviction that he collapsed when he came to visit him in jail after the verdict and had to be transported to the hospital by ambulance. After Aaron was transferred to state prison, his parents and siblings visited as often as possible, never wavering in their support and belief in his innocence. Visiting meant traveling long hours to state prison facilities, enduring long waits to process, and being herded through metal detectors, all in an effort to spend a few hours together. Though Aaron remains very close to parents, who are now in their 80's, his incarceration stole irreplaceable time together. Plaintiffs Ngoc Le Thi Phan and

Hoang Minh Nguyen seek compensation of the wrongful denial of the society and comfort of, and companionship and familial relationship with, their son, as a result of Aaron's wrongful incarceration.

## VI.    PARTICIPATION, STATE OF MIND, AND DAMAGES

58.    All Defendants acted illegally under color of law.

59.    Each individual Defendant participated in the violations alleged herein, and/or directed the violations alleged herein, and/or knew or should have known of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved, or acquiesced in the violations alleged herein.

60.    As joint actors with joint obligations, each individual Defendant was and is responsible for the failures and omissions of the other.

61.    Each individual Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiffs' rights.

62.    Each Defendant acted deliberately, purposefully, knowingly and/or with deliberate indifference to, or reckless disregard for an accused's rights or the truth in engaging in the conduct alleged herein.

63.    As a direct and proximate result of the described acts, omissions, customs, practices, policies, and decisions of the Defendants, Plaintiff AARON NGUYEN was wrongfully prosecuted, convicted, and incarcerated for over nine years.

64.    As a direct and proximate result of his wrongful arrest, conviction, and incarceration, Plaintiff AARON NGUYEN has lost his liberty and the quality and enjoyment of his life both during his period of incarceration and thereafter.

65.    As a direct and proximate result of his wrongful arrest, conviction, and incarceration, Plaintiffs have suffered, continue to suffer, and are likely to suffer in the future, extreme and severe mental anguish, mental and physical pain and injury, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment,

harm to reputation, and apprehension. For such injuries, they have incurred and will continue to incur significant damages.

66.   As a direct and proximate result of his wrongful arrest, conviction, and incarceration, Plaintiff AARON NGUYEN has lost past and future earnings.

67.   As a direct and proximate result of his wrongful prosecution, incarceration, and conviction, Plaintiff Aaron Nguyen has been deprived of familial relationships as well as the society and companionship of friends and family. As a direct and proximate result of Aaron Nguyen's wrongful prosecution, incarceration and conviction, Plaintiffs NGOC LE THI PHAN and HOANG MINH NGUYEN have been deprived of their familial relationship with their son, AARON NGUYEN.

68.   The aforementioned acts and/or omissions of Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith, and done knowingly, purposefully, and/or with deliberate indifference to and/or reckless disregard for Plaintiffs' constitutional rights or the truth.

## VII.   CLAIMS FOR RELIEF

### A.   FIRST CLAIM FOR RELIEF: 42 U.S.C. §1983, INCLUDING VIOLATIONS OF PLAINTIFF AARON NGUYEN'S FOURTEENTH AMENDMENT DUE PROCESS RIGHT TO BE FREE FROM DEPRIVATION OF LIBERTY ON THE BASIS OF COERCED INCULPATORY STATEMENTS, DELIBERATELY FABRICATED EVIDENCE, SUPPRESSION OF FAVORABLE EVIDENCE, AND DEPRIVATION OF PLAINTIFFS' CONSTITUTIONALLY PROTECTED FAMILIAL RELATIONSHIPS

*Against All Individual Defendants and DOES 1-10*

*By All Plaintiffs*

69.   Plaintiffs reallege all foregoing and subsequent paragraphs as if fully set forth herein.

70.   Defendants, while acting under color of law, individually and in concert with each other and/or with others not named herein, caused Plaintiff

Aaron Nguyen to be deprived of rights, privileges, and immunities secured by the Constitution and laws of the United States, and State of California, by, *inter alia*, fabricating evidence, omitting critical exculpatory evidence from reports and charging documents, mischaracterizing inculpatory statements (both by omission and by affirmatively misleading statements), employing highly coercive and abusive techniques known to generate false evidence when used against juveniles, failing to correct deliberately fabricated evidence, failing to disclose material exculpatory evidence (including but not limited to exculpatory witness statements of Julie Nguyen and others), destroying exculpatory and potentially exculpatory evidence including through failing to record portions of the investigators' interactions with Nina Nguyen, and conducting a reckless investigation that shocks the conscious regarding Plaintiff's alleged presence and participation in the gang confrontation and shooting, causing Mr. Nguyen to be deprived of liberty without due process of law. Defendants' acts and omissions that caused these violations were done with deliberate indifference to or in reckless disregard of Plaintiff's rights and the truth.

71.   Defendants' misconduct includes interviewing a minor using highly coercive and abusive techniques known to generate false evidence and notwithstanding substantial evidence establishing Plaintiff's innocence. For hours, Nina Nguyen was cajoled, threatened, and lied to and relentlessly pressured by a team of officers. These techniques shock the conscience and offend the community's sense of fair play and decency. They would have overborn the will of any person – adult or juvenile – causing them to feel so trapped they would resort to making false inculpatory statements.

72.   Defendants' misconduct includes fabricating evidence of guilt – including false inculpatory witness statements, police reports, and/or other out-of-court documents – thereby setting in motion a chain of events that caused Plaintiff's deprivation of liberty. The false evidence asserted herein is comprised of

material omissions as well as affirmatively false and misleading statements given in connection with the homicide investigation. The specific acts of misconduct by the Defendants, include, but are not limited to the following, and as detailed in Section V.

73.    Defendants used techniques that were so coercive and abusive that they knew that, or were deliberately indifferent to whether, those techniques would yield false information that was used to criminally charge, to prosecute and/or to convict the plaintiff.

74.    Defendants' misconduct further includes failing to memorialize, relay and/or disclose material exculpatory evidence and information to the prosecutors, so that it could, in turn, be provided to Mr. Nguyen's defense counsel, thereby setting in motion a chain of events that resulted in the deprivation of Mr. Nguyen's liberty and in a criminal trial at which material, exculpatory evidence was suppressed by the government.

75.    Defendants' misconduct further includes reckless investigation techniques resulting in fabricated evidence, including recklessly disregarding exonerating evidence and/or coaching witnesses' testimony to falsely implicate Mr. Nguyen in the face of contrary evidence.

76.    The constitutional source of the violations and obligations asserted herein is primarily the due process clause of the Fifth and Fourteenth Amendments, and Plaintiff asserts both procedural and substantive due process violations. To the extent that the source of Plaintiff's rights is any constitutional or statutory source other than due process, this claim is brought on those bases as well.

77.    Defendants, and each of them, engaged in, knew about, or should have known about the acts and/or omissions that caused the constitutional deprivations alleged herein and failed to prevent it and/or ratified/approved it and/or acquiesced to it.

78.   Defendants, and each of them, committed the aforementioned acts and omissions in bad faith and with knowledge that their conduct violated well-established law.

79.   One or more of the acts and omissions alleged herein were a cause of Plaintiff Aaron Nguyen's pretrial incarceration, conviction, and post-conviction incarceration. Had the recklessly false and fabricated evidence not been presented (or had exculpatory evidence described previously been disclosed), it could, and there is a reasonable probability that it would, have resulted in a different course of events pretrial, including that he would not have been charged at all, that the charges even if filed would have been dismissed, and that he would have been released on bail, more favorable to Mr. Nguyen. Had the fabricated evidence presented at trial as a result of Defendants' conduct not been presented, it could have resulted in a different verdict.

80.   Acting under the color of state law, Defendants and others acted in concert, conspiring, and agreeing to deprive Mr. Nguyen of rights, privileges, or immunities secured by the Constitution and laws of the United States.

81.   As a direct and proximate result of Defendants' actions, Mr. Nguyen was wrongly arrested, detained, prosecuted, convicted, and incarcerated for more than nine years and suffered other grievous injuries and damages set forth above. As a direct and proximate result of Defendants' actions, Plaintiff was injured and is entitled to compensatory damages according to proof.

82.   As a result of the violation of Aaron's Nguyen rights, Plaintiffs Ngoc Le Thi Phan and Hoang Minh Nguyen were deprived of the companionship, comfort, society and familial relationship with their son, Aaron Nguyen, in violation of their substantive due process rights under the Fourteenth Amendment. Defendants' actions, which shocked the conscience and/or offended the community's sense of fair play and decency, were the direct and proximate cause of Plaintiff Aaron Nguyen's nine-year incarceration, during which his parents

suffered tremendously. Plaintiffs Ngoc Le Thi Phan and Hoang Minh Nguyen had a fundamental liberty interest to be free from governmental interference with the society and comfort of, and companionship and familial relationship with, their adult son, Aaron Nguyen. Plaintiffs Ngoc Le Thi Phan and Hoang Minh Nguyen seek compensation of the wrongful denial of the society and comfort of, and companionship and familial relationship with, their son, as a result of Aaron's wrongful incarceration.

83.    The aforementioned acts and omissions of Defendants were committed by each of them knowingly, willfully, maliciously, oppressively, and/or in reckless disregard of Plaintiffs' rights. By reason thereof, Plaintiffs are entitled to punitive and exemplary damages from Defendants according to proof.

### B.    SECOND CLAIM FOR RELIEF: §1983 MONELL CLAIM
### *Against Defendant City of Garden Grove (GGPD)*

84.    Plaintiffs reallege all foregoing and subsequent paragraphs as if fully set forth herein.

85.    Entity defendant City of Garden Grove possessed the power and authority to adopt policies and prescribe rules, regulations and practices governing the interview of witnesses, including juvenile witnesses and suspects, in criminal investigations, including customs, policies, and/or practices relating to witness interrogation, as well as to personnel supervision, performance evaluation, internal investigations, discipline, records maintenance and/or retention.

86.    Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, Defendants City of Garden Grove, including through the Garden Grove Police Department, with deliberate indifference, and/or conscious or reckless disregard to the rights of Plaintiff Aaron Nguyen and others accused of crimes, maintained, enforced, ratified, acquiesced in, and/or applied constitutionally deficient policies, customs and/or practices regarding homicide

23

investigations, interviews and interrogations of juvenile witnesses/suspects, disclosure of exculpatory evidence, and disclosure of benefits to witnesses.

87.   Plaintiffs are informed and believe and thereon allege that, during all or portions of the period relevant to this case, Defendant GARDEN GROVE failed to adopt and implement systems, policies, practices, customs, training, supervision, or discipline in areas where the need for such things to occur was obvious. Defendant had: a) no stated, written or adequate policies; and/or b) inadequate training and supervisions regarding, *inter alia*, the following issues:

i.   Ensuring that coercive and abusive interrogation techniques likely to yield false evidence were not employed, against either suspects or witnesses;

ii.   Ensuring appropriate training and supervision of all homicide investigators responsible for interviewing juvenile witnesses and/or suspects;

iii.   Ensuring homicide investigators had proper experience and credentials, including having qualified investigators to conduct interviews of juvenile suspects and witnesses in accordance with appropriate standards.

iv.   Adopting policies to ensure that interrogations of minors conform to recognized standards for questioning juveniles and prohibiting interview techniques known to yield false evidence;

v.   Ensuring that any detectives, investigators, and other members of the investigatory team memorialized and relayed all exculpatory evidence gathered during an investigation of a case presented to the District Attorney's Office for prosecution, including video and audio recording of all interactions with juvenile witnesses/suspects, so that evidence would be turned over to the defense as required by law.

vi.     Ensuring that any threats or coercive conduct made to any witnesses by law enforcement were disclosed to the charging, preliminary hearing and trial representatives of the District Attorney's Office so that the information would be turned over to the defense.

vii.     Ensuring that the key police reports and other key case documents provided full and complete descriptions of witness interactions, called attention to any irregularities, deviations from policy or evidence favorable to the defense, and did not omit important information relevant to an assessment of the evidence being used to assert guilt.

88.    The customs, policies, and/or practices of the Defendant GARDEN GROVE were a moving force behind the constitutional violations alleged by Plaintiffs resulting injuries to Plaintiffs, entitling Plaintiffs to compensatory damages according to proof.

89.    As a direct and proximate result of Defendant's acts and omissions as alleged herein, Plaintiffs were damaged as alleged above.

### C.    THIRD CLAIM FOR RELIEF: §1983 SUPERVISORY LIABILITY – FAILURE TO TRAIN, SUPERVISE & TAKE CORRECTIVE MEASURES

*Against Defendants Reynolds, Martin and DOES 1-10 (Including DOE Defendants employed by the City of Garden Grove)*

90.    Plaintiffs reallege all foregoing and subsequent paragraphs as if fully set forth herein.

91.    Plaintiffs are informed and believe and thereon allege that prior to the incident alleged herein, Defendants REYNOLDS, MARTIN and DOES 1-10, acting under the color of their authority as supervisory personnel failed in the following responsibilities: to maintain appropriate procedures for conducting homicide investigations, to maintain proper procedures for interviewing juvenile witnesses/suspects, to ensure proper supervision of homicide investigators tasked

SECOND AMENDED COMPLAINT

with interviewing juvenile witnesses/suspects, to ensure that interviews of juveniles conformed to recognized standards for juvenile interrogations, to ensure video documentation of all interactions between the investigatory team and juvenile witnesses/suspects, and to ensure the preservation and disclosure of all exculpatory information obtained during homicide investigations. The failure to correct such failures was a moving force behind Mr. Nguyen's deprivation of liberty and conviction.

92.    Mike Reynolds and Sergeant Martin participated in the homicide investigation by providing direct oversight of Lord and others, including by reviewing and signing off on their police reports. Reynolds, Martin, and DOES 1-10 were responsible for ensuring that interviews of juvenile suspects/witnesses conformed to recognized standards and would be subject to appropriate review processes.

93.    Each of these supervisory defendants are liable on the basis that they were either personally involved in the violation of Mr. Nguyen's right to be free from prosecution and deprivation of liberty on the basis of fabricated evidence, or there was a sufficient causal connection between their wrongful conduct and the violation of Mr. Nguyen's rights. *See Crowley v. Bannister*, 734 F.3d 967, 977 (9th Cir. 2013) (supervisory liability requires either personal involvement or a sufficient causal connection between the supervisor's conduct and the constitutional violation); *Mackinney v. Nielsen*, 69 F.3d 1008 (9th Cir. 1995).

94.    Plaintiffs are informed and believe that Defendant REYNOLDS, MARTIN and DOES 1-10 had a duty to train and instruct their subordinates to prevent similar acts, but failed to take steps to properly train, supervise, investigate, or instruct detectives in the course of homicide investigations.

95.    As a legal result of the conduct of Defendants REYNOLDS, MARTIN and DOES 1-10, as described above, Plaintiffs were damaged as alleged herein and as set forth above.

## VIII.    <u>**Requested Relief**</u>

WHEREFORE Plaintiffs AARON NGUYEN, NGOC LE THI PHAN, and HOANG MINH NGUYEN request relief as follows, and according to proof, against each Defendant:

1.  General and compensatory damages in an amount according to proof;

2.  Special damages in an amount according to proof;

3.  Exemplary and punitive damages against each Defendant, except the CITY OF GARDEN GROVE, in an amount according to proof;

4.  Costs of suit, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable provision of law; and,

5.  Such other relief as may be warranted or as is just and proper.

Respectfully submitted,

McLANE, BEDNARSKI & LITT, LLP

DATED: May 10, 2022           By: /s/  *Barrett S. Litt*
                                   Barrett S. Litt
                                   Attorneys for Plaintiff AARON NGUYEN,
                                   NGOC LE THI PHAN, and HOANG MINH
                                   NGUYEN

McLANE, BEDNARSKI & LITT, LLP

DATED: May 10, 2022           By: /s/ *Lindsay Battles*
                                   LINDSAY BATTLES
                                   Attorneys for Plaintiff AARON NGUYEN,
                                   NGOC LE THI PHAN, and HOANG MINH
                                   NGUYEN

/ / /
/ / /

## **JURY DEMAND**

Trial by jury of all issues is demanded.


Respectfully submitted,

McLANE, BEDNARSKI & LITT, LLP

DATED: May 10, 2022        By: */s/ Barrett S. Litt*
                                                Barrett S. Litt
                                                Attorneys for Plaintiff AARON NGUYEN,
                                                NGOC LE THI PHAN, and HOANG MINH
                                                NGUYEN


McLANE, BEDNARSKI & LITT, LLP

DATED: May 10, 2022        By: */s/ Lindsay Battles*
                                                LINDSAY BATTLES
                                                Attorneys for Plaintiff AARON NGUYEN,
                                                NGOC LE THI PHAN, and HOANG MINH
                                                NGUYEN

SECOND AMENDED COMPLAINT