BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
DAVID S. McLANE, SBN 124952
Email: dmclane@mbllegal.com
LINDSAY BATTLES, SBN 262862
Email: lbattles@mbllegal.com
RODRIGO PADILLA, SBN 339523
rpadilla@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660, Fax: (626) 844-7670

*Attorneys for Plaintiffs* AARON NGUYEN, NGOC LEE THI PHAN, AND HOANG MINH NGUYEN

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON NGUYEN, et al. <br> Plaintiffs, <br><br> v. <br><br> CITY OF GARDEN GROVE, et al. <br><br> Defendants. | Case No.: 8:21−cv−01775−JVS (ADSx) <br><br> [Hon. James V. Selna] <br><br> **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR AFFIRMATIVE PARTIAL SUMMARY ADJUDICATION** <br><br><br> Hearing Date: 11/20/2023 <br> Time: 1:30 p.m. <br> Crtm: 10C |

# **TABLE OF CONTENTS**

I.    Introduction ................................................................................................1

II.   Overview of Facts......................................................................................4

    A. Criminal Trial ......................................................................................4

    B. Aaron and Nina's Interrogation and Arrest.........................................7

III.  Lord's Arrest Report Is Replete with Material Misrepresentations.....................8

    A. Lord Falsely Describes the First Interrogation Session .................................8

        1. Nina's Timeline (8:11 – 8:42 a.m.) ........................................................8

        2. Lord's Report Falsely Attributes Nina's Memory of Being at a "Pool Hall" to Phi Hong, Rather than 2000 Club (Two Thousand) on a Different Day ......................................................................................11

        3. Lord's Report Falsely States that Nina Confessed to Being Present When She Unambiguously Denied Being at the Phi Hong on 3/20/11 ............12

    B. Aaron & Alexander Tran Provided Alibis Consistent with Nina ..................13

    C. Detectives' Inadvertently Recorded "Hallway" Meeting Shows Lord's Misrepresentations Were Deliberate ...............................................................13

    D. Lord's Report Omits Nina's Statements Describing an Aggressive Off-Camera Confrontation .......................................................................................14

    E. Lord's Report Mischaracterizes the Second Interrogation............................15

        1. Nina Repeatedly Denied Being at the Phi Hong Before Any Admission.................................................................................................15

        2. Nina Failed to Describe the Caravan Driving onto Westminster ...........17

        3. Nina's Description of a Car "Chase".....................................................19

        4. The Fabricated Diagram Was Heavily Contradicted the Evidence.........19

        5. Detectives Lied About Nina's Identification of Aaron's Car.................21

        6. Lord's Report Mischaracterizes Nina's Full Recantation .....................21

    F. Lord Arrested Aaron for Homicide With No Further Investigation .............23

IV.   Argument.................................................................................................24

    A. Defendants Submitted a Fabricated Diagram and False Report ...................25

    B. The Report and Diagram Caused Aaron's Deprivation of Liberty...............27

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Black v. Montgomery Cnty.*,
  835 F.3d 358 (3d Cir. 2016)................................................................24

*Carrillo v. Cnty. of Los Angeles*,
  798 F.3d 1210 (9th Cir. 2015) ............................................................28

*Costanich v. Dep't of Soc. & Health Servs.*,
  627 F.3d 1101 (9th Cir. 2010) ............................................................25

*Crowe v. Cty. of San Diego*,
  608 F.3d 406 (9th Cir. 2010) ....................................................26, 27, 30

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) ............................................................24

*Halsey v. Pfeiffer*,
  750 F.3d 273 (3d Cir. 2014).................................................................24

*Harris v. Bornhorst*,
  2004 WL 7340519 (N.D. Ohio)...........................................................19

*Jones v. Slay*,
  61 F.Supp.3d 806 (E.D. Mo. 2014) ....................................................30

*Kyles v. Whitley*,
  514 U.S. 419, 115 S. Ct. 1555 (1995)..................................................28

*Manning v. Miller*,
  355 F.3d 1028 (7th Cir. 2004) ............................................................25

*Newsome v. McCabe*,
  256 F.3d 747 (7th Cir. 2001) ..............................................................25

*People v. Anderson*,
  47 Cal.4th 92 (2009) .............................................................................5

*Ricciuti v. N.Y.C. Transit Auth.*,
  124 F.3d 123 (2d Cir. 1997).................................................................24

*Robinson v. Cain*,
  510 F. Supp. 2d 399 (E.D. La. 2007)...................................................29

1

*Spencer v. Peters*,
  857 F.3d 789 (9th Cir. 2017) ...........................................................24, 25, 27

*Stoot v. City of Everett*,
  582 F.3d 910 (9th Cir. 2009) ....................................................................26

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## I.    Introduction

This § 1983 lawsuit arises from Plaintiff Aaron[1] Nguyen's 9-year wrongful incarceration for a homicide of which he is completely innocent. His was one of the rare convictions reversed for insufficiency of the evidence, demonstrating how indispensable the fabricated evidence was for his prosecution. Plaintiff moves for affirmative, partial summary adjudication of liability on the claim that he was deprived of liberty without due process, based on false statements in Defendant Mark Lord's arrest report, mischaracterizing a coerced juvenile interrogation, and a diagram that Det. Lord manufactured. Though Plaintiff moves for summary adjudication only with respect to the false report and diagram, he also asserts claims for deprivation of liberty based on Nina's coerced statements, which will be presented at trial.

During Aaron's 2017 trial, the centerpiece of the prosecution's case was a diagram[2] drawn by his girlfriend, Nina Nguyen, which the prosecution characterized as depicting a car chase immediately preceding the shooting on Westminster, half a block away from the **Phi Hong Billiards** ("Phi Hong"). During her interrogation, Detectives told Nina to write "Westminster" on the diagram (essentially equivalent to writing "crime scene") and lied at trial about so instructing her. Nina testified at trial that she only drew the diagram because officers pressured her into doing so. The diagram bore almost no resemblance to the incident and was entirely contradicted by physical evidence. It resulted from highly coercive interrogation that produced a fleeting confession, in which detectives falsely created the key piece of evidence (the diagram) and fabricated a report to: (1) cover up their illegal coercion, (2) distort Nina's statements, and (3) give the diagram meaning inconsistent with Nina's statements. The prosecution nonetheless treated the diagram as powerful and *uncontested* confession evidence, urging the jury to prioritize the diagram and Nina's short-lived admissions –

---

[1] We use first names to avoid confusion with other Nguyens in this case.

[2] The diagram can be found at p. 29 of Exhibit 51.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

1

recanted the same day – over substantial evidence showing Aaron was not even present at the scene.

Aaron's wrongful prosecution would never have occurred in the absence of the false police report (and the diagram). The discrepancies in the report were not trivial, but contained material, flagrant misrepresentations of fact that both distorted Nina's statements and concealed coercion that would have caused most adults to confess. (Nina was 17 years old, by only 4 days). The police report **affirmatively misrepresented** Nina's statements during the first session in stating that: (1) Nina admitted to being at the Phi Hong during her first videotaped interrogation (Not true. Nina consistently denied she was there during the first session); (2) when shown a photo of the establishment, Nina confirmed she was at the Phi Hong (The opposite is true: the video shows she **unambiguously denied** being there and that *after seeing the photo, Nina denied being present 10 times*). Undisputed Material Facts ("UMF") 164, 196, 490, 491. Defendants also distorted Nina's statements by omitting that when Defendants asked her about a "pool hall" Nina mentioned the 2000 Billiards **9** times (and indicated she was talking about a different pool hall [not Phi Hong] on a different day). When detectives failed to secure a confession after the first session, DDA Feldman said they would have to "flip" someone, Defendant Martin confronted Nina off-camera, and berated her until she was crying inconsolably. There is no recording memorializing Martin's confrontation. Nina described this aggressive confrontation (on video), but detectives omitted it from their report.

After the confrontation by Martin, and more than 5 hours after her first interrogation began, Detectives finally secured a short-lived admission that Nina/Aaron went to the Phi Hong. The report conceals that Nina's statements flew in the face of physical evidence and almost everything known about the shooting. It conceals that, detectives directed her to write the word "Westminster," to create the false appearance that the diagram pertained to the crime scene. It conceals that when she agreed to draw

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

2

the diagram, she told officers that she was drawing a location 3.6 miles away, not the crime scene. At trial, Lord lied about his instructions to write "Westminster," which mischaracterized the diagram, transforming an illustration of an unrelated moment on the shooting night into a falsified admission of guilt. The report falsely indicates that Aaron helped trap a gang rival's car when, in fact, she unambiguously stated - twice – that Aaron played no role in blocking/trapping a car. The report conceals that Nina recanted her admissions in less than an hour, stating repeatedly and definitively that she had no memory of being at the crime scene.

Defendants omitted from their report overwhelming evidence that Nina's short-lived admissions were coerced. Nina denied over **16 times** that she and Aaron were not at the crime scene (UMF 505), including **12** times before her first admission.  During both sessions, ***defendants flagrantly lied to her*** about the evidence, falsely claiming that they had irrefutable technological  evidence placing her at the crime scene, including video surveillance (**7 times** when the footage in fact *did not* show Aaron's car) and cell phone GPS data (**10 times** when the data in fact *corroborated their alibi*). UMFs 463, 464. Defendants used props to support their false evidence ploys, including cell phone maps and photos they represented to be Aaron's car. These tactics are known to increase the risk of false confession, especially when used in a juvenile interrogation. When Nina denied guilt, detectives cut her off with forceful, repeated accusations of dishonesty (**20+ times)** (UMF 459), threat of prosecution for conspiracy to murder, and promises she could go home "in 5 minutes" if she would "tell the truth" (**5 times** in the first interview).

Defendants used the false report and diagram to secure Aaron's charges and invalid conviction. As the Court of Appeals found, there was no other evidence pointing to Aaron's guilt—no cell phone data, witness ID's, surveillance footage, evidence of gang membership – there was nothing. There was positive evidence that his car was not at the crime scene, and that one of the victims was his friend. The defendants knew it, but they coerced Nina's false confession, and fabricated evidence in their report and

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

3

diagram (the key piece of evidence) to secure Aaron's charges and invalid conviction. It was their conduct that deprived Aaron of his constitutional right to a fair trial.

## II.    Overview of Facts

### A.    Criminal Trial

Lord arrested Aaron on April 20, 2011. In February 2017, he was convicted and sentenced to 40-years to life on the theory that he aided/abetted or conspired in disturbing the peace, the natural consequence of which was a homicide. The disturbance was a gang confrontation in the parking lot of the Phi Hong Billiards (at Harbor Blvd. and Westminster Ave. in Garden Grove). On the night of the shooting, 6-8 cars converged outside Phi Hong to confront their rivals who were playing pool inside. Near 2:16 a.m., the victims' SUV exited westbound on Westminster Avenue, pursued by several cars of rivals. Approximately half a block down Westminster, a car driven by "Puffy" (Andrew Tran) pulled up next to the SUV. His passenger opened fire, killing one person and hitting another. The prosecution alleged that Aaron's car was present at the Phi Hong and he joined the caravan chasing the SUV down Westminster Ave. Aaron unwaveringly maintained that he was not present.

In May 2020, an appellate court reversed Aaron's conviction finding that it was supported by insufficient evidence. As the majority observed, the prosecution presented "no evidence, circumstantial or otherwise, that Nguyen intended to be involved in any confrontation or fight between TRG and its rivals." The decision emphasized that "[i]t was undisputed that Nguyen was not a gang member nor affiliated with any gang. Nguyen had no personal interest in TRG's rivalry with POV or others." The prosecution's veteran gang expert, Det. Peter Vi, confirmed that Aaron had no gang affiliation. The decision noted that "[t]he evidence at trial did not show that Nguyen was involved in efforts to box in or trap the victims' car – there was little evidence his car

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

4

was in the parking lot."[3] ("UMF") 1-5, 8-10.

No eyewitness testified to seeing Aaron in the parking lot; two prosecution eyewitnesses testified they did *not* see his car. Jimmy Nguyen, one of eight victims in the SUV, testified for the prosecution that when they exited the parking lot and fled down Westminster, Jimmy was riding in the cargo compartment of the SUV with his cousin Thai (Jason Nguyen); they were both facing out of the back window. They did not identify Aaron at the scene. According to Jimmy, Thai was friends with Aaron and had hung out on many occasions, including shooting pool and getting coffee. Jimmy and Thai knew Aaron was not in a gang. Thai belonged to a rival gang of TRG. If Aaron had been affiliated with Thai's rivals, they would not spend time together. UMFs 6, 14-26.

No cell phone evidence established Aaron's presence; to the contrary, Aaron's cell phone placed him 3.6 miles away (a 10–15-minute drive) at around 1:58 a.m. (19 minutes before the shooting). As the appellate decision noted, "Nguyen's cell phone records confirmed that when the TRG [aggressor] members were converging on the pool hall around 2:00 a.m., he was several miles away, near a restaurant he, Nina [his girlfriend] claimed to have stayed at because he lost [the group]." While cell phone data did not completely eliminate the possibility that Aaron drove to Phi Hong by 2:17 a.m., it certainly added to the mountain of evidence showing he was not there, and there was "no evidence that he arrived and then joined in a plan to box in the rivals' SUV in the parking lot." UMF 7, 11, 27.

During closing, the prosecutor conceded no cell phone evidence placed Aaron at the Phi Hong, and flatly acknowledged *no one* saw Aaron's car in the parking lot. The DDA (Dan Feldman) speculated that perhaps Aaron was not noticed due to poor lighting and the number of cars. UMF 45, 46. Surveillance footage capturing all of the cars at the

---

[3] Aaron was not re-prosecuted; an insufficient evidence as a matter of law determination is the equivalent of an acquittal. See *People v. Anderson*, 47 Cal.4th 92, 104 (2009) [97 Cal.Rptr. 3d 77].

scene of the shooting was not presented to the jury. UMF 28. Had it been presented to the jury, it would have shown that Aaron's car was not there.

Without any evidence of guilt, Aaron's conviction hinged almost entirely on Nina's testimony, which she gave under a grant of immunity. At trial, Nina admitted that she had made inculpatory statements to detectives about being at the Phi Hong. She testified that she had no memory of being there, and firmly denied that she and Aaron were present at the time of the shooting. She unequivocally stated that Aaron never participated in any plan to trap a car. UMF 32-41. Her complete video interrogation – which spanned several hours – was not played for the jury. UMF 41. If it had, it would have shown that the officers had lied in their reports, and on the stand, that they were not credible witnesses, and that Nina's inculpatory statements were coerced and in conflict with the physical evidence and her repeated and omitted protestations of innocence and same-day recantations. Her coerced admissions would not have been deemed reliable evidence to be counted on by the jury in determining Nina's credibility.

Though Nina insisted that they were absent from the Phi Hong, the prosecution introduced a diagram she had drawn during her interrogation; it became the centerpiece of the prosecution's case. At closing, the prosecutor conceded Nina's testimony was highly inconsistent, yet emphasized the jury could not ignore the map she drew:

> "She goes back and forth about a million things, but it would be a shortcut for you to just discredit her testimony because she went back and forth on other things…You just can't ignore that young woman when she says, 'Here's the map and the way in which we executed this plan.' You just can't write that off."[4]

The prosecution essentially relied on Nina' diagram – which contradicted critical

---

[4] In closing, Aaron's defense attorney made the same point: "In fact, I think you understand, and [the prosecutor] agrees with this…the only reason we're here today is because of that diagram that Nina drew, and we'll talk a lot about that."

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

6

physical evidence of the crime – to refute substantial evidence that exonerated Aaron – including Nina's own inconsistencies and contradictions – and to thereby secure a conviction that fell short of proof of guilt beyond a reasonable doubt. UMF 42-44.

### B.    Aaron and Nina's Interrogation and Arrest

The shooting occurred at 2:17 a.m. on 3/20/2011. Within hours, detectives interviewed the shooting survivors, including Roger James, Thai (Jason) Nguyen and Thai's cousins, Jimmy Nguyen and John Nguyen. The preliminary investigation revealed that, on 3/20/11, at around 2:00 a.m., the aggressor groups (TRG/Hellside) converged in the parking lot of the Phi Hong where the victim groups (POV, VT) were playing pool inside. Members of the victim group left the parking lot in a Lexus SUV, westbound on Westminster.  A caravan of cars from the aggressor group followed them out, westbound onto Westminster. Leading the chase was a Lexus sedan driven by Puffy (Andrew Tran). Half a block away, at West Street, Puffy approached the victim's SUV from the left lane and pulled up next to the driver's side. His front passenger (Ben) fired into the SUV, killing one person and hitting another. UMF 47-56. Surveillance video captured the entire caravan of cars that traveled westbound on Westminster. Aaron's silver Accord was *not* among the cars chasing the SUV. UMF 63-73, 75, 76, 98.

GGPD immediately apprehended everyone in Puffy's car (except Ben) and then sought to apprehend others who joined the confrontation in the Phi Hong parking lot. On 4/20/11, detectives executed search warrants at 14 locations. Aaron was included in the list of targets, as was Alexander Tran, a passenger in his car on the night of the shooting. Of the target locations, the search of Aaron's home was the only one **not** supported by a warrant because GGPD lacked sufficient evidence to place him at the crime scene. UMF 57, 62. Before contacting Aaron, they had GPS evidence for his phone. The cell phone ping closest in time to the shooting was 1:58 a.m. and placed him 3.6 miles away at approximately Bolsa and Bushard/Brookhurst. They knew Aaron was 26 years old, had no criminal history, and no prior arrests. UMF 59-61

---

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

7

Detective Mark Lord's team arrived at Aaron's home at 7:00 a.m., where they found Aaron and Nina sleeping in bed. UMF 58, 74. Aaron and Nina came to GGPD for interviews. Nina was 17 years old (as of 4 days). Nina's videotaped questioning began at 8:08 a.m. Over the next **seven** hours, four homicide detectives, including Defendants Lord and Sgt. Martin, took passes questioning Nina, off-and-on, until 3:25 p.m.

At 10:55 a.m., GGPD officers discussed the fact that Aaron/Nina gave consistent alibis, that GGPD still did not have enough evidence against Aaron, and that they would have to "flip" someone. Nina finally gave officers an admission in the second video-recorded session – at 1:02 p.m., five hours after they brought her to the station. By 1:02, she had denied being at the Phi Hong more than **12** times; none of these denials appear in Lord's report. Nina almost immediately backtracked on her supposed admissions. By 1:40, she recanted, insisting she only admitted to being at Phi Hong because detectives relentlessly pressured her. At 2:50 p.m., Lord arrested Aaron for homicide even though he was not a gang member, his car was not captured on video surveillance, no GPS data placed him at the scene, he vehemently denied being present, and his alibi was consistent with Alexander Tran (passenger in his car) as well as Nina's initial statement.

## III. Lord's Arrest Report Is Replete with Material Misrepresentations
### A. Lord Falsely Describes the First Interrogation Session

Lord **falsely** reports that, during the first interrogation session, Nina admitted that they were "down at the Phi Hong." Completely false. An even bigger lie, he goes on to say: "I showed Nina a picture of the Phi Hong Billiards and she admitted she was there with Aaron." Nina denied being present 10 times after he showed her the photo.

#### 1. Nina's Timeline (8:11 – 8:42 a.m.)

Nina's recorded interviews took place in a 6x8, windowless room. Lord began the interview by disingenuously stating that she and Aaron were "not in trouble and wouldn't be in trouble." He said had already traced Aaron's phone location (which was true). He then showed Nina a "red book" purporting to contain cell phone data, claiming "this is all the proof. I'll show you certain things, dear. But this is the proof. [the proof

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

8

that Aaron wants] is all in this red book..." He continues: "we know where he was. We know who he called. We know who called him…I mean I already know that you guys were over there. And what I'm asking you, is to just be honest about it. I mean, at this point you're not in any trouble." UMF 78 – 90.

Between 8:16 – 8:42, Nina discloses what she remembered from the night of the shooting, a Saturday one month earlier, when she and Aaron were drinking with friends into the early morning hours. The group in their car included Aaron (driving), Nina, Alexander Tran, "Julie" and "Tony." They went to a party at Puffy's house, left after the party with a group of cars, and went to a park (apparently Stonecress Park). At the park, Nina heard gang members discussing chasing down rivals (POV). Nina confirmed that Aaron was not a gang member and did not get out of the car. They left the park following CJ (who later participated in the Phi Hong incident). They lost CJ and the group of cars near Miles Square Park ("MSP"), specifically near the Walgreens. They pulled over and waited at a Vietnamese restaurant to reconnect because they didn't have anywhere to go. After the restaurant, she thought they went to Tony's house. She also said they stopped for donuts. UMFs 96, 97, 101-103, 111, 112, 114, 115, 117-119, 122-128, 132, 133, 136.

Lord's report omits his own, repeated efforts to insert a "poolhall" into Nina's timeline. Four minutes into the session (8:11:50 – 8:12:03 a.m.), Lord tells Nina "I know you guys were there… People already told us you were at the poolhall." Lord quickly peppers with: "Where were you guys at *before* you went to the poolhall." (8:14:47). Confused, Nina responds: "Sir, I have a really bad memory, do you know what pool hall? **Two Thousand**, right?"? (8:14:50 – 8:14:54 a.m.). Lord responds: "at Harbor and Westminster," to which Nina replies (8:14:58) "Two Thousand, right?" (2000 Club was a different poolhall, not *located at Harbor and Westminster*).[5] When asked about a poolhall, Nina's *two* immediate references 2000 were a red flag that her memory of a poolhall concerned 2000, not Phi Hong. UMF 85, 91-95, 99, 120, 100, 121.

_____

[5] The transcript *omits* Nina's two references to 2000 at 8:14 a.m.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

9

At 8:20, Lord tells Nina he "know[s] they went to the poolhall" after the restaurant and the police have video surveillance footage to prove it. UMF 100. This was false. UMF 70-71. Nina explained that she thought they went to Tony's after the restaurant, then said (inconsistently) she thought everyone split up and went home. UMF 101. 103. Raising his voice, Lord cut her off, insisting he knew they didn't go home because they were "seen in the car at the poolhall." Detectives lied again saying that Aaron had already admitted they were there. ("Well, Aaron was there… He's already told us that. That was already discussed."). Aaron had not yet been interviewed; he consistently denied being present. UMF 104-106.

At 8:22, when Nina still does not incorporate "the poolhall" into her timeline, Lord admonishes her: "lying about this could be a problem, so don't." He falsely stated: "It is not a crime to be there" "but it is a crime to lie to us." They emphasize - repeatedly – the faster she tells them what they want, the faster she can go home. Danielson says: "just tell us what *you really know*. *So we can get you home and get you done*."; Lord repeats, "the quicker you tell me what happened, Nina, the quicker you can go home. Okay, so stop beating around the bush…the quicker you just tell the truth about what happened, the quicker we can get you out of here." It became clear that she was not free to leave until she told detectives their version of the truth. UMF 107-110. [6]

By 8:39 a.m., Nina had explained **4** times that her car had lost the group and was waiting in a restaurant parking lot. UMF 128. Lord accuses her of lying: "Okay. This is where I have a hard time believing that…you need to tell me the truth. Because I know for a fact that you and Aaron were there." Lord then lies again, claiming they have video surveillance and phone GPS pings that conclusively places them at Harbor and Westminster. Nina explains – again – that they went to the Vietnamese restaurant, then M&M donuts. Danielson accuses her of lying "It really doesn't take that long to

---

[6] "And the quicker you guys just say the truth, we'll get you out of here" followed by "We know what the truth sounds like…just tell us the truth." UMF 113.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

10

remember things. It takes time to make up a story…You don't need to not tell us the truth, alright? … And I don't understand why you are trying to make up a story." UMF 129 – 131, 134, 135, 137-139.

### 2. Lord's Report Falsely Attributes Nina's Memory of Being at a "Pool Hall" to Phi Hong, Rather than 2000 Club (Two Thousand) on a Different Day

At 8:42, Lord interjects – a fifth time – that they were at a pool hall: "So tell me what happened when you went over to the pool hall. Cause I know you guys went over there. I know you did." UMF 140.  Between 8:42 and 8:53, significant confusion ensues as Nina describes a memory of being at a poolhall, but includes details indicating she is not referring to the Phi Hong on the night of the shooting.[7] UMF 141-146. At 8:45, when detectives express confusion, she tells them she's "mixing up" the day they were at a poolhall with the day of the shooting, indicating two separate events ("I think I'm getting these…these things all mixed up. The things that I remember…I think I'm getting that day mixed up with another…the day of the shooting."). UMF 147, 148.

Detectives instruct her to focus on her memory of the "pool hall" and she clarifies that she's talking about a day at **2000 (a different poolhall)**, with "Thai." UMF 149. Lord accused her of dishonesty. As the conversation unfolds, she references 2000 and mentions *playing pool inside of the poolhall with* Thai and "his cousins,"[8] a scenario that could never happened on the night of the shooting. UMF 150-157, 181. At 8:51, Detectives accused her of lying and changing her story, despite indications she was talking about a different day entirely. At 8:52, she states unambiguously, that she is

---

[7] She describes people with Puffy on 03/20/11, but also adds another girl who was not; she describes different people in Aaron's car, and states they later met up with the victim who was shot in the neck.

[8] This was exculpatory and indicated a social relationship with the victims. Jimmy Nguyen later testified at trial that he shot pool with Aaron at the 2000 Billiards. Detectives knew that, on the shooting night, no one from the aggressor group was playing pool inside the Phi Hong.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

11

describing 2000 in Koreatown Plaza (miles from the Phi Hong). UMF 158-163. While there has been discussion of a "poolhall," and detectives had interjected "Westminster" 5 times, at this point, there had been no discussion of "Phi Hong." Nina says **2000 nine times** during the first session**;** the words "2000" (wrong pool hall and therefore exculpatory) appear nowhere in Lord's report. UMF 492, 493.

### 3. Lord's Report Falsely States that Nina Confessed to Being Present When She Unambiguously Denied Being at the Phi Hong on 3/20/11

Whatever confusion existed, it was resolved at **8:53** a.m., when Lord showed Nina a photo of the Phi Hong Billiards sign (attached to his report) and asked – directly – if that was the poolhall to which she was referring. In viewing the photos, she stated twice – clearly – that she was **not** at the Phi Hong. UMF 164, 165. Nina tells detectives **10 times** she  had **no** memory of being at the Phi Hong on the night of the shooting (UMF 196 (10 times), while re-confirming her previous timeline for the night of the shooting (i.e. waited at a Vietnamese restaurant). UMF 168 – 170, 176, 179, 180, 182, 183, 184, 185, 192, 193, 195. **None of these – ten – denials are reflected in Lord's police report, which falsely states she looked at the photo and confirmed she was there.**

Detectives doubled down on the claim that they had incontrovertible cell phone GPS evidence placing her at the Phi Hong. At 8:55, they showed her GPS maps so she will "start telling the truth," asking her "So are you going to tell me what's up or not? We already know. I already told you." None of the trickery worked. Nina looked at the maps and denied being at Phi Hong. Two minutes later, at 8:57, they tell her (again) they have cell records definitively placing Aaron at the Phi Hong: "He was there and you were with him." Throughout the first session, detectives tell Nina – at least 5 times – that they had cell records conclusively placing her and Aaron at the "the poolhall" or the Phi Hong. They twice say they have video of his car. UMFs 171-175, 186.

When Nina insists she has no memory of being at the Phi Hong, they relentlessly accuse her of lying – telling her at least several times that she is making up stories, telling partial truths, or deliberately concealing information. UMF 177, 178, 187-191. ("It's a

decision on your part to conceal information from us, It's not "you don't remember: …I really don't want [you] to use the word honestly in that sentence because that's not what you're being….I'd rather you tell me [you don't want to get Aaron in trouble] than beat around the bush.") At 9:07, raising his voice, Detective Danielson admonishes her: "stop it, stop this game, stop this 'I don't know, I can't remember, I've got a bad memory.' Just tell us what happened for God sakes. You can tell us the truth and I'll be done asking you questions in like five minutes." UMF 190. The effect of these tactics on Nina was obvious. Throughout the interview, she expressed the concern that detectives refused to believe her even though she was being honest. UMF 130, 167, 194 *Nina even requested to take a lie detector test*. UMF 143.

### B. Aaron & Alexander Tran Provided Alibis Consistent with Nina

The first videotaped session of Nina's interrogation ended at 9:11 a.m. UMF 197. While Nina was being interviewed, between 8:06 a.m. and 9:10 a.m., Detective Farley interviewed Alexander Tran, another passenger in Aaron's car. Over the course of two interviews, Alex explained their group got lost and waited in a restaurant parking lot. He used a restroom inside, and asked officers visit the restaurant to try to confirm his alibi. UMF 198-202.

From 9:27 – 10:23, Lord and Danielson questioned Aaron. Aaron consistently denied being at Phi Hong. Aaron said that they had been at Puffy's party, left looking for another party, and went to a park. He repeatedly explained that he got lost and parked in front of the Thanh My Vietnamese restaurant where they waited for a long time to reconnect. He asked detectives to look for video surveillance of the restaurant parking lot. He also explained that he was not in a gang and would never back up gang members. UMF 203-218. As Lord testified at trial, he knew that cell phone evidence corroborated his alibi and showed him in that area at 1:58 a.m. UMF 60.

### C. Detectives' Inadvertently Recorded "Hallway" Meeting Shows Lord's Misrepresentations Were Deliberate

The misrepresentations in Lord's report were no accident. [9] At ~10:53 a.m., Lord met his supervisor, Sgt. Martin, DDA Dan Feldman, Det. Danielson and Det. Vaicaro. The officers' conversation was inadvertently recorded. During this meeting, Sgt. Martin asks if anything puts Aaron at the Phi Hong besides his phone. Lord answers "no." Martin asks: "Well, why would we go to his house, then?" Lord acknowledges that Aaron admitted to being at the park, but said that "he's following CJ, and then he gets lost." Lord explains that they pulled over at some restaurant, sat there for an hour and waited for a phone call. Lord tells Martin that they said they waited for almost an hour. They ask if anyone questioned Aaron's girlfriend (Nina); Lord answers [yes] "**she says the same thing.**" Thus, contrary to his report, Lord was certain Nina never admitted to being at the Phi Hong. UMF 219-232.

Detectives and DDA Feldman next strategize how to elicit admissions. Feldman asks, "Have you hit him up and said that his girlfriend puts him there, that we cracked her, that she just came clean because she doesn't want to go down for a murder…." [Lord apparently responds affirmatively] and Feldman responds: "And he was stone faced, stuck to it? Shiit." Feldman suggests they put Aaron and Nina together to see if they will confess. DDA Feldman advises that they might be able charge Aaron **if** they have cell phone evidence (they did not), and statements of other witnesses, "realizing that they might have to ***flip*** someone." Martin testified in deposition that the term "flip" meant to get one defendant to "roll over" on another, which would "get them consideration with the DA." Feldman confirmed this interpretation. UMF 233-237.

### D.    Lord's Report Omits Nina's Statements Describing an Aggressive Off-Camera Confrontation

It is undisputed that ***after*** the "hallway meeting," in which Feldman and detectives discuss the need to "flip someone," Sgt. Martin initiated an unrecorded conversation with Nina. UMF 238. After the conversation, Lord found Nina, crying in a conference

---

[9] Asked in his deposition whether GGPD requires "truthful and accurate reporting," Detective Lord responded "I don't understand what you mean." UMF 518.

room. UMF 238.  Minutes into the second videotaped interview, still crying, Nina told Lord that she was crying because "he was in my face. He was pointing at me…" UMF 239-247. An hour later, she says again, to Aaron, on video observed by officers, he was "yelling at me, he was in my face. He was pointing at my face. He was like, you do not ever fucking lie to them," emphasizing "but I wasn't lying. I wasn't." UMF 252. Even if Martin disputed this description, Nina's statements carried obvious exculpatory value. Instead of memorializing these exculpatory statements, Lord only reported that Nina said she had not been completely honest and that Nina immediately told Lord she wanted to talk again. UMF 238. Martin denies shouting at Nina.

During her deposition, Nina described being taken into an office where the officer aggressively confronted her: "I was crying because he was pointing in my face" … "I was crying because I was scared. He pulled me out of this interview room and he pulled me into his office and he started screaming at me. He had his leg on my chair...And he screamed and put it in my face, like this far from my face. [gesturing]. He was screaming …telling me that I'm not telling the truth and just stop fucking lying or else I'll get in really deep trouble…." He called her a "God damn liar" and that she was a "fucking liar." Nina testified she was "terrified."[10] UMF 248-251, 253, 260-271, 279-281. DDA Feldman testified in deposition that he observed an Asian girl at the station who was crying. He did not know why she was crying, but it made an impression. UMF 272-278.

### E.    Lord's Report Mischaracterizes the Second Interrogation

#### 1.  *Nina Repeatedly Denied Being at the Phi Hong Before Any Admission*

Nina's second video-taped interrogation began at 12:39 p.m. As the video shows, she was crying, visibly distraught and continued crying for some time. Martin briefly entered the room and Nina protested: "I am not lying to you sir," confirming that he accused her of lying (off-camera). Lord then enters and accuses her of lying "So what's

---

[10] In Aaron's 2017 trial, Nina described a sergeant pointing in her face, repeating that she was a liar, and admonishing her to tell the truth or she would "get in more trouble." UMF 254-259.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

15

the deal? Are you going to tell me what really happened now?... don't know why you didn't think this was a serious matter before…But you didn't tell me the truth." Between 12:43 -12:45, Nina is crying inconsolably. UMF 282 – 286, 288, 289.

For the first approximately 20 minutes, Nina maintains the same timeline, with no mention of the Phi Hong. She reconfirms that gang members left the park to find rivals. Aaron's car followed the group but lost them near MSP and went to the Vietnamese restaurant, where they waited for "like an hour." Leaving the restaurant, they went to Tony's house or M&M's. UMF 287, 290, 291-306.

Nina's denial triggers a critical exchange, omitted from Lord's report. At 12:57, Lord insists that she went to the Phi Hong, falsely claiming that she had already admitted as much to the sergeant: "And now you are telling me you didn't go to the pool hall. Even though you told my sergeant you did. And he said, you didn't tell me the truth before and now you wanted, you understand how serious the situation is. And you wanted to talk to me again. You did go to the pool hall because, guess what? Other people who were at the pool hall…." Nina promptly refuted him, describing Martin's coercive conduct, which conceals this in his report. After Nina again denies being at the Phi Hong, Lord aggressively – and repeatedly – accuses her of lying: you are "ridiculous"; you are a "liar." Lord again accuses: "You are a liar." Nina pleads again: "why would I lie straight to your face when you ask me *over and over again*," to which Lord responds: "You're a liar. You and Aaron are liars." Between 12:57 – 12:58 he calls her a liar 5 times. By 12:59 p.m., she is crying heavily, pleading: "I promise you, just please believe me. I promise you. Okay, if we were there, then I was there. But I don't remember turning into the place and going to the park and parking at the McDonalds." In response, Lord threatens: "the more you lie…the more you are going to get yourself in trouble. You are digging a hole for yourself." At this point, Nina asks "can I just admit everything?" UMF 307-322.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

16

This is the turning point. At 1:01, Nina tells Lord "Okay…I was there *but I don't remember*, *I don't remember*, I was there but *I don't remember*." UMF 324, 325. Lord runs with it, asking, "what happened?" after they went to the Phi Hong. Nina said Tony got out of the car to talk to CJ. This is her first admission, which occurred at 1:02 p.m. UMF 329-332. Seconds later, Lord asked what happened next and she responded: "I don't remember being at …well, I am trying to remember where we went after the Phi Hong." UMF 334-336. By the time of her admission, she had denied being at the Phi Hong **12 (twelve) times. None of those denials are reflected in Lord's report.** UMF 323. By this time, 1:01, detectives had falsely claimed, at least **8 times**, that they had irrefutable proof in the form of video and phone data. UMF 333, *see also,* 326-328. Lord's report omits Nina's protestations of innocence, his accusations of lying, and her request to "admit everything." UMF 498..

### 2. *Nina Failed to Describe the Caravan Driving onto Westminster*

Lord's report also presents a materially misleading description by creating the impression that Nina gave admissions consistent with the evidence. When asked, she could not describe – *at all* – where they were parked in the parking lot. UMF 338. The report misleadingly portrays that Nina described an incident on Westminster by **incorrectly** stating that Nina *described following other cars out of the Phi Hong parking lot*. In fact, in response to Lord's leading questions, Nina stated **3 times they followed <u>no</u> other cars** leaving the lot. When asked *a fourth time*, Nina said: "Maybe, but I don't remember seeing, seeing following them or anything." This was critical. To the extent Nina could not describe exiting with other cars onto Westminster, it suggested they were not part of the caravan involved in the chase. UMF 340, 341, 343-345, 500.

The report states that Nina "initially" said they exited on Harbor Blvd. then changed to Westminster. This is technically true, but the report omits that Nina gave the wrong answer **twice** before she finally said, in response to Lord's repeated questioning, she thought they went on Westminster *to the freeway to Tony's house*. UMF 339, 342.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

17

Lord asks yet *again* if there were other cars on the road – specifically suggesting maybe cars from Stonecress Park – and Nina responds that she could only remember CJ, *driving the opposite direction in traffic*. UMF 346-348 (This description contradicted known facts about the incident; no one described any car driving the *opposite* way in traffic). Lord asks yet again whether they were traveling with cars on the road – suggesting "right by the side of you, by the back of you, the front of you? On the driver side? – and Nina answers "Maybe one car, but I am not sure if it was them." UMF 349, 350. Contrary to Lord's report, her responses show she had no memory of a caravan of cars on Westminster.

At 1:13 p.m., another detective, Detective Farley enters. Farley asks whether they exited the Phi Hong parking lot on Harbor, Nina begins to answer "something…" when Lord interjects (telling Farley that she initially said Harbor, but then changed to Westminster). Farley then asks if Nina (even) knows where Westminster is; Nina responds "I am bad at my streets" indicating that she *did **not*** have a clear understanding of the location. (Lord's report omits Nina's statement indicating she wasn't sure about the location of Westminster). UMF 352-356. At 1:35 p.m., Farley returns in another attempt to clarify. Farley asked Nina to demonstrate using a satellite photo/map how they exited the Phi Hong parking lot. Nina – again – gave a verbal description that contradicted key facts. Nina turns the map around several times and eventually indicates that they exited on Harbor, not Westminster. Farley then coaches her – insisting twice that he **knows** they exited on Westminster - and eventually gets her to agree they "could have" gone either way." UMF 393-397.[11] Lord's report doesn't indicate that she – again – gave the wrong answer when asked about whether she exited on Harbor vs. Westminster. *See Harris v. Bornhorst*, 2004 WL 7340519 (N.D. Ohio) (consequential

---

[11] Later, Farley asks: "Simple question, were you at the Phi Hong." Nina answered: "I don't remember being there. But everyone said I was there, so I don't…(trailing off)." This exchange is omitted from Lord's report as well as Farley's.[11] UMF 389-391.

factor in assessing voluntariness of confession was that the suspect could not provide specific details of the crime).

### 3. Nina's Description of a Car "Chase"

Nina describes what she believed were cars chasing and "trying to trap" another car. However, her description is interpreted, it is clear that she repeatedly indicates that they were trying to "trap" a white Honda Accord. UMF 359, 362. Nina didn't know who drove the white Honda. UMF 290. As detectives knew, this white Honda didn't belong to the victims, it belonged to someone in the TRG group who left the park and later ended up at the Phi Hong. UMF 524. In other words, the car Nina thought they were trying to "trap" was from the group they were following. During this chasing/trapping incident, Nina describes CJ driving erratically and going the opposite direction in traffic. UMF 347, 380, 388, 401, 402. This detail was entirely inconsistent with the Westminster incident, and more consistent with CJ quickly turning around to rush to the Phi Hong (at which point Aaron/Nina lost him). Lord's report creates the **false** impression that Nina said Aaron participated in a plan to box in or trap another car. The opposite is true. Nina **twice** unequivocally denied that Aaron blocked someone in or that Aaron helped block someone in "Q: You're sure about that? A: I am positive." UMF 363, 375 – 378, 502.

### 4. The Fabricated Diagram Was Heavily Contradicted the Evidence

The pivotal event of the second session was Lord's request, at 1:19 p.m.—and Nina's compliance with that request—to draw what has been described as a sketch of the cars driving on Westminster Avenue. This diagram, fabricated by the police, was the key piece of evidence used by Feldman to convict Aaron at trial. Without the fabricated diagram, Aaron never would have been convicted. There was no other evidence of guilt.

She told me she would draw a map, and I had her do this," but Lord asked Nina to draw the map. Lord testified in court that he did not direct Nina to write anything on the diagram; the video shows he explicitly directs her to write "Westminster" (and prompts her to draw lanes) UMF 38, 364-369. (His report does not disclose he told her to write Westminster). As she was drawing, she verbally indicated she was attempting

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

19

to draw where they pulled over to the restaurant (UMF 370); the restaurant was not on or near Westminster. As Nina drew objects depicting cars, and placed them in three lanes, she drew an arrow indicating that Aaron exited to the right – with a large circle – where she verbally indicated where the restaurant was ("**and the restaurant is over here**") confirming her drawing depicted a street near where they stopped at the restaurant. UMF 370-373. Nina had repeatedly, previously described, the restaurant near where they lost CJ, near MSP. Lord also knew, from Aaron's interview, "the restaurant" was Thanh My near Bolsa and Bushard (3.6 miles away), where Aaron's phone pinged at 1:58. Lord's report omits this critical information, transforming Nina's illustration of getting lost near MSP, into a false admission of being present during the chase on Westminster.

If construed to depict the chase on Westminster, Nina's diagram is fundamentally inconsistent with physical evidence. Detectives knew Puffy approached the victim's silver Lexus SUV from the far-left lane and the shooter fired from Puffy's front passenger seat into the SUV's driver's side. (All bullets entered the SUV's driver's side). Nina's diagram placed Puffy to the right of the victim's car. Lord's report omits that her drawing is incorrect on this key spatial point. She also drew a box to represent the "white Honda" she believed they were chasing. The victim's car was a silver SUV, not a white Honda; the white Honda belonged to Danny Tran, who was with Nina/Aaron's group at the park, and who CJ could not have been trying to attack. Lord omits that she misidentified the victim's car (in verbal description and photos). UMF 351, 361, 374, 375. 381, 398, 519-524.

Lord's report mischaracterizes the diagram as a depiction of Aaron's group trying to "box in" a white car, when detectives knew from the video footage that the victim SUV was not boxed in. The video showed the moment Puffy pulled alongside the SUV; when the shots were fired, the victim and shooter vehicles were a full five seconds ahead of the next car behind them. There was no "boxing" in of the victims' SUV.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

20

### 5. Detectives Lied About Nina's Identification of Aaron's Car

Omitted from the report, at 1:23, Lord showed Nina surveillance footage and falsely represented that it showed Aaron's car, causing her to inaccurately identify Aaron's car. Before Nina "identified" Aaron's car, Lord told her twice: "looks a lot like Aaron's car doesn't it?" [12] UMF 379-383. The car in question, was not Aaron's. It was a Toyota Camry, not a silver Honda Accord. At 1:38, Farley also showed her a photo and *falsely suggested* it looked like Aaron's "Silver Accord." UMF 399-400.

### 6. Lord's Report Mischaracterizes Nina's Full Recantation

At 1:40 p.m., detectives put Aaron and Nina together to observe whether they would confess. The plan did not work. Between 1:40 p.m. and 1:53, Nina and Aaron consistently say how they were not at the Phi Hong (as reflected in Lord's report). At 1:41, Lord shows Aaron Nina's drawing. Nina immediately interjects: "that wasn't by the pool hall. That was by Miles Square Park." Contrary to Lord's report, she did not recant the location. Though omitted from Lord's report, in drawing the diagram, she said "the restaurant is over here," indicating that she was referring to when they lost CJ (near MSP); she only wrote Westminster at Lord's direction. Nina also tells Lord – on camera – that she only agreed to being at the Phi Hong because detectives *pressured* her with lies ("he "kept lying to her" that she was there); Lord's report entirely omits Nina's statement that she was pressured to say she was at the Phi Hong. UMF 404-410.

Lord's report omits Nina's repeated subsequent denials to detectives. At 2:24 p.m., Sgt. Martin entered the room. Over the next 20 minutes (until 2:46 p.m.), Martin barrages Nina with accusations of dishonesty and his own flagrant lies about purported, incontrovertible phone and video evidence placing Aaron/Nina at the Phi Hong. When Nina insists she is being "100% honest," Martin lies, suggesting that Alexander Tran, "Julie" and "Tony" already admitted to GGPD they were at the Phi Hong. This was a

---

[12] Nina "identified" Aaron's car based on her incorrection assumption his was the only silver car. Detectives knew there was a silver Camry present, driven by Sally Ngo/Kim Anna Nguyen. None of this is reflected in the report.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

21

lie. (Alex Tran had denied being at the Phi Hong; GGPD had not interviewed Julie or Tony at all). Martin insists – again – that they have cell phone data that puts her and Aaron "right there…Listen, we put you right there." (UMF 411-415.)

Martin then showed Nina the word "Westminster" on the drawing: "You [told] the officer this is where you were, this is Westminster. *You wrote it….you can't go sideways on me.*" (emphasis supplied). (This was disingenuous because Lord told her to write Westminster; she said she was drawing a location where Aaron pulled over to the restaurant). Nina then asked permission to explain the drawing, stating that the drawing referred to the MSP area. She explained that detectives kept putting words in her mouth "Because it seems like that what all you guys wanted to hear. And I tell you guys…over and over…I was never there. I don't remember being there." Detectives then insist that it was Nina who first uttered the words "Phi Hong," another entirely disingenuous statement intended to confuse Nina. Lord first introduced the words "Phi Hong" when he showed her a photo of the sign. This entire exchange – is *omitted* from Lord's report. (UMF 416-422).

Nina explains that she is not afraid of Aaron and was pressured by police (not Aaron) to say things about where she was: "I told you from the beginning that I don't remember being at the Phi Hong. And you guys kept telling me that everyone's been telling you [we were there]." Martin again insisted that they have video and cell phone evidence irrefutably establishing that Aaron and Nina were at the pool hall: **(**Martin: we know that his phone pings at Harbor and Westminster. We can put him, the phone, his car. You saw pictures of his car, right? ... That's all Westminster. We know actually where that is. So, we don't need a lot… We don't need people to tell us that you and your boyfriend were there. Because, we have technology, we have video. **…** And a phone, yes… Absolutely proof.).  Nina responds: "you guys have proof but I don't remember being there."  UMF 423-433.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

22

Martin then threatens that, while Aaron has sealed his fate, she has a chance to "still have a life" and will one day be a mother. At 2:33 p.m. Nina is crying. **Martin explains that people who showed up to the Phi Hong could be charged with conspiracy to murder, emphasizing "and you are in one of those cars, young lady."** UMF 434-436. Even in the face of this threat, Nina denies they went to Phi Hong, and explains, again, how they got separated from the group. Martin repeats (falsely) that GGPD has proof in the form of GPS and video, pleading with Nina: "**All you have to say is, yeah, we were here.**" Nina doesn't take the bait, insisting she and Aaron are being 100% honest. Martin then draws *his own* diagram and tries to explain to Nina how the shooting happened. UMF 437-447. The tape ends at 3:25, after detectives return to ask questions about Tony's identity, the other passenger in Aaron's car. UMF 448-451.

### F.    Lord Arrested Aaron for Homicide With No Further Investigation

The only evidence supporting Aaron's arrest and prosecution were the misrepresentations in Lord's report regarding Nina's coerced admissions, and the fabricated diagram. Although Lord suggested to DDA Feldman that cell phone location data possibly placed Aaron at the scene, none existed, as Lord already knew.[13]

Lord incorrectly represented to DDA Feldman – verbally and in his report – that 3 other witnesses placed Aaron at the Phi Hong. Anthony Nguyen identified Aaron in a silver Camry; he drove a Honda Accord. (Detectives knew that two girls - Sally Ngo and Kim Nguyen – had the 2005 Camry captured on video). John Nguyen claimed he saw Aaron, but assumed he left before everything happened because he didn't see Aaron in the cars pulling out. Elvis Doan stated that Aaron was at a neighborhood party after the shooting, not that he was at the Phi Hong. (Aaron confirmed, during his own interview that they were hanging out with a bunch of people in the neighborhood after they reconnected). UMF 506-517. None of these individuals testified at trial.

---

[13] Farley reported that cell phone GPS data placed Alex Tran 3 miles away from the shooting minutes after it occurred. The exculpatory cell data has not been located.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

23

Detectives did not investigate whether witnesses or video confirmed the Thanh My alibi. Detectives ascertained the identity of Tony in Aaron's car ("Anthony Do"), but did not interview him until September **2012**. Like Aaron, Alex and Nina, Tony Do also maintained they were at a restaurant when the shooting occurred. He was certain they were not at the Phi Hong. Detectives never interviewed "Julie." UMF 556-564.

## IV.    Argument

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the Government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001); *Spencer v. Peters*, 857 F.3d 789, 802 (9th Cir. 2017) (citing *Halsey v. Pfeiffer*, 750 F.3d 273, 292–93 (3d Cir. 2014) ("[N]o sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence"); *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice."); *see also Black v. Montgomery Cnty.*, 835 F.3d 358, 371 (3d Cir. 2016) ("[D]eliberate framing by officials offends the most strongly held values of our nation." (internal quotes omitted)).

Deliberate misrepresentations in police reports violate due process. To prevail on a §1983 fabrication claim, a plaintiff must prove that: (1) the defendant deliberately fabricated evidence; and, (2) the deliberate fabrication caused the plaintiff's deprivation of liberty. Fabrication of evidence claims can be established through direct or circumstantial evidence. *Spencer*, 857 F.3d at 793 (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010). False statements in police reports support a claim for fabrication of evidence under a direct evidence theory. *Spencer*, 857 F.3d at 793*; Costanich* 627 F.3d at 1111 ("[A]n interviewer who deliberately mischaracterizes witness statements in her investigative report…commits a

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

24

constitutional violation."). In cases involving direct evidence, "the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved." *Id.*

Omissions and exclusion of exculpatory evidence, including by failure to disclose coercive investigation tactics, also violate *Brady. Brady* requires officers to disclose when they have presented false statements, fabricated evidence or have undermined the integrity of evidence through investigatory misconduct. *Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (FBI agents failed to tell prosecutors they induced false witness statements and submitted false written reports); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (failure to disclose officers' coaching of witnesses violated *Brady*).

**A. Defendants Submitted a Fabricated Diagram and False Report**

The discrepancies in Lord's report, (assisted by the other defendants in their contributions to the interrogation and failure to correct the report), are not trivial, they are egregious misrepresentations of fact. The report affirmatively misrepresents Nina's consistent denials in the first session, omits her report of Martin's aggressive confrontation, and omits coercive tactics used in both interviews. The report likewise did not alert the prosecution to Lord's fabrication of Nina's diagram, false statements in his report regarding the diagram, and the inconsistencies between Nina's diagram/statements and the physical evidence.

In describing Nina's first videotaped session, Lord falsely states that Nina admitted they were "down at the Phi Hong." Even worse, Lord wrote: "I showed Nina a picture of the Phi Hong and she admitted she was there with Aaron." Not true. After being shown this photo, Nina denies **10 times** that she was at the Phi Hong. None of the denials appear in the report. Nina referenced being at the 2000 Club **9** times. Lord falsely states she admitted to being at Phi Hong, when, in fact she described 2000, not Phi Hong, on a different day. Lord's report does not even include the words 2000.[14] UMF 492-494.

---

[14] Lord omits additional exculpatory details of Nina's description of playing pool *with Thai* and his cousins—all 3 of whom were in the victim's SUV on the night of the shooting. This was exculpatory because it clearly referenced a different day and

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

25

Lord's report conceals the significant coercion between the two videorecorded sessions, by providing a one-sided description of Martin's confrontation. Lord includes Martin's assertion that Nina admitted she had not previously told the entire truth, but entirely conceals Nina's description of an aggressive confrontation, depriving the prosecutor of vital information necessary to evaluate her later admissions. Nina stated (on video, observed by detectives) that she was crying because Martin was shouting, pointing in her face, and cursing "do not ever fucking lie to [us]." UMF 495-497.

Lord's report conceals that he told Nina to write "Westminster" on the diagram, even though she told him the diagram showed the area near MSP, where they lost CJ. After she drew it, and referred to it as the "near the restaurant" (omitted from the report) the defendants falsely said that she drew the crime scene because she wrote Westminster. She only did so because Det. Lord told her to do it. UMF 365-370, 503, 504. The meaning of the diagram, even though drawn by Nina, was altered by the police in directing her to write Westminster, and by Lord's report's efforts to falsely characterize it as depicting the crime scene. This transformed her drawing of a street near MSP/restaurant, nowhere near the crime scene, into a falsified admission of guilt. *See Crowe v. Cty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010), *cert. denied sub nom; Blum v. Crowe*, 562 U.S. 1135 (2011); *Stoot v. City of Everett*, 582 F.3d 910, 927-28 (9th Cir. 2009) ("A reasonable fact finder could conclude that it was not reasonable for an officer to believe that it was constitutional to coerce a confession and then to hand that information to a prosecutor—without divulging the means by which the confession was acquired—for use in a criminal case.") (citation omitted).

Lord's report conceals other highly coercive tactics including incessantly lying to Nina that they had irrefutable proof in the form of cell evidence and video. The concealment of detectives' coercion is especially egregious considering that Nina was a

_____

showed Aaron had a friendly relationship with 3 people in the victim's SUV and no motive to attack them.

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

26

juvenile witness, for whom there is a significantly greater risk of false confession, particularly in the face of false evidence ploys, threats, promises and incessant accusations of lying. UMF 452-487. They told her repeatedly she could just go home if she would tell them "the truth," making it clear that (1) she was not free to leave; and (2) they did not accept her statements as the truth. UMF 484-486. At least **20** times they accused her of being dishonest. UMF 459. Further, they threatened her with conspiracy to murder when she recanted being at Phi Hong/Westminster. UMF 436. The report gives the false impression that she maintained the admissions throughout, concealing that, less than 40 minutes after making the admissions, she fully recanted them, *insisting that detectives pressured her* and confused her with lies. (Lord falsely reports that she recanted the location to which the diagram referred; he doesn't report that she *unequivocally recanted being at the Phi Hong*). UMF 488-505. Nina made **16 total** denials that are not reflected in Lord's report. UMF 505.

**B.    The Report and Diagram Caused Aaron's Deprivation of Liberty**

Causation is established where the deprivation would not have occurred in the absence of the conduct, and where the injury is of a type that a reasonable person would see as a likely result of the conduct in question. *Spencer*, 857 F.3d at 798. When officers deliberately falsify evidence, the direct and foreseeable consequence is that the suspect will be charged and convicted (including the direct, and equally foreseeable result that the evidence will sustain an invalid conviction). *See Crowe,* 608 F.3d 406 at 430–31 ("[t]he requisite causal connection can be established … by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.")). Here, Defendants' coercive interrogation, false report and fabricated diagram set in motion a chain of events that caused Aaron's prosecution, invalid conviction, and incarceration.

Without this diagram and Lord's fabricated report, Aaron would not have been prosecuted. As Plaintiffs' prosecution expert Heidi Rummel explains, in making

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

27

charging decisions, prosecutors rely almost exclusively on the truthful and accurate representations of police officers, as communicated in their police reports and in their verbal statements. Police reports are the primary means by which prosecutors access the information required to initiate and pursue criminal prosecutions; they are the chief means by which prosecutors disclose exculpatory information to the defense. UMF 529-536. Here, a DA investigator even used Lord's report to prepare Nina to testify at trial.[15] DDA Feldman testified that, in filing charges, he relied upon officers' representations, including verbal representations and reports. Feldman used the diagram at trial as the key piece of evidence against Aaron. UMF 525-528.

The consequences of the false report and diagram are not negated by disclosure of the video-recorded interrogation sessions. Even if police reports constitute summaries, rather than verbatim transcripts that include every detail, the reports are expected to be truthful, accurate, objective summaries that capture all relevant facts, to ensure that all important facts relevant to an assessment of the case are communicated to the prosecutor. It is particularly important, and required, that reports highlight or call attention to exculpatory information relayed in such interviews. UMF 537-538. *See*, e.g., *Kyles v. Whitley*, 514 U.S. 419, 115 S. Ct. 1555 (1995); *Carrillo v. Cnty. of Los Angeles*, 798 F.3d 1210, 1212 (9th Cir. 2015).

Lord's false report omitted every piece of material, exculpatory information, deceiving DDA Feldman and undermining his ability to evaluate the evidence. In a complex homicide investigation, it is especially important for prosecutors to be able to rely on the accuracy and completeness of police reports. This investigation generated over 60 taped interviews totaling 90+ hours of interview footage. Because prosecutors cannot be expected to sift through dozens of hours of videos to ensure they have made a correct charging decision, they rely on officers to flag exculpatory evidence generated

---

[15] Nina never viewed the complete video of her interrogation until 2023. Nothing in this case suggests that DDA Feldman, or his investigator, Joe Kim, alerted Nina to the mischaracterizations in Lord's report. UMF 30, 31.

in interviews. UMF 539-540. Had Lord disclosed the tactics used to secure Nina's confession, coupled with the abject failure to investigate Aaron's alibi, it would have raised serious concerns regarding the integrity of the entire investigation. *See Robinson v. Cain*, 510 F. Supp. 2d 399 (E.D. La. 2007) (investigating officers' false attribution of an identification tends to impeach the credibility of the officers and their investigation).

Even with the video, the prosecutor lacked any record of Sgt. Martin's unrecorded confrontation of Nina. It goes without saying that prosecutors rely exclusively on police reports for accurate descriptions of witness interviews that were not recorded at all – including, for example, the unrecorded interview of Nina by Sgt. Martin. UMF 541. Lord's police report does not document Nina's statements about what transpired with Sgt. Martin. At the time of the charging decision (~4/20/11), the only record of Nina's description of Martin's confrontation existed on the video of her second recorded interview, where she explains she was crying because he was in her face, pointing his finger and cursing. Because Feldman would have had to review hours of video to discover these references, he was deprived of any meaningful reference to her account.

Even if the exclusion of exculpatory evidence from police reports (including the diagram) were considered permissible because information is available elsewhere (i.e. a video), that is not the case when, by excluding the exculpatory information, and including affirmative misrepresentations, the report and diagram communicate a false and misleading description of events. It is a core obligation of the police to never provide false or misleading reports. Police reports – heavily relied on by prosecutors, defense counsel, the court and often experts – must be complete, truthful, objective and unbiased. Falsity by omission is equally egregious as falsity by affirmative misrepresentation. And while prosecutors have an independent obligation to assess the evidence they present at trial, when prosecutors receive police reports, particularly in the context of serious and complex cases, their default assumption is that the information contained within the report is truthful, accurate and reasonably complete. UMF 542-546, 547-555. *See*

Memorandum in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

29

*Crowe*, 608 F.3d 406 at 432; *Jones v. Slay*, 61 F.Supp.3d 806, 832 (E.D. Mo. 2014) (officers' false representation to prosecutor supports due process claim for manufacture of evidence where the prosecutor relied on officers statements in deciding to prosecute).

It is clear that DDA Feldman remained misled by Lord's misrepresentations all the way through trial six years later because he apparently did not realize Lord directed Nina to write "Westminster" on her diagram (Feldman did not follow up when Lord falsely testified he did not direct Nina to write anything on the diagram); he used Lord's report to prepare Nina to testify (he wouldn't have done so if he knew it was replete with misrepresentations). UMF 30. Had Defendants disclosed that Nina was instructed to write "Westminster", that she consistently stated that the diagram depicted events near MSP, and that the arrow and circle she drew pointed to a restaurant 3.6 miles away from the crime scene, it would not have been used by Feldman at trial as the key piece of physical evidence showing that Nina confessed to being at the crime scene.

Because Aaron was acquitted on appeal, it is not necessary to consider whether any specific misrepresentation was material to the jury's (invalid) determination of guilt (e.g., whether there would have been guilt beyond a reasonable doubt without Nina's diagram). An appellate court has already determined that – even with Nina's diagram and fleeting admissions – there was insufficient evidence to support a conviction, which resulted in acquittal on appeal. An invalid conviction - one unsupported by proof of reasonable doubt – is a direct and foreseeable consequence of framing someone for murder despite an abundance of evidence demonstrating their innocence. Defendants' misrepresentations and omission of exculpatory evidence via Lord's report and representations to DDA Feldman caused Aaron's prosecution and invalid conviction.

DATED:    September 22, 2023     MCLANE, BEDNARSKI & LITT, LLP

By: /s/ *Lindsay Battles*
Barrett S. Litt
Lindsay Battles
Attorneys for Plaintiffs