BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
DAVID S. McLANE, SBN 124952
Email: dmclane@mbllegal.com
LINDSAY BATTLES, SBN 262862
Email: lbattles@mbllegal.com
RODRIGO PADILLA, SBN 339523
Email: rpadilla@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660, Fax: (626) 844-7670

*Attorneys for Plaintiffs* AARON NGUYEN, NGOC LEE THI PHAN, AND HOANG
MINH NGUYEN

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON NGUYEN, et al.<br>Plaintiffs,<br><br>v.<br><br>CITY OF GARDEN GROVE, et al.<br><br>Defendants. | Case No.: 8:21−cv−01775-JVS (ADSx)<br><br>[Hon. James V. Selna]<br><br>**PLAINTIFFS' OPPOSITION TO INDIVIDUAL OFFICERS' MOTION FOR SUMMARY JUDGMENT (DKT. 75)**<br><br>Complaint Filed:    Oct. 26, 2021 |

# **TABLE OF CONTENTS**

I.   Introduction .................................................................................................1

II.  Fact Overview ............................................................................................1

    A.   First Videotaped Session .....................................................................2

    B.   Hallway Meeting & Martin's Off-Camera Confrontation............................3

    C.   Second Video-Taped Session ..............................................................4

    D.   Post-Interview Investigation ...............................................................5

    E.   Prosecution, Conviction and Reversal ..................................................6

III. Argument....................................................................................................6

    A.   Due Process Prohibits Deliberate Fabrication of Evidence........................6

        1.   False Police Reports and Coercion of Third-Party Statements Support a Deliberate Fabrication Claim ...............................................................6

        2.   Coerced Confessions are Inherently Unreliable ...................................7

        3.   Juvenile Interrogations Must Be Handled with the Greatest Care ...........8

        4.   Detectives' Tactics Are Known to Yield False & Unreliable Admissions .....................................................................................9

            a) Detectives' Relentless Pressure & Intimidation ..................................9

            b) Detectives Disoriented Nina with Lies .............................................11

            c) Coercive Promises & Threats .........................................................12

            d) Nina's Admissions Obviously Lacked Reliability as they  Contradicted Known Facts ...............................................................................13

            e) Nina Consistently Said Her Admissions Were Coerced......................14

        5.   Defendants Misunderstand the Law ..................................................14

    B.   Defendants Exhibited Conscious and Reckless Disregard for the Consequences of their Actions ..........................................................15

    C.   Lord's False Report Concealed Brady Evidence....................................17

    D.   Clear Causation Exists .....................................................................18

    E.   Qualified Immunity Is Unavailable .....................................................20

    F.   Supervisory Liability ........................................................................21

IV. Conclusion................................................................................................21

i

# **TABLE OF AUTHORITIES**

*Amaya-Ruiz v. Stewart,*
121 F.3d 486 (9th Cir. 1997)..................................................................15

*Aleman v. Village of Hanover Park,*
662 F.3d 897 (7th Cir. 2011) ...............................................................11

*Alvarado v. Hickman,*
316 F.3d 841 (9th Cir. 2002) .................................................................9

*Brewster v. Shasta Cty.,*
27 F. App'x 908 (9th Cir. 2001)...........................................................12

*Caldwell v. City and County of San Francisco,*
889 F.3d 1105 (9th Cir. 2018) .......................................................18, 19

*Carillo v. County of Los Angeles,*
798 F.3d 1210 (9th Cir. 2015) .........................................................6, 21

*Cooper v. Dupnik,*
963 F.2d 1220 (9th Cir. 1992) .........................................................7, 10

*Costanich v. Dep't of Soc. & Health Servs.,*
627 F.3d 1101 (9th Cir. 2010) ...............................................................6

*Crowe v. County of San Diego,*
608 F.3d 406 (9th Cir.2010) .........................................................Passim

*Cunningham v. City of Wenatchee,*
345 F.3d 802 (9th Cir. 2003) ...............................................................15

*Devereaux v. Abbey,*
263 F.3d 1070 (9th Cir. 2001)...............................................................21

*Doody v. Schriro,*
548 F.3d 847 (9th Cir. 2008) ...........................................................8, 14

*Gallegos v. Colorado,*
370 U.S. 49 (1962)................................................................................8

*Gantt v. City of Los Angeles,*
717 F.3d 702 (9th Cir. 2013) ...........................................................7, 15

*Garcia v. Moreno Valley Police Dept.,*
2018 WL 7571322 (C.D. Cal. 2018)....................................................18

*Gault,*
387 U.S. 1 (1967)..................................................................................8

*Gilbert v. Merchant,*
488 F.3d 780 (7th Cir. 2007) .................................................................8

*Gregory v. City of Louisville,*
  444 F.3d 725 (6th Cir. 2006) ..................................................19

*Harris v. Bornhorst,*
  2004 WL 7340519 (N.D. Ohio)..................................10, 14, 16

*Henry v. Kernan,*
  177 F.3d 1152 (9th Cir. 1999) ..................................10, 13, 14

*Higazy v. Templeton,*
  505 F.3d 161 (2d Cir. 2007)..................................................19

*Hurt v. Wise,*
  880 F.3d 831 (7th Cir. 2018) ................................................10

*Hyung Seok Koh v. Graf,*
  307 F.Supp.3d 827 (N.D. Ill. 2018) ..............................10, 11

*In the Interest of Jerrell C.J.,*
  283 Wis.2d 145 (Wis. 2005) ..................................................11

*Jones v. City of Chicago,*
  856 F. 2d 985 (7th Cir. 1988) ..............................................19

*Lewis v. Henderson,*
  520 F.2d 896 (2nd Cir. 1975)..................................................8

*Livers v. Schenck,*
  700 F.3d 340 (8th Cir.2012) ....................................................7

*Ricciuti v. N.Y.C. Transit Auth.,*
  124 F.3d 123 (2d Cir. 1997)....................................................7

*Rodriguez v. McDonald,*
  872 F.3d 908 (9th Cir. 2017) ................................................13

*Santos v. Thomas,*
  830 F.3d 987 (9th Cir. 2016) ..................................................7

*Schneckloth v. Bustamonte,*
  412 U.S. 218 (1973)................................................................7

*Spencer v. Peters,*
  857 F.3d 789 (9th Cir. 2017) ..........................................1, 6, 7

*Stoot v. City of Everett,*
  582 F.3d 910 (9th Cir. 2009) ......................................7, 18, 19

*Tennison v. City & Cnty. of San Francisco,*
  570 F.3d 1078 (9th Cir. 2009) ..............................................17

*Tobias v. Arteaga*,
  996 F.3d 571 ...................................................................................................13

*U.S. v. Kin–Hong*,
  110 F.3d 103 (1st Cir. 1997).........................................................................7

*United States v. Haswood*,
  350 F.3d 1024 (9th Cir. 2003) ......................................................................8

*United States v. Preston*,
  751 F.3d 1008 (9th Cir. 2014) .................................................................9, 15

*United States v. Roberts*,
  430 F.Supp.3d 693 (D.Nev. 2019).................................................................8

*United States v. Skilling*,
  554 F.3d 529 (5th Cir. 2009) .......................................................................17

*Wilkins v. De Reyes*,
  2006 WL 8443775 (D.N.M. Aug. 16, 2006) ..............................................13

*Winslow v. Smith*,
  696 F.3d 716 (8th Cir. 2012) .......................................................................16

*Woods v. Clusen*,
  794 F.2d 293 ........................................................................................11, 13

iv

## I.   **Introduction**

Aaron Nguyen's 9-year incarceration resulted from a deliberate and calculated miscarriage of justice initiated by a coercive, hours-long interrogation, of Aaron's then-girlfriend, 17-year-old, Nina Nguyen. Defendant Lord submitted a false police report, misrepresenting Nina's statements, concealing coercive interview tactics, suppressing *Brady* information, and falsely characterizing a diagram he directed her to draw as an admission of presence at the crime scene, when she indicated, while drawing, it was a different location.

Aaron asserts violations of his due process rights to be free from deprivation of liberty based on deliberately-fabricated evidence and suppressed exculpatory evidence. While the Ninth Circuit requires conscience-shocking behavior for deliberate fabrication claims, in this context, conscience-shocking behavior encompasses "[d]eliberate indifference," defined as "the conscious or reckless disregard of the consequences of one's acts or omissions." *Spencer v. Peters*, 857 F.3d 789, 802 (9th Cir. 2017). Deliberate indifference is easily established by the events of this case.

Nina's coerced admissions and Lord's false report set in motion the chain of events leading to Aaron's prosecution and incarceration. Any presumption of prosecutorial independence is negated by Lord's false report, which concealed significant exculpatory information. The Ninth Circuit has unambiguously held that qualified immunity does not protect officers who coerce third-party statements, falsify police reports and suppress Brady information.

## II.   **Fact Overview**

As Lord testified at trial, prior to interviewing Aaron, he knew Aaron's phone placed him, at 1:58 a.m., 3.6 miles away from the Phi Hong, consistent with the alibi of everyone in his car. AMF-59. No phone data placed Aaron at the Phi Hong. AMF-46. Prior to 4/20/11, Detectives knew a metallic 2005 Toyota Camry was involved (driven by Kim Anna Nguyen and Sally Ngo ). AMF-72–73. Detectives had video surveillance capturing all cars in the caravan; it shows a car with 2005 Camry features, but no 2001 Honda Accord. AMF 63-73,75,76,98.

1

During GGPD's preliminary investigation, Aaron's name was mentioned only by Leesa Huynh and Tien Phung (C.J.). Leesa reported Aaron was at the Phi Hong, yet clarified she did not see his car. She only assumed his presence because she saw him later "in the neighborhood." Leesa reported Aaron was not a gang member. Leesa was not called at trial. AMF-565–567.

On 3/20/11, C.J., a TRG member, falsely told police he and Aaron both drove towards the Phi Hong, but arrived at Harbor/Westminster after all the cars exited the parking lot. Investigators determined CJ was lying. On 4/23/11, C.J. provided a statement that departed significantly from his first interview. He admitted to being at the Phi Hong parking lot; he did not identify Aaron's car there. C.J. was not called at trial. AMF 568–571.

## A.     First Videotaped Session

On 4/20/2011, Defendants Lord and Martin interrogated 17-year-old Nina Nguyen for hours. Nina disclosed what she could remember of the night of the shooting, including Puffy's party and later sitting in the car at a park. Her timeline did not include the Phi Hong. When she failed to confirm their version of events, Detectives persistently accused Nina of dishonesty and deliberately concealing information. AMF-58,74,78-90, 96-128, 132,133, 136, 177,178,187-191, 451.

While accusing Nina of dishonesty, detectives shamelessly lied to her, endlessly asserting irrefutable GPS and video surveillance placing them at the crime scene, and embellishing their lies with visual props. AMF—59-61, 104-106, 129-131, 134, 135, 137-139, 171-175, 186, 333, 459, 463, 464–466. Detectives made implicit and explicit promises. They repeatedly told her she could just go home if she would tell them "the truth," clearly communicating that (1) she was not free to leave; and (2) they did not accept her statements as the truth. AMF-107-110, 190, 454 - 455, 484-487. Despite officers' heavy-handedness, Nina unequivocally denied being at the Phi Hong during the first session. At 8:53 a.m., Lord showed Nina a photo of the Phi Hong Billiards sign (attached to his report) and asked – directly – if she had been there on the night of the

shooting. She immediately stated – twice – that she was **not** at the Phi Hong. AMF-164-165.

During the first interview, she told detectives **10 times** she had no memory of being at the Phi Hong the night of the shooting. AMF-196. Lord wrote a false report affirmatively misrepresenting her statements. He claimed she admitted being at the Phi Hong and confirmed her presence when shown a photo, omitting that she repeatedly described being at a different poolhall, (2,000) on a different day, with a group including people from the victims' SUV. AMF-490–494. (See Plaintiffs' Affirm. MSA, Dkt. 73, for additional explication regarding the two sessions.)

## B.    Hallway Meeting & Martin's Off-Camera Confrontation

Defendant Lord understood Nina's denials, as reflected in detectives' inadvertently recorded conversation. At ~10:53 a.m., after interviewing Aaron, Lord conferred with Sgt. Martin and DDA Dan Feldman. Sgt. Martin asked if anything put Aaron at the Phi Hong besides his phone (Aaron's phone did not place him there). Lord answers "no." Lord recounts Aaron's alibi and states that "[Nina] **says the same thing."** Feldman said there could be enough evidence against Aaron *if* they had cell phone evidence (they did not—already-analyzed GPS corroborated their alibi) and realized they would have to "flip" someone. AMF-203–237.

After that "flip[ing]" discussion, Martin pulled Nina into his office alone, and initiated a terrifying off-camera confrontation, screaming—his leg on her chair, his finger in her face—that if she didn't "stop fucking lying" she would be in "deep trouble," and calling her "Goddamned liar" and "fucking liar". AMF-238–271.[1] Lord's report confirms a conversation took place, but conceals Nina's description. Nina told detectives – the same day – that Martin was in her face, yelling and cursing. AMF-238–239, 247-251, 253, 260-271, 279-281, 272, 278.

---

[1] In Aaron's 2017 trial, Nina described a sergeant pointing in her face, calling her a liar, and threatening that she would "get in more trouble." UMF 254-259.

### C.    Second Video-Taped Session

A second session began at 12:39 p.m. The video shows Nina crying unconsolably and pleading with officers to believe her. Lord rejected her persistent denials. Between 12:57–12:58 he called her a liar 5 times. By 12:59 p.m., she was crying again; Lord responded to her pleading with more threats and false assertions regarding non-existent evidence. Nina asks, "Can I just admit everything?" AMF-282-289, 307-322.

At 1:01, Nina told Lord "Okay…I was there *but I don't remember*, *I don't remember*, I was there but *I don't remember*." AMF-324-325. Lord ran with it, asking, "what happened?" after the Phi Hong. Nina responded: Tony got out of the car to talk to CJ. Nina made this first admission at 1:02 p.m.[2] AMF-329-336. By 1:02, she had denied being at the Phi Hong **12 times**; Lord's report omits each denial. AMF-323, 505. By 1:02, detectives had falsely claimed, at least **8 times**, that they had irrefutable video and GPS data placing them at the scene. AMF-333, 326-328.

Over the next 40 minutes, Nina agreed she was at the Phi Hong, yet made statements unmistakably contradicting the evidence, presenting obvious red flags that her admissions were unreliable. During this segment, she did, however, describe what she perceived to be a car chase in which she believed they were supposed to "trap" another car. (Nina unequivocally denied <u>Aaron</u> helped trap another car – Lord's report omitted these statements). AMF-329–363, 375-378, 500, 524.

The session culminated at 1:19 when Lord directed Nina to draw a diagram depicting the perceived chase. Nina wrote "Westminster" on the diagram at Lord's direction..  She drew an arrow and circle, verbally indicating the arrow/circle indicated where they pulled over—"the **restaurant**." Her reference to "the restaurant" confirmed, consistent with her previous statements, the diagram depicted events near Miles Square Park ("MSP"), where they lost CJ and turned into the Vietnamese restaurant (she

---

[2] In deposition, Nina was asked why she would say she didn't remember being there, then immediately afterwards agree to being present: "It is because he totally disregarded my answer and kept asking questions; "I didn't know what else to say."

repeatedly said this happened near MSP), and not events on Westminster. Lord knew (from Aaron) the restaurant was Thanh My, at Bolsa/Bushard, 3.6 miles from the Phi Hong, a location consistent with Aaron's phone GPS data. AMF-364-373, 503-504, 520. By directing her to write Westminster, Lord transformed her diagram of events near Thanh My/MSP into a false inculpatory admission of being at the shooting on Westminster.

Within ~20 minutes of drawing the diagram, Nina unambiguously recanted, insisting she had no memory of being at the Phi Hong and only capitulated because detectives pressured her. Sgt. Martin returned, barraging Nina with accusations of dishonesty, interspersed with lies about purported, incontrovertible GPS and video evidence, and threats of prosecution for conspiracy to murder, pleading: "All you have to say is, yeah, we were here." The tape ends at 3:25. AMF-406-451. By the end of two sessions, Nina told detectives **16** times she had no memory of being at the Phi Hong. Lord's report omits these denials. AMF-505.

### D.    Post-Interview Investigation

Detective Lord arrested Aaron for murder, submitting a false report that affirmatively mischaracterized Nina's statements. Before the arrest, he conducted no further investigation of Aaron's alibi (e.g., additional cell phone analysis, interviews of Aaron's other passengers, investigation at the Thanh My restaurant). AMF-558-563.

Lord's report falsely claimed three individuals placed Aaron at the crime scene, referencing only their interviewing detectives (not the witnesses' names). One did not identify Aaron at the scene. John Nguyen claimed Aaron was at the parking lot, but emphasized he did not see Aaron pulling onto Westminster; he assumed Aaron left before anything happened. Anthony Nguyen, misidentified Aaron's car as a silver Camry, yet identified the only potential Camry in the surveillance video as "the girls' car," and said Alex, who officers *knew* was Aaron's passenger, was "never there." Lord's report omitted this exculpatory information. [3] Detectives *knew* 2 girls were in a

---

[3] Defendants claim Tom Phung placed Aaron at the Phi Hong. His interrogation video

metallic Camry and Aaron drove a 2001 Honda Accord.  AMF-506-517. *Carillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (suppression of information undermining the reliability of an eyewitness identification – including hesitancy, incorrect details and identification of two people – violates *Brady*).

### E.    Prosecution, Conviction and Reversal

Aaron was prosecuted, convicted, and sentenced to 40-years-to-life. Nina's fabricated diagram was the centerpiece of the prosecution's case. Not a single eyewitness identified Aaron at the crime scene (two prosecution witnesses said they did *not* see him). The prosecution's gang expert testified Aaron was not in a gang; one victim testified Aaron had a social relationship with the victims. At trial, Nina explained that she was pressured into telling police they had been at the "pool hall" and ultimately had no memory of being at the Phi Hong; she testified she was pressured into drawing the diagram, which was intended to depict events earlier in the evening, near MSP. No determination was made regarding the voluntariness of her statements. Aaron spent 9 years in continuous custody before his conviction was reversed for insufficient evidence (equivalent to acquittal) on appeal. AMF-1-10, 11-28, 32-46, 573, 575.

## III.  **Argument**

### A.    **Due Process Prohibits Deliberate Fabrication of Evidence**

#### 1.    ***False Police Reports and Coercion of Third-Party Statements Support a Deliberate Fabrication Claim***

Deliberate fabrication can be established through direct or circumstantial evidence. *Spencer v. Peters*, 857 F.3d 789, 799-800 (9th Cir. 2017). False statements in police reports constitute direct evidence of fabrication. *Id.* (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010) ("deliberately mischaracterize[ing] witness statements" in investigative reports is "a constitutional

---

shows that, after initially *not identifying* Aaron, Phung *excluded* Aaron when asked about him specifically. Phung later adopted Loffler's suggestion that Alex must have been present because Aaron was there, but Phung (incorrectly) guesses Aaron's car was white, and that the only silver-vehicle-photo showed Puffy's car, establishing Phung was not familiar with Aaron's car. AMF-572.

violation."). Beyond direct evidence, there are two circumstantial methods of proving deliberate fabrication: (1) investigative techniques so coercive and abusive that police know or should know they will yield false information; and, (2) continuing an investigation where detectives know or should know the plaintiff was innocent. *Spencer*, 857 at 799-800. The use of coercive and abusive techniques to fabricate **third-party** statements supports a fabrication claim. *Spencer*, 857 F.3d at 799 (9th Cir. 2017); *Gantt v. City of Los Angeles*, 717 F.3d 702 (9th Cir. 2013) (coercion of third-party statement through "hours-long" interrogation with threats of murder charges if witness did not identify suspect). [4]

### 2. Coerced Confessions are Inherently Unreliable

In the deliberate fabrication context, liability hinges on whether investigative techniques are known to yield **false** or **unreliable** evidence. *Spencer* at 801-802. In § 1983 and Fifth Amendment suits, federal courts recognize coerced confessions are *inherently unreliable. Crowe v. County of San Diego,* 608 F.3d 406, 433 (9th Cir.2010) ("[C]oerced confessions are legally insufficient and unreliable and thus cannot factor into the probable cause analysis."); *Santos v. Thomas*, 830 F.3d 987, 1003 (9th Cir. 2016) (citing, *inter alia*, *Livers v. Schenck*, 700 F.3d 340, 358 (8th Cir.2012) ("No reasonable officer could believe statements from a coerced confession could alone provide probable cause."); *U.S. v. Kin–Hong*, 110 F.3d 103, 121 (1st Cir. 1997) ("[A] confession obtained by duress is inherently unreliable.")).

"[P]sychological coercion is sufficient;" physical violence is not required. *Stoot v. City of Everett*, 582 F.3d 910, 929 (9th Cir. 2009); *Cooper v. Dupnik*, 963 F.2d 1220, 1245 (9th Cir. 1992). The question is not whether any single technique is impermissibly coercive, but whether the totality of the circumstances undermined the suspect's free will. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). The totality analysis includes

---

[4] *See also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997) ("No arrest [even lawful] gives an arresting officer ... license to deliberately manufacture false evidence...To hold that police officers...[are]... free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice...").

both the coerciveness of techniques used and individual characteristics rendering suspects more vulnerable, including youth, inexperience with law enforcement, and intelligence or education level. *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003).

### 3. Juvenile Interrogations Must Be Handled with the Greatest Care

Juvenile interrogations are judged by a higher standard. *Crowe*, 608 F.3d at 431 (*citing In re Gault,* 387 U.S. 1 (1967) ("the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair."); *Gallegos v. Colorado*, 370 U.S. 49, 52–54 (1962) (a juvenile "cannot be compared with an adult" when determining whether a confession was obtained in violation of due process).

Extensive research shows youth (under age 21) are more vulnerable to coerced, false confessions. As Dr. Saul Kassin, explains, "[d]evelopmental research shows that adolescents are more malleable than adults, more compliant in the presence of authority, more suggestible in response to misinformation, and often more limited in their comprehension of Miranda rights and how to invoke them." AMF-453,471.

Nina was particularly vulnerable; she was 17 by four days, in high school, questioned without a parent, [5] and had never been arrested. *United States v. Roberts*, 430 F.Supp.3d 693, 712-715 (D.Nev. 2019) (18-year-old questioned in early morning hours despite expressing he was tired, cold, and needed medication); *Doody v. Schriro*, 548 F.3d 847, 866 (9th Cir. 2008) (17-year-old's vulnerability "enhanced by the fact that he had never been arrested before"); *Lewis v. Henderson*, 520 F.2d 896, 901 (2nd Cir. 1975) (twenty-two-year-old had "little prior experience with police methods, … rendering him particularly susceptible to police pressure.").

---

[5] *Gilbert v. Merchant*, 488 F.3d 780, 791 (7th Cir. 2007) (The absence of a parent "bears on voluntariness because a teenager may not be able to fully appreciate what is at stake when the police seek to question him,") (citing *Colorado v. Gallegos*).

The absence of *Miranda* warnings compounded the coercion. Officer statements would have left no reasonable 17-year-old in Nina's situation feeling free to leave. AMF-82, 107-110, 454-455. *See Alvarado v. Hickman*, 316 F.3d 841, 851 (9th Cir. 2002) (age relevant in determining whether reasonable person would have felt free to leave). AMF-80, 452-455.

### 4. Detectives' Tactics Are Known to Yield False & Unreliable Admissions

Despite the obvious need for caution, Lord and Martin interrogated Nina in a 6x8 room, off-and-on for over six hours, using techniques that would have compelled many adults to falsely confess. These techniques included prolonged, repeated, and suggestive questioning, incessant accusations of dishonesty (while simultaneously tricking her with lies), screaming in her face, cursing, and suggesting she could "just go home" if she would "tell the truth," yet would be charged with murder if she didn't confess. AMF-78-79, 451, 468-483.

### a) Detectives' Relentless Pressure & Intimidation

Relentlessly pressuring witnesses to tell a particular story is inherently coercive, especially for witnesses vulnerable due to age or other characteristics. *See United States v. Preston*, 751 F.3d 1008, 1027-1028 (9th Cir. 2014) (repetitive questioning, threats to continue interrogation indefinitely, pressure to adopt certain responses, use of two incriminating alternative questions, and false promises to an intellectually-disabled suspect rendered confession involuntary); *Crowe*, 608 F.3d at 432 (conscience-shocking behavior where detectives "isolated and subjected [juvenile suspects] to hours…of interrogation in which they were cajoled, threatened, lied to, and relentlessly pressured").

Detectives communicated they would accept nothing but an admission of presence at the Phi Hong. During the first session, detectives persistently insisted they knew Nina was there and forcefully cut off her denials with accusations of dishonesty. When this failed to yield an admission, Martin intervened, brought Nina to his office (off-camera), screamed in her face, placed his foot on her chair, finger pointing inches from her face, cursing, and threatening worse trouble if she didn't confess. Nina testified

in deposition that she was "terrified." AMF-247-271, 462. This type of confrontation is known to produce false evidence with vulnerable witnesses. *See Hyung Seok Koh v. Graf,* 307 F.Supp.3d 827, 851–59 (N.D. Ill. 2018) (officer's physical proximity and physical touches could be interpreted as threats of violence). AMF-456-461.

After Martin's confrontation, Lord resumed questioning, notwithstanding Nina's inconsolable crying and protestations of innocence ("I'm not lying to you, sir"). Any reasonable detective would have interpreted her emotionally-distraught state as a warning that she was at risk of falsely confessing to escape an unbearable situation. AMF-283-285, 576. Questioning a witness despite signs of psychological distress is relevant to coerciveness. *Henry v. Kernan*, 177 F.3d 1152, 1157 (9th Cir. 1999) ( "[t]hroughout his interrogation, petitioner was shaken, confused, and frightened, crying in parts and frequently asking for forgiveness."); *Cooper,* 963 F.2d 1220, 1240-1241 (9th Cir. 1992) (investigators "…badgered [the suspect] for four hours;" he was "hammered, forced, pressured, emotionally worn down, stressed, and infused with a sense of helplessness and fear," reducing the defendant "to a state of agitation and anxiety marked by tears and sobbing"); *Hyung,* 307 F.Supp.3d at 851–59 (noting signs of mental exhaustion: defendant sat hunched in his chair occasionally hitting himself). Lord exercised no caution in response to Nina's crying; instead continuing to berate her, calling her "ridiculous" and a "liar" (at least four times, falsely insisting she was seen at the Phi Hong, awake in Aaron's car). AMF-310-311, 316, 320.

Nina desperately pleaded that officers believe her and offered to take a lie detector test. AMF-460. Given her youth, repeated denials, and emotional state, any reasonable detective would have appreciated the risk of extracting a *false*, *unreliable* confession. *See Harris v. Bornhorst*, 2004 WL 7340519 (N.D. Ohio) (12-year old suspect interrogated for 80 minutes using confrontational interrogation techniques; deception regarding inculpatory evidence; promising prosecutorial leniency); *Hurt v. Wise*, 880 F.3d 831, 845 (7th Cir. 2018) (coercive tactics included fact-feeding, calling suspect a liar each time she denied involvement and threatening murder charges; "the rule forbidding such conduct has been established for decades"); *see also, In the Interest of*

*Jerrell C.J.*, 283 Wis.2d 145 (Wis. 2005) (involuntary confession where, over seven-and-a-half hours in custody, police disregarded 14-year-old's repeated denials, and urged him to tell a "different truth," emphasizing youths' particular vulnerability to false confession).

### b)    Detectives Disoriented Nina with Lies

Deception is a form of coercion that may yield false admissions, particularly when employed against youth and other vulnerable witnesses. Deception is impermissibly coercive when it is likely to procure an untrue statement. *See Aleman v. Village of Hanover Park*, 662 F.3d 897, 906-907 (7th Cir. 2011) ("[A] trick that is as likely to induce a false as a true confession renders a confession…unreliable;" "A confession so induced is worthless as evidence…"); *Harris* (police "took advantage of [minor suspect's] youth and inexperience by using deception to…" convince him "he had no option but to confess;" "fabricat[ing] or inaccurately suggest[ing] the existence of inculpating evidence…"); *Crowe*, 608 F.3d at 420 (9th Cir. 2010) (impermissible coercion included subterfuge regarding inculpatory evidence); *Hyung,* 307 F.Supp.3d at 851–59  (coercion included deception regarding inculpatory evidence, rejection of denials, accusations of lying, and confusing questions, etc.); *Woods v. Clusen*, 794 F.2d 293, 295-296 (detectives falsely claimed to have found suspect's fingerprints).

Detectives endlessly lied to Nina, falsely claiming at least 12 times, that incontrovertible evidence placed her at the scene, and that all of Aaron's passengers had confessed. Dr. Kassin, explains, "[i]n ways that were particularly egregious, detectives confronted Nina Nguyen with a litany of lies, the likely effect of which was to make her feel trapped, confuse her, disorient her, and cause her to question her own memory. And whenever she sought to assert herself, they countered with the same ostensibly incontrovertible and objective evidence…The deceptions were unequivocal and relentless, oral and visual, leading Nina to search for an explanation as to why she did not recall the events as described to her." AMF-462-481.

Psychological research confirms that subterfuge increases the risk of false confession, particularly with juveniles. Misinformation can distort visual perceptions,

beliefs, and emotions, leading innocent people to confess to crimes they did not commit. Lies "put innocent people at risk in two ways: (1) by causing them to feel trapped by the apparent weight of evidence and eliciting compliance by instilling a sense of inevitability and despair; and (2) by causing confusion and disorientation, sometimes leading them to question their own memories and at times internalizing a false belief in their own culpability." *The effects of post-event misinformation on memory are even greater for youth, especially under duress;* teens do not know that police can and will lie about evidence, increasing the risk of false confessions. AMF-475, 482-484.

Detectives embellished their lies with physical props. Lord initiated the first interview by opening his "red book," claiming it had "all the proof" of their whereabouts. When Nina denied being at the Phi Hong, Lord showed Nina cell phone GPS maps, falsely claiming they established Aaron's presence ("maybe you'll start telling the truth?"). Detectives even claimed that a still-shot taken from video-surveillance was Aaron's car, when they had no basis for that belief ("that looks a lot like Aaron's car, doesn't it"). AMF-87-88, 171, 379, 400. The coerciveness of these techniques is well-established. *See Brewster v. Shasta Cty.*, 27 F. App'x 908, 912–13 (9th Cir. 2001) ("suggestive procedures with the intent of obtaining an identification" of a suspect, "irrespective of whether he was in fact guilty," qualifies as a coercive investigative technique).

Detectives' misrepresentations made Nina feel overwhelmed, confused and disoriented. Social science confirms that, "[w]hile orally presented false evidence can cause innocent people to confess… an even greater risk exists when the lie is supplemented by false visual evidence." Though she could not remember being at the Phi Hong, she believed detectives when they claimed to have proof and she eventually began to doubt her memory. AMF-311, 461, 467, 478, 483.

### c) *Coercive Promises & Threats*

Detectives minimized Nina's perception of the consequences of an admission ("it's not a crime to be there"), while threatening worse trouble if she did not confirm their version of events ("but it is a crime to lie to us" or, if you don't talk it "makes you

look like …the hard core one"). They told her five times that the faster she gave them the information they wanted, the faster they would send her home. Martin also threatened bigger trouble during his off-camera confrontation; he doubled down on his threat after she recanted, emphasizing that, while Aaron made his decision, Nina was "still young enough to have a life," and threatening Nina with conspiracy to murder, offering "all you have to do is say 'yeah' we were there.'" AMF 107, 127, 265, 484-486.

Such threats are inherently coercive, especially in juvenile interrogation. *Woods,* 794 F.2d at 295-296 (7th Cir. 1986) (involuntary confession where *Mirandized* 16-year-old was interrogated for two consecutive 20-minute-sessions; during the second session detectives "suggested things would 'be better' or 'go easier' if suspect answered questions); *Henry v. Kernan*, 177 F.3d 1152, 1157 (9th Cir. 1999) ("slippery and illegal tactics" overcame suspect's will; he continued his confession only because of misleading statements such as 'what you say can't be used against you right now'); *Tobias v. Arteaga*, 996 F.3d 571, 581-582 (promise to release suspect without a charge upon confession was coercive as matter of law); *Rodriguez v. McDonald*, 872 F.3d 908, 921-924 (9th Cir. 2017) (involuntary confession where police suggested leniency by promising they would tell the prosecutor that he was "not entirely bad dude" and there was " a little bit of influence from the other guys…" and "you still have a lifetime."); *Wilkins* 2006 WL 8443775, at *16 ("…no question … that a jury could find that threats of harm, as well as promises of help, leniency, and safety, are improperly coercive tactics, particularly when used against a young, uneducated defendant who has been denied the opportunity to talk to a lawyer.").

### d)    *Nina's Admissions Obviously Lacked Reliability as they Contradicted Known Facts*

Discrepancies between Nina's statements and the evidence presented unmistakable red flags that Nina did not observe the events preceding the shooting.: Nina repeatedly failed to describe turning onto Westminster with a caravan of cars. She repeatedly described a white Honda being "chased". (Detectives knew the victims drove a Silver Lexus SUV and that the white Honda was with the TRG-group.) Nina's diagram

erroneously placed Puffy to the right of the white car being "chased." (Detectives knew Puffy pulled up on, and his passenger shot from, the SUV's left). Nina's diagram sandwiched the "chased" car between Puffy's and CJ's cars, suggesting the victim was surrounded; video surveillance shows the victim's car was *not* surrounded (Puffy pulled up next to the victims 4 seconds before the next car). AMF-53-54, 145, 290, 361-363, 381, 392-402, 521-524, 565. *See Kernan*, 177 F.3d at 1157 ("police tactics and trickery produced a confession which was neither rational nor the product of an essentially free and unconstrained choice"); *Doody*, 548 F.3d at 866 (9th Cir. 2008) (discrepancies between admissions and the facts "provides strong evidence that his will was overborne."); *Harris*, 2004 WL 7340519, *16 (N.D. Ohio) (inability to provide details is "consequential factor" in assessing voluntariness).

### e)    *Nina Consistently Said Her Admissions Were Coerced*

During her interrogation, Nina twice, unambiguously told detectives they pressured her into saying she was at the crime scene, when she had no memory of being at the Phi Hong. AMF-505 (e.g., "I told you from the beginning that I don't remember being at the Phi Hong. And you guys kept telling me that everyone's been telling you [we were there]."). Nina testified consistently in Aaron's 2017 trial.  AMF-32-35.

During deposition, Nina confirmed this pressure: "[A]s much as I tried my best to cooperate and tell them the truth, nothing but the truth, they still wouldn't believe me. They just – they just kept calling me a liar." AMF 487 *see e.g.*, ,  ("They kept asking me the exact same thing, I answered with the same exact answer, and I felt like I had to just tell them what they wanted to hear in order for me to leave." Q:"What is it that you thought they wanted to hear?" A:"Agreeing that I was on Westminster or at Phi Hong on the day of the shooting when we weren't, and we were at a Vietnamese restaurant.").

### 5.   *Defendants Misunderstand the Law*

Defendants sanitize the interrogation, insisting police may admonish witnesses to tell the truth, say they don't believe them, or say they can go home sooner if they tell the

truth. That sugarcoats the interrogation techniques used against Nina[6], and fails to address whether they constitute coercion under the totality of the circumstances.

Defendants' reliance on *Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003) is misplaced. *Cunningham* involved interviews of child sex abuse victims: after an initial denial, police continued questioning one child until she disclosed abuse. *Cunningham* involved almost none of the coercive tactics here: no aggressive confrontation involving screaming, cursing and pointing in their face, no trickery by outright lies, no incessant accusations of lying, and no explicit promises and threats.[7]

*Amaya-Ruiz v. Stewart,* 121 F.3d 486 (9th Cir. 1997), is less apposite. *Amaya-Ruiz* held that a confession was not coerced where, during a 40-minute interview, officers inflated evidence of guilt, but their "voices were calm and nonthreatening." *Amaya-Ruiz* involved a shorter and less coercive interrogation than Nina's. *Amaya-Ruiz* was *overruled* because it analyzed coerciveness divorced from the suspect's vulnerabilities (i.e. intelligence). *See Preston*, 751 F.3d 1008, 1019 (9th Cir. 2014).

## B.    Defendants Exhibited Conscious and Reckless Disregard for the Consequences of their Actions

Deliberate fabrication claims require conscience-shocking behavior. Here, because actual deliberation is possible, conscience-shocking behavior encompasses "[d]eliberate indifference," defined as "the conscious or reckless disregard of the consequences of one's acts or omissions." It entails more than negligence but less than action with the "purpose of causing harm." *Spencer*, 857 F.3d at 802 (9th Cir. 2017); *Gantt*, 717 F.3d at 707-708 (9th Cir. 2013).

This investigation reveals a deliberate and calculated miscarriage of justice as reflected by the affirmative misrepresentations and material omissions in Lord's police report. The report (1) *falsely* claimed Nina was shown a photo and confirmed she was at the Phi Hong, when the opposite occurred: Nina saw the photo and immediately denied

---

6 See Plaintiffs' MSA for more detail on officers' coercive interrogation techniques.
[7] Contrary to Defendants' brief, the supect, <u>not the children</u>, was interrogated for 8 hours. That was <u>not</u> the basis of the false evidence claim.

being present; (2) *falsely* claimed Nina admitted to being at the Phi Hong during the first interview, omitting her 10 denials; (3) omitted  Nina's 7 explanations that her memory was of being at a different pool hall (2,000), *not* on the shooting day; (4) omitted *Lord told Nina to write "Westminster" on the diagram*, even though she told him it represented a street near where they pulled over to "the restaurant" (3.6 miles away); (5) omitted Nina's repeated recantations of being at the Phi Hong (outside of Aaron's presence); (6) omitted detectives' coercion, including false evidence ploys, promises she could go home if she told "the truth," and threats to charge her with a crime. AMF-196, 463-464, 485-486, 488-505.

There is no innocent explanation for these discrepancies. The inadvertently recorded meeting further demonstrates Lord unquestionably knew Nina had denied being at the Phi Hong, and that detectives recognized they could not charge Aaron unless they "flip[ped]" someone. Sgt. Martin promptly initiated a threatening, off-camera confrontation where he pointed in Nina's face, calling her "fucking liar" and "Goddamned liar." AMF-227-271.   The failure to record this conversation was purposeful and reflects reckless disregard for the truth (and bad faith).

Detectives' reckless disregard for the truth is reinforced by the absence of any follow-up investigation regarding Aaron's Thanh My-alibi, especially given exonerating video surveillance and cell GPS evidence corroborating his account. *Winslow v. Smith*, 696 F.3d 716, 735 (8th Cir. 2012) (viable due process violation where police "recklessly ignored evidence suggesting the Plaintiffs' innocence or systematically pressured witnesses to manufacture false testimony to fill gaps in an investigation"; detectives did not permit "discrepancies in the evidence to serve as red flags, Defendants instead pressed ahead and continued to exert pressure on vulnerable witnesses to provide testimony that was not within those witnesses' personal memory."); *Harris*, 2004 WL 7340519 (N.D. Ohio) (deliberate misconduct could be inferred from targeting juvenile suspect despite exonerating evidence pointing to alternate suspects). AMF-563; *See also* AMF-556-562.

### C.      Lord's False Report <u>Concealed</u> Brady Evidence

Lord's report deprived the prosecutor of meaningful access to impeachment evidence for the prosecution's only witness against Aaron. The report concealed that Nina made 10 denials in the first session, while omitting that her description of "a poolhall" pertained to 2,000 club, not Phi Hong, on a different day, and included socializing with members of the *victim* group, with whom Aaron was friends. Lord's report omitted her description of Martin's aggressive confrontation, which preceded her capitulation, over 5 hours after the first interview began. The report omitted that she fully recanted to officers (outside of Aaron's presence), twice stating that detectives pressured her into making admissions. The report conceals that Lord told her to write "Westminster" on the diagram, mischaracterizing it as an admission of presence at the crime scene, when she expressly stated it was near "the restaurant." [8] AMF-196, 492-498, 503-505.

GGPD erroneously argues there can be no *Brady* violation where detectives disclosed their interrogation videos. Not so. As federal courts have held, police must disclose exculpatory information in a *meaningful* way (e.g. memorializing it in official reports). *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358 (2010) ("government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078, 1090 (9th Cir. 2009) (placing notes in the police file did not satisfy *Brady* obligations. Evidence that a witness credibly identified alternate suspects, advising police they arrested the wrong person "should not have been buried in a file, but should have been made known to the prosecutor").

Disclosure of interview videos does not constitute meaningful disclosure of *Brady* information where exculpatory details are buried in 90+ hours of video. Because

---

[8] See Plaintiffs Opp. to Garden Grove's MSJ for additional analysis of *Brady* issues; see Plaintiffs Motion for Affirmative Partial MSA for detail regarding omissions from the report.

prosecutors cannot be expected to sift through 90+ hours of videos to evaluate their charging decision, they rely on reports to flag exculpatory evidence, especially in complex investigations involving numerous witnesses and 15+ co-defendants. AMF 533-542.

Nor can disclosure of the video excuse officers' failure to objectively describe Martin's off-camera confrontation. Prosecutors necessarily rely on police reports for accurate descriptions of *unrecorded* interviews. Lord's police report conceals Nina's description of a terrifying confrontation, depriving Feldman of meaningful access to information necessary to evaluate the reliability and voluntariness of her statements. AMF-495-497.

**D.    Clear Causation Exists**

Causation is easily established.[9] In §1983 cases, officers are responsible for the "natural and reasonably foreseeable consequences of [their] actions." *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009). By coercing Nina's statements, defendants set in motion a chain of events leading directly to Aaron's prosecution and deprivation of liberty. *Crowe*, 608 F.3d 406, 430–31 (9th Cir. 2019) (coercing a confession " 'set[s] in motion a series of acts by others which the [officer] knows or reasonably should know would cause' the statement to be introduced."); *see also Garcia v. Moreno Valley Police Dept.*, 2018 WL 7571322, at *8 (C.D. Cal. 2018) (in the *Miranda* context, even assuming the accuracy of the police report, and no attempt to deceive the prosecutor, "Detectives set in motion a chain of events which reasonably could be expected to result in the use of the wrongfully procured statements.").

Aaron's prosecution, deprivation of liberty, and invalid conviction were precisely the consequences that detectives should have foreseen in coercing Nina's admissions, fabricating her diagram and submitting a false report. *E.g., Stoot,* 582 F.3d at 926–27

---

[9] Plaintiff "need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty – being criminally charged is enough. *Caldwell v. City and County of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018).

(police officer could "reasonably have foreseen that a coerced confession would be used against [the suspect] and would lead to [] detention.") (internal quotation omitted); *Higazy*, 505 F.3d at 177 ("[E]ven if the intervening decision-maker … is not misled or coerced" chain of causation exists "where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.").

Causation is further solidified by Lord's express request that his false report be used to support Aaron's prosecution. *See Gregory v. City of Louisville*, 444 F.3d 725, 740–41 (6th Cir. 2006) (forensic report "affected the course of the criminal proceedings independent of [expert's] testimony to its contents."). Lord's report conceals Nina's denials, detectives' coercive tactics, and the mischaracterization of her diagram, depriving the prosecutor of information necessary to evaluate the reliability of her statements. *Stoot*, 582 F.3d at 927-28 (jury could determine it was not reasonable "to coerce a confession and then to hand that information to a prosecutor—without divulging the means by which the confession was acquired.") (citation omitted). DDA Feldman testified he lacked sufficient information to evaluate the voluntariness of Nina's statements. AMF-278, 528.

Any presumption of prosecutorial independence is rebutted by the false report. "[I]f a Plaintiff establishes that officers either presented false evidence to or withheld crucial information from the prosecutor, the plaintiff overcomes the presumption of prosecutorial independence…" *Caldwell*, 889 F.3d at 1116-1117 (9th Cir. 2018); *see also*, *Jones v. City of Chicago*, 856 F. 2d 985, 994 (7th Cir. 1988) (police "cannot escape liability by pointing to the decisions of prosecutors... *They cannot hide behind the officials whom they have defrauded*") (emphasis added).

Disclosure of interrogation videos does not excuse the submission of false reports. Reports are not verbatim transcripts, but they must be truthful, accurate, objective, and reasonably complete. Omission of exculpatory details is an independent *Brady* violation, especially where it misleadingly presents facts (Section III, C). AMF-537-547.

Defendants' insistence that Feldman did not rely on police reports lacks merit. Feldman testified that he relied on the police reports. In deposition, he was asked if, in a case of this magnitude, he would have relied on detectives' representations to determine if sufficient evidence supported the filing of a complaint. He answered: "**Precisely**." He also would have specifically relied upon detectives' false oral and written representations (during the hallway conversation) that three witnesses placed Aaron at the Phi Hong. AMF-506-517, 526-527.  Feldman remained deceived by Lord's misrepresentations through trial. When Lord falsely testified he did not direct Nina to write anything on the diagram, Feldman did not correct this false statement, apparently not realizing that Lord directed Nina to write "Westminster." AMF-37-38. Feldman used Lord's report to prepare Nina to testify, yet said he would never have prepared a witness with a report known to contain material misrepresentations. AMF-30. [10] Feldman presumably would not have used Nina's diagram as the key evidence placing Aaron at the scene had Defendants disclosed that Lord directed Nina to write "Westminster" even though *she drew the arrow to indicate the restauran*t (3.6 miles from the crime scene). AMF-42-46, 364-373.

Prosecution expert Heidi Rummel, explains that prosecutors necessarily rely on the accurate representations of police officers, as communicated in reports and verbal statements. Because reports are the primary means by which prosecutors access information required to initiate and pursue criminal prosecutions, when prosecutors receive police reports, they assume the information they contain is truthful, accurate and reasonably complete. AMF-529-536.  AMF-542-546, 547-555. *See Crowe,* 608 F.3d 406 at 432.

### E.    Qualified Immunity Is Unavailable

It is "virtually self-evident" there is "a clearly established constitutional due process right not to be subjected to criminal charges on the basis of" deliberately

---

[10] Nina never viewed the complete video of her interrogation until 2023. There is no evidence that Feldman alerted Nina to the mischaracterizations in Lord's report. AMF-31.

fabricated, false evidence. *Devereaux*, 263 F.3d at 1074-75. Qualified immunity is unavailable for coercion of third-party admissions. *Crowe*, 608 F.3d at 432 (qualified immunity "manifestly inapplicable" where juveniles were subjected to hours-and-hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by police officers; these techniques shocked the conscience under clearly established law in 1998, including *Cooper v. Dupnik*, and the U.S. Supreme Court's decision, *In re Gault*, directing that juvenile interrogations be conducted with "the greatest care"). Qualified immunity is equally unavailable for suppression of *Brady* information. *Carillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (Clearly established since at least 1984 that *Brady* obligations apply to police officers).

### F.    Supervisory Liability

Sgt. Martin is liable as supervisor and as a direct participant in the coercion of Nina's statement. Reynolds was the effective supervisor on this case and was an integral participant in the investigation; as the case agent, he was responsible for the integrity of the investigation. He was in a position to recognize that Nina's statements presented serious reliability concerns and that failure to conduct additional investigation reflected reckless disregard for the truth.

## IV.    Conclusion

For the reasons stated above, Defendants Lord, Martin and Reynolds are not entitled to summary judgement.

DATED:    October 20, 2023    MCLANE, BEDNARSKI & LITT, LLP

By: /s/ *Lindsay Battles*
Barrett S. Litt
David S. McLane
Lindsay Battles
Rodrigo Padilla
Attorneys for Plaintiffs
AARON NGUYEN, NGOC LEE THI PHAN, and HOANG MINH NGUYEN

**L.R. 11-6.2 – CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,940 words, which complies with the word limit of L.R. 11-6.1.

DATED:      October 20, 2023           McLane, Bednarski & Litt, LLP

                                       By: /s/ *Lindsay Battles*
                                       Barrett S. Litt
                                       David S. McLane
                                       Lindsay Battles
                                       Rodrigo Padilla
                                       Attorneys for Plaintiffs
                                       AARON NGUYEN, NGOC LEE THI PHAN, and HOANG MINH NGUYEN