WOODRUFF & SMART, APC
CAROLINE A. BYRNE – State Bar No. 196541
cbyrne@woodruff.law
MEREDITH D. STEWART – State Bar No. 217212
mstewart@woodruff.law
555 Anton Boulevard, Suite 1200
Costa Mesa, California 92626-7670
Telephone: (714) 558-7000
Facsimile: (714) 835-7787

Attorneys for Defendants CITY OF GARDEN GROVE, a public
entity; SERGEANT MARK LORD, an employee of Defendant City
of Garden Grove, a public entity; DETECTIVE MICHAEL
REYNOLDS, a former employee of Defendant City of Garden Grove,
a public entity; and SERGEANT MIKE MARTIN, a former employee
of Defendant City of Garden Grove, a public entity

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON NGUYEN, NGOC LE THI PHAN, AND HOANG MINH NGUYEN,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF GARDEN GROVE, MARK LORD, MICHAEL REYNOLDS, SERGEANT MIKE MARTIN, AND DOES 1-10, INCLUSIVE,<br><br>Defendants. | CASE NO.: 8:21-cv-01775-JVS (ADSx)<br><br>BEFORE THE HONORABLE JAMES V. SELNA COURTROOM 10C<br><br>**DEFENDANT MARK LORD'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[*Filed Concurrently with Statement of Genuine Disputes of Material Fact; Objections to Plaintiffs' Evidence; and Compendium of Evidence*]<br><br>HEARING DATES PENDING:<br>Type: Defendants' Motion for Summary Judgment<br>Date: December 11, 2023<br>Time: 1:30 p.m.<br><br>Type: Final Pre-Trial Conference<br>Date: January 2, 2024<br>Time: 8:30 a.m.<br><br>Type: Trial<br>Date: January 30, 2024<br>Time: 8:30 a.m. |

///

1

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1    Defendant SERGEANT MARK LORD ("Lord") submits the following

2 memorandum of points and authorities in opposition to the motion for partial

3 summary judgment filed by Plaintiffs.

4 DATED: October 20, 2023    WOODRUFF & SMART, APC

7       By: */s/Meredith D. Stewart*_____
         CAROLINE A. BYRNE

8         MEREDITH D. STEWART

9         Attorneys for Defendants CITY OF
         GARDEN GROVE, a public entity;

10        SERGEANT MARK LORD, an employee of
         City of Garden Grove, a public entity;

11        DETECTIVE MICHAEL REYNOLDS, a

12        former employee of City of Garden Grove, a
         public entity; and SERGEANT MIKE

13        MARTIN, a former employee of City of

14        Garden Grove, a public entity

# TABLE OF CONTENTS

**Page**

1.   INTRODUCTION ..............................................................................6
2.   FACT SUMMARY ...........................................................................6
     A.   Background facts ....................................................................6
     B.   Lord's first interview of Nina ..............................................8
     C.   Lord's second interview of Nina..........................................9
     D.   DDA Feldman's charging decision .....................................10
     E.   Nina's criminal trial testimony ..........................................11
3.   LORD DID NOT FABRICATE EVIDENCE .................................12
     A.   Plaintiffs failed to show Lord deliberately fabricated evidence ........13
          1)   Plaintiffs advanced no direct proof of deliberateness...............13
          2)   Lord's interview tactics do not "shock the conscience"..........16
               a)   More than mere coercion is required.............................16
               b)   Lord's interview was not coercive .................................19
          3)   Lord did not violate Brady.........................................21
     B.   Plaintiffs fail to prove causation .......................................22
4.   LORD IS PROTECTED BY QUALIFIED IMMUNITY ...........................23
5.   CONCLUSION ................................................................................26

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1795067.1

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Amaya-Ruiz v. Stewart*, 121 F.3d 486 (9th Cir. 1997)..............................................19, 20

*Bagley v. CMC Real Estate Corp.*, 923 F.2d 758 (9th Cir. 1991)...............................21

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir. 2015)................................................12

*Brittain v. Hansen*, 451 F.3d 982 (9th Cir. 2006).........................................................13

*Caldwell v. City and Cty. of San Francisco*, 889 F.3d 1105 (9th Cir. 2018) ...13, 20, 22

*City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500 (2019) ....................................23, 24

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992)..........................................16, 19, 24

*Costanich v. Dep't of Soc. & Health Services*, 627 F.3d 1101
  (9th Cir. 2010)..........................................................................13, 14, 15, 16

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) .........................................12, 16

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) ..................17, 19, 20, 24

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir. 2003) .................16, 19, 20

*D.C. v. Wesby*, 138 S.Ct. 577 (2018)...........................................................................24

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ........................................12, 19, 20

*Gausvik v. Perez*, 345 F.3d 813 (9th Cir. 2003) .........................................................13

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014) .........................................................20

*Jones v. Williams*, 297 F.3d 930 (9th Cir. 2002) ...........................................................7

*Kisela v. Hughes*, 138 S.Ct. 1148 (2018) .....................................................................23

*Milstein v. Cooley*, 208 F.Supp.2d 1116 (C.D. Cal. 2002).........................................13

*Pearson v. Callahan*, 555 U.S. 223 (2009) .................................................................24

*Saucier v. Katz*, 533 U.S. 194 (2001) ....................................................................23, 24

*Shafer v. County of Santa Barbara*, 868 F.3d 1110 (9th Cir. 2017) ..........................24

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ...................................................passim

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009).............................................passim

*Tatum v. Moody*, 768 F.3d 806 (9th Cir. 2014) ..........................................................22

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1795067.1

1

## **TABLE OF AUTHORITIES**

2

**Page**

3

### **FEDERAL CASES**

4

*Tekoh v. County of Los Angeles*, No. CV 16-7297-GW(SKx), 2018

5

   WL 9782523, *10 (C.D. Cal. Mar. 8, 2018)......................................................16

6

*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir. 2021)...........................................24, 26

7

*Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008) ....................................23

8

*United States v. Miller*, 984 F.2d 1028 (1993) ....................................................19

9

*United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) ..........................................19

10

*United States v. Wolf*, 813 F.2d 970 (9th Cir. 1987) ....................................................19

11

12

13

14

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1795067.1

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.    INTRODUCTION

Plaintiffs motion for partial summary judgment is brought against only one Defendant, Sergeant Lord and seeks to adjudicate a single issue: "Liability for Procedural Due Process Claims (False Police Reports) against Defendant Lord." (Dkt. 73.) To support their motion, Plaintiffs have set out 564 separate facts, which they claim are material and undisputed. They are not. Plaintiffs' facts are redundant and largely irrelevant. They stray far afield of what is material and undisputed. Many of Plaintiffs facts address conduct by other officers or detectives. Many of them aren't even facts at all but are Plaintiffs' counsel's argument, speculation or surmise. Many of their facts are not supported by admissible evidence. When Plaintiffs' motion is stripped of the irrelevant, non-supported facts and Plaintiffs' counsel's hyperbole, it is clear the motion should be denied.

### 2.    FACT SUMMARY

#### A.    Background facts

The night before the shooting (March 19, 2011), Aaron and Nina attended a house party hosted by Andrew Tran ("Puffy"), which was attended by members of two allied street gangs, TRG and Hellside. At around midnight, attendees of Puffy's party got into their cars and disbursed to other locations. Many drove to Stonecress Park where plans were made to go after rival gang members.

At around 2:00 a.m. on March 20, 2011, members of TRG and Hellside met in the parking lot of Phi Hong billiards club at Westminster and Harbor. TRG and Hellside members engaged in a verbal confrontation with members of rival gangs. After the confrontation, TRG member Puffy chased a rival gang member's car out of the parking lot and onto Westminster. Friends or affiliates of Puffy gave chase, collectively boxing in the victims' car and facilitating the shooting. (Lord's Statement of Genuine Disputes of Material Fact ["SGD"] 56)

///

1795067.1

The shooting occurred on Westminster. (SGD-53) Shots were fired from one car into another, one person was killed, another injured. (SGD-54) Cell phone data did not conclusively rule in or out the possibility that Aaron and Nina were at the location of the shooting when it happened. (SGD-46,59) Witnesses, however, reported that Aaron and Nina were at Stonecress Park and Phi Hong. John "Ryder" Nguyen unequivocally placed Aaron and Nina in the poolhall parking lot after they left Stonecress Park. (SGD-510) Anthony Nguyen unequivocally identified Aaron as being at the poolhall. (SGD-511) Leesa said she was in the Phi Hong parking lot with Skyler, Puffy, Aaron, Nina, Alex and Julie. (SGD-146) Alex was riding in Aaron's car with Nina and he said they were driving up and down Westminster that night. (SGD-156,200)

One month after the shooting, on April 20, 2011, Nina and Aaron were among many individuals interviewed by GGPD. (SGD-81) At the time, Nina was 17 years old. (SGD-452) She had been involved in a year-long romantic relationship with Aaron, who was 10 years her senior. (SGD-61, 74 [Nina was sharing a bed with Aaron when GGPD requested an interview], 452) She also regularly and knowingly hung out with gang members; she went to parties most weekends, drank alcohol and sometimes used drugs. (SGD-21-23,452)

Nina's interview was in two parts and together lasted a little more than two hours, excluding breaks. (Plaintiffs' Ex. 1(a),2(a))

During the first interview, Nina was questioned separately from Aaron. Between the two interviews, Plaintiffs claim Martin conducted an unrecorded interrogation of Nina at which Lord was not present nor did he witness it. While Martin's alleged conduct was not constitutionally excessive and did not cause a deprivation of rights, this conversation also is not relevant to the Plaintiffs' motion because an individual can only be held liable under section 1983 upon a showing of personal participation in the alleged deprivation. *Jones v. Williams*, 297 F.3d 930, 934-935 (9th Cir. 2002). For part of the second interview, Aaron and Nina were

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

7

1    questioned together and also were left alone together.

2        Nina understood if she needed to use the restroom or to get something to eat or

3    drink, and if at any time she wanted to stop talking, she could. (Plaintiffs' Ex. 1(a),

4    8:09) Lord explained that if at any time she wanted to talk to her parents, she could

5    and they would arrange it. (Plaintiffs' Ex. 1(a), 8:09; SGD-80,82)  In April 2011, Nina

6    was staying alone in her apartment with a 20-year-old cousin while her mom was out

7    of the country. (SGD-80) Nina never asked to call her mother while she was at GGPD.

8    (SGD-80)

9        **B.    Lord's first interview of Nina**

10       Nina initially denied knowing anything about the night of the shooting, saying

11   many times she did not remember being at Phi Hong. (SGD-95,179,180,182,192)

12   Nina was told multiple times to tell the truth. (SGD-84,89,113,357) Many times, Lord

13   and the other detectives expressed disbelief at some of Nina's statements, said she was

14   lying and/or that they didn't believe her or words to that effect. (SGD-

15   129,187,152,190) Lord and the other detectives told Nina they had proof she and

16   Aaron were at Phi Hong, some of which proof they did not have. (SGD-

17   86,87,89,100,106,131,134,135) Nina told Lord that at some point in the evening they

18   went to a Vietnamese restaurant (SGD-96) and after that to Aaron's friend Tony's

19   house. (SGD-101) Then she said that everyone split up and went home after the

20   Vietnamese restaurant. (SGD-103) She also mentioned going to M&M, a donut shop.

21   (SGD-133,136,306,336)

22       Raising his voice, Lord told Nina he knew she did not go home because she was

23   seen in the car with Aaron at the poolhall. (SGD-104,105) Lord and the other officers

24   told Nina the quicker she told the truth, the sooner she could get out of there. (SGD-

25   108,109,110,188,190)

26       Eventually, Nina admitted they had been to a park. (SGD-111) Nina told the

27   officers they were following someone – chasing after someone; they were looking for

28   POV. (SGD-115) Asked where the plan was made to look for enemies, Nina said, "I

1795067.1

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

think it was at the park." (SGD-124) Nina said she knew they "were looking for them to beat 'em up." (SGD-125)

An unidentified officer asked, "So I'm going to ask you straight out, were you at the billiard hall at Brook … at Harbor and Westminster?" (SGD-135) To which Nina replied, "Yes we were." (SGD-135) After that, Nina claimed she was getting her days mixed up and whether it was Phi Hong or 2000 Billiards. (SGD-147) Yet Nina also told officers she played pool with Aaron and Alex on the night of the shooting. (SGD-156) Nina acknowledged she was telling Lord different stories. (SGD-158) At Aaron's criminal trial Nina testified she told the officer they went to the poolhall and that she wasn't lying to the officers. (SGD-40)

Sometimes, Nina told the officers she was referring to 2000 Billiards rather than Phi Hong. (SGD-160,168,183,184) Nina and the detectives discussed that 2000 Billiards is located on Garden Grove Boulevard, five miles from Phi Hong. (SGD-170) Nina told officers they were following CJ onto Westminster and then they lost him. (SGD-162) Lord showed a photo of Phi Hong to Nina during her interview. (SGD-165) Nina equivocally stated she did not remember being there; however, at times Nina also said she was at Phi Hong. (SGD-164,195,196)

## C.   Lord's second interview of Nina

Nina briefly cried a couple of times, but the video evidence also shows that each time she cried, she calmed down and was able to resume being interviewed. (SGD-245,246,289,447) Nina said, "I was there, but I don't remember … seeing Phi Hong in the parking lot where McDonald's was. Okay, I was there, but I don't remember." (SGD-324) Then, Nina described the events she said took place at Phi Hong. (SGD-329) Nina said they drove on Westminster to Tony's house. (SGD-342)

Farley asked Nina whether they left the poolhall on Harbor. (SGD-353) Lord clarified that Nina said they went down Westminster. (SGD-354) Nina said she saw the cars trapping another car, a white Honda. (SGD-360,361) Nina explained that CJ told Aaron to follow the black car, which would trap the white car. (SGD-362) Nina

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1   stated they were not part of the trapping, but they were behind the car that was doing

2   the trapping. (SGD-363)

3       Before Aaron was in the room, Nina drew a diagram mapping how the cars

4   were trapping the white car. (SGD-364) Before creating the diagram, Nina told the

5   officer (presumably Lord) she and Aaron and Tony had been in the parking lot of the

6   poolhall and they left to go to Tony's house and when they left, they drove on

7   Westminster. (SGD-36-39) After Nina said they had been on Westminster, Lord said

8   "I want you to draw me a picture …. of the way that you saw the cars." (SGD-36-39)

9   And Nina said "okay." (SGD-36-39,364) Lord then said, "Draw Westminster, *just*

10  *draw a street*." (SGD-36-39,364) Nina then chose to draw Westminster. (SGD-36-39)

11  As she was drawing, Nina explained where CJ's and Aaron's cars were. (SGD-367)

12  Lord then points to Nina's drawing and asks, "Are these the lanes?" (SGD-368) Nina

13  replied, "Yeah," and then drew some lines. (SGD-368) As she was drawing, Nina

14  explained "I think this … was Puffy" and "the white car was in front of us," and "CJ

15  went further and then after we just lost them." (SGD-369)

16      Later, Farley showed Nina an aerial photo of the Phi Hong parking lot. (SGD-

17  392) Using the aerial, Nina showed which way they turned to get onto Westminster.

18  (SGD-395) Nina testified at deposition that no one at the police station held her hand

19  and made her draw the diagram, and no one made her draw anything specific. (SGD-

20  35) When Aaron was brought into the interview room with Nina, Lord showed Aaron

21  the diagram, telling him Nina had drawn the picture indicating Aaron and Puffy and

22  CJ were by the poolhall. (SGD-404,406) It was then, and not before, that Nina said the

23  diagram represented events by Mile Square Park. (SGD-373, 407,408,409,419,420)

24      **D.    DDA Feldman's charging decision**

25      Feldman made the decision as to who to prosecute. He participated in

26  conversations with various detectives on April 20, 2011, while the interviews of

27  witnesses and suspects were ongoing. (SGD-228) Feldman learned the substance of

28  what was being said in the interviews, and he suggested putting Aaron and Nina in a

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

10

1795067.1

room together. (SGD-233,235)

Feldman did not rely on the completeness, accuracy and truthfulness of the police report because he is aware that police reports are summaries and never have all details. (SGD-490) Feldman understood that police reports are not intended as transcriptions. (SGD-490) The DVDs of all interviews were personally delivered to the OCDA and turned over to Aaron's defense counsel in 2011. (SGD-490-496,498-508,526-527,533-545,548-555; see also Reynolds' and Schriver's declarations)

### E.    Nina's criminal trial testimony

Aaron's defense counsel objected to the use of Nina's statements to GGPD as coerced. (SGD-528) The trial court allowed Nina to testify.

Nina testified she made statements during her interview indicating she and Aaron had been to Phi Hong. (SGD-32) Nina testified she had no memory of being at Phi Hong, but also testified she and Aaron were there. (SGD-33) She also testified that Tony told Aaron to go to the poolhall after the restaurant. (SGD-33) Nina explicitly denied lying to the officers when she told them they had been to the poolhall. (SGD-33) Nina testified as follows:

> Q    … Ms. Nguyen, did you go to the pool hall in a car driven by your boyfriend at the time Aaron Nguyen?
>
> A    No.
>
> Q    Did you tell the officers that you did?
>
> A    Yes.
>
> Q    Were you lying to the officers?
>
> A    No.
>
> Q    Who did you see when you got to the pool hall?
>
> A    I did not see any – it was dark. I couldn't see anyone. (SGD-33)

Nina also testified at the criminal trial that Aaron had told her to lie to the police and tell them she had been at home watching a movie. (SGD-405)

///

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

### 3. **LORD DID NOT FABRICATE EVIDENCE**

The right to substantive due process contained in the Fourteenth Amendment may be violated where the government subjects the plaintiff to criminal charges based on deliberately fabricated evidence. *Devereaux v. Abbey*, 263 F.3d 1070, 1074-1075 (9th Cir. 2001). "The standard for showing a Fourteenth Amendment substantive due process violation … is quite demanding." *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir. 2009). "[O]nly the most egregious official conduct" is "arbitrary in the constitutional sense," and constitutes a violation of substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation and quotation marks omitted). Thus, a Fourteenth Amendment claim is cognizable only if the abuse of power "shocks the conscience" and "violates the decencies of civilized conduct." *Id*.

"Fundamentally, the plaintiff must first point to evidence he contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). Then, the plaintiff must prove that the falsification was deliberate. *Id*.

A plaintiff can prove intent (i.e., deliberateness) in one of three ways. A plaintiff can produce direct evidence. *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir. 2017). Alternatively, a plaintiff can produce two types of circumstantial evidence: "(1) [d]efendants continued their investigation … despite the fact that they knew or should have known that [the plaintiff] was innocent; or (2) [d]efendants used investigative techniques that were so coercive and abusive that they knew or should have known that those techniques would yield false information." *Devereaux*, 263 F.3d at 1076.

Regardless of the method chosen, the plaintiff must prove the officer deliberately fabricated evidence. "Failing to follow guidelines or to carry out an investigation in a manner that will ensure an error-free result" does not rise to the level of a constitutional violation, and "mere allegations that defendants used interviewing techniques that were in some sense improper, or that violated state regulations, without more, cannot serve as the basis for a claim under [Section] 1983." *Devereaux*, 263 F.3d at 1075-1077; see also *Gausvik v. Perez*, 345 F.3d 813, 817 (9th

12

Cir. 2003). Further, the "fact that the plaintiff's conviction was reversed … does not prove innocence nor does it show that the defendants should have known that [the plaintiff] was innocent at the pre-prosecution stage of the case." *Milstein v. Cooley*, 208 F.Supp.2d 1116, 1123 (C.D. Cal. 2002).

Plaintiffs must also prove the falsification was the cause in fact and proximate cause of Aaron's deprivation of liberty. *Caldwell v. City and Cty. of San Francisco*, 889 F.3d 1105, 1115 (9th Cir. 2018). These are "stringent" standards (*Gausvik*, 345 F.3d at 817) as a plaintiff must show "both a deprivation of her liberty and conscience shocking behavior by the government" to establish a substantive due process violation. *Brittain v. Hansen*, 451 F.3d 982, 991 (9th Cir. 2006); see also *Spencer*, 857 F.3d at 798. Plaintiffs failed to carry their burden on both intent and causation.

### A.    Plaintiffs failed to show Lord deliberately fabricated evidence

Plaintiffs make three claims about Lord's report: it failed to report Nina's "denials" at being at Phi Hong; it should have explained Lord manipulated Nina into creating the diagram; and it incorrectly stated Nina admitted to being at Phi Hong. As shown above, Nina admitted to being at Phi Hong after claiming not to remember and Lord did not coerce Nina to draw the diagram in a particular manner. Even if the Court finds minor discrepancies between Lord's report and that of the videorecording, those alleged discrepancies do not rise to the level required under the case law to prove deliberateness. Moreover, Lord's report was not admitted into evidence at the criminal trial, nor did it form the basis for DDA Feldman's charging decision. And Lord did not deliberately fabricate Nina's diagram.

### 1)    Plaintiffs advanced no direct proof of deliberateness

Alleged discrepancies or misstatements in Lord's police report cannot be the basis for Plaintiffs' deliberate fabrication claim because it was never evidence. At page 24, Plaintiffs cite *Spencer*, 857 F.3d at 793, and *Costanich v. Dep't of Soc. & Health Services*, 627 F.3d 1101, 1111 (9th Cir. 2010), for the proposition that false statements in police reports amount to direct evidence of deliberateness. Plaintiffs

miss a key distinction. In both cases, the report itself was the evidence that caused the loss of a liberty or property right. Such is not the case here.

In *Spencer*, Investigator Krause investigated reports of sexual abuse made by the plaintiff's daughter and prepared reports of her interviews. 857 F.3d at 793-794. "The interviews took place almost entirely in Krause's motel room and her rental car, without anyone else present." *Id.* at 795. Multiple reports were prepared by Krause describing in detail sexual abuse by the plaintiff of his two biological children and stepson. *Id.* at 796. The plaintiff pled guilty to statutory rape under a law allowing a defendant to maintain his innocence where there is apparent evidence of guilt. In the civil action, the plaintiff alleged that were it not for the contents of Krause's reports, he never would have pled guilty and spent nearly 20 years in prison. *Id.* at 802.

At the civil trial, the plaintiff put forward evidence that contradicted Krause's reports. Krause "attributed many quotations to Matthew," but at trial, Matthew testified that many of those quotations were fabricated. *Id.* at 795. Krause's report also "contain[ed] scores of specific, explicit quotations attributed to Kathryn," and again at trial, Kathryn testified that the substantive quotations were all fabrications. *Id.* "Kathryn testified at trial that, in fact, she denied to Krause that anyone had sexually abused her." *Id.* The Ninth Circuit affirmed the jury's finding in favor of the plaintiff, holding that the plaintiff had introduced evidence of deliberate fabrication that the jury was permitted to credit. *Id.* at 799. In sum, the investigator's reports contained what were identified as direct quotations from the alleged victims that the victims later recanted in the civil trial, and those reports were the reason for the injury.

In *Costanich*, the state revoked the plaintiff's foster care license and initiated guardianship termination proceedings based on an investigation undertaken by social worker Duron. Duron submitted a report during proceedings on the license revocation and a declaration in support of the guardianship termination, both of which contained "deliberately falsified statements." *Costanich*, 627 F.3d at 1111. The Ninth Circuit listed the false evidence: "Duron's report indicated that she had interviewed thirty-

four people. She later admitted that she had made only brief contact with eighteen of the individuals listed. …. The suggestion that she interviewed three of the therapists and received reports from a fourth lent credibility to her report, but, as Duron testified at the ALJ hearing, she did not actually speak to '[m]edical professionals.' … Other witnesses pointed out that the report contained evidence or statements they never made. … Duron purposely used quotation marks around many of the purported witness statements in her investigative report," including statements that were unequivocally refuted by those witnesses. *Id*. at 1112.

Like in *Spencer*, Duron's declaration and report, containing what were represented as direct quotations or nearly so, were *the evidence* that was used by the state to terminate the plaintiff's guardianship. *Id*. at 1105-1106.

Plaintiffs here argue that *Spencer* and *Costanich* stand for the proposition that false statements in police reports is proof enough to support a deliberate falsification claim. (Motion, p. 24.) Plaintiffs misread and misapply these cases. First, *Spencer* and *Costanich* recounted repeated instances where the investigator purportedly quoted a witness who later denied saying as much. In addition, both involved repeated instances where the investigator claimed to have conducted an investigatory step or met with a particular witness and then later denied ever having done so. At best, all Plaintiffs can point to here is that Lord's report should have been more akin to a transcription in its recitation of everything Nina said. No case law holds that officers are held to such a standard, or that failing to do so would rise to the level of a constitutional violation.

Plaintiffs focus much of their ire on a single sentence in Lord's report: "I showed Nina a picture of Phi Hong Billiards and she admitted she was there with Aaron." (Plaintiffs' Ex. 73-7, GG01273) Plaintiffs argue this sentence means that *when* he showed Nina a picture of the Phi Hong, she responded by admitting to being at Phi Hong. (SGD-491) Plaintiffs mischaracterize this sentence. At most, Lord's error was one of punctuation, using an "and" rather than a period. "I showed Nina a

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

picture," which is true. "Nina admitted she was at Phi Hong," which also is true. Plaintiffs have failed to cite any case law that holds poor draftsmanship equates to deliberately fabricated evidence.

The other important distinction between this case and that of *Spencer* and *Costanich* is that there, the document containing misstatements was the evidence that caused the harm. Here, the opposite is true. Feldman's charging decision was his own, and he affirmed that he considered the police reports as summaries that sometimes contain discrepancies. And it is undisputed that Lord's report was never evidence at the criminal trial.

### 2)    Lord's interview tactics do not "shock the conscience"

A claim that coercive interrogation techniques violated a plaintiff's right to substantive due process "is cognizable only if the alleged abuse of power 'shocks the conscience' and 'violates the decencies of civilized conduct.'" *Stoot v. City of Everett*, 582 F.3d at 928. "Conscience shocking" is, as the phrase implies, a very high standard, reserved for very low behavior. *County of Sacramento*, 523 U.S. at 846-47. Whether an interrogation is coercive is determined based on a review of the totality of the circumstances. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir. 2003) ("A coercive interrogation exists when the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will."). Mere coercion is not sufficient to prove a violation of substantive due process. *Stoot*, 582 F.3d at 928-929; *Tekoh v. County of Los Angeles*, No. CV 16-7297-GW(SKx), 2018 WL 9782523, *10 (C.D. Cal. Mar. 8, 2018).

### a)    More than mere coercion is required

The cases finding a substantive due process violation require more than mere coercion. The Ninth Circuit in *Stoot* discussed and distinguished the interrogation in *Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir. 1992) (en banc), from the facts before it:

> *Cooper*, for example, involved a calculated plan to ignore the suspect's Constitutional right to remain silent as well as any

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

request he might make to speak with an attorney …, to hold the suspect incommunicado, and to pressure and interrogate him until he confessed, in full recognition that such actions were unlawful under *Miranda* and would render any confession inadmissible at trial. This court described the officers' techniques as sophisticated psychological torture designed to extract a confession after hours of mistreatment, the twentieth-century inquisitorial version of the Star Chamber. *Stoot*, 582 F.3d at 929 (internal citations and quotations omitted).

The Ninth Circuit held the interrogation in *Stoot* did not meet that high threshold. That case involved the interrogation of a 14-year-old suspect, Paul, for two hours in the school principal's office. Officers suspected Paul of sexual abuse of a 4-year-old girl. Near the end of the interrogation, Paul confessed to the molestation.

Investigator Jenson did not contact Paul's parents before the interview. *Id*. at 914. Jenson questioned Paul for "close to two hours," during which Paul denied any wrongdoing. Paul claimed that Jenson threatened "heightened punishment if Paul denied guilt, and impermissible promises of leniency if he admitted guilt." *Id*. at 915. Paul's parents also claimed he was a developmentally delayed young boy who could not comprehend the promises and threats made by Jenson. *Id*. at 928-929. Paul's confession was excluded by the criminal trial court and the charges dropped. *Id*. at 912. In the civil case, the Ninth Circuit held that "[w]hile these allegations might be relevant to the question of whether Paul's confession was in fact voluntary and therefore admissible, … they fall below what is required to state a claim under the Fourteenth Amendment." *Id*. at 929.

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) (cited by Plaintiffs), is another example of interrogation tactics that meet this high threshold but that bears no resemblance to Lord's interview of Nina. In *Crowe*, three 14- and 15-year-old boys, Michael, Aaron and Joshua, were accused of the murder of Michael's

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

12-year-old sister. Michael's sister was stabbed to death in her bedroom while the family slept. Michael was interrogated four times. The third interview lasted more than three hours and took place at the police station. Michael asked to see his parents and expressed how stressful the days since his sister's murder had been. Michael repeatedly denied murdering his sister. The detective told Michael the police knew he killed her and that perhaps Michael doesn't remember doing it. Michael was interviewed a fourth time for more than six hours. *Id*. at 420. Throughout the six-hour interview, Michael repeatedly said he did not remember killing his sister. During that interview, the detectives offered to help him remember. *Id*. at 421. The detectives told Michael that if he confessed he would get help rather than go to jail. *Id*. at 422. Michael then told the officers he would be lying if he were to tell them he murdered his sister and his story would be wrong. The detectives latched onto Michael's statement as a confession. *Id*.

The detectives employed similar tactics in their interviews of the other two boys, who the detectives claimed supplied the knife. The detectives interrogated Aaron three times. The first time for 30-45 minutes, the second time for about 2 hours, and the third time for 9.5 hours at the police station. *Id*. at 423-424. Joshua was interrogated three times. The first interview lasted one hour; the second interview lasted 13. 5 hours, during which they denied Joshua's requests for sleep; and the third interview lasted approximately 12 hours with a two-hour break. *Id*. at 424-425. After the boys were charged with murder, DNA testing confirmed that a transient had murdered the sister. *Id*. at 417.

The Ninth Circuit held that the detectives' conduct "shock[ed] the conscience" and that Michael and Aaron "were isolated and subjected to hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." *Id*. at 432. The court held that the boys' interrogations were fairly described as "[p]sychological torture." *Id*.

///

1795067.1

The interview techniques and conditions of Nina's interview are nothing like those in *Crowe* or in *Cooper*. Lord's interview of Nina was roughly the same duration as that in *Stoot*, where the juvenile suspect was even younger than Nina; Nina was offered an opportunity to call her mother; Nina was offered food and water and restroom breaks; Nina was a mature 17-year-old, involved in a romantic relationship with 26-year-old Aaron and regularly partied with Aaron and his friends late into the night. The facts of this case do not meet the egregiousness standard required to prove a Fourteenth Amendment substantive due process claim t.

### b)    <u>Lord's interview was not coercive</u>

The interview tactics Lord employed were not coercive under the law or in effect. And the criminal trial court already ruled that Nina's statements, including the diagram, were not coerced.

At pages 26-27, Plaintiffs claim the following tactics were coercive: Lord told Nina to label the diagram with the street name, Westminster; Lord lied to Nina about having proof of her and Aaron's whereabouts; Lord told Nina she could go home as soon as she told the truth; and Lord accused Nina of lying.[1]

<u>None of these tactics are coercive under the law</u>. Telling a witness to speak truthfully is not police coercion. *Devereaux*, 263 F.3d at 1076-1077; *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir. 1997), overruled on other grounds in *United States v. Preston*, 751 F.3d 1008, 1019-1020 (9th Cir. 2014). Nor are accusations that the witness is lying. *Cunningham*, 345 F.3d at 810; *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir. 1987). Deception by the police is permitted and does not render a confession involuntary. *United States v. Miller*, 984 F.2d 1028, 1031 (1993). Police officers may constitutionally tell witnesses that they do not believe them, that they

---

[1] Citing Plaintiffs' UMF-436, Plaintiffs also accuse Lord of threatening Nina with conspiracy to murder when she denied being at Phi Hong or on Westminster. (Motion, p. 27.) However, UMF-436 purports to describe what Martin "suggested" to Nina. This accusation can be ignored as it does not describe personal participation by Lord. See *Jones,* 297 F.3d at 934.

19

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

must tell the truth, and that they can go home sooner if they tell the truth. *Devereaux*, 263 F.3d at 1076-77; *Amaya-Ruiz*, 121 F.3d at 494; *Cunningham*, 345 F.3d at 812. Police officers may promise police protection or even pay a witness for testifying. *Caldwell*, 889 F.3d at 1120. Case law further holds that police are not required to stop an interview when a witness becomes emotional, and failing to stop the interview does not make the interview coercive. *Cunningham*, 345 F.3d at 810. Just because "testimony that is incorrect or simply disputed" does not mean it was fabricated when "it turns out to have been wrong." *Halsey v. Pfeiffer*, 750 F.3d 273, 295 (3d Cir. 2014).

*Cunningham* is representative of interview tactics not violative of substantive due process that were more coercive than what Lord employed here. There, a daughter receiving custodial mental health treatment claimed her father sexually abused her. The father was interrogated for eight hours, he was not denied a break for food or water, he was denied a phone call with his therapist, and the detective, at times, raised his voice, but never yelled or used physical violence. 345 F.3d at 805-806. At the end of the interrogation, the father confessed to abusing his daughters. He was emotional and, at times, confused. *Id*. at 810. The detective then interviewed the two daughters. When he interviewed the daughter at the treatment facility, she denied any abuse by her father. But when but the detective "allegedly told her that she would have to stay at Pinecrest until she disclosed her father's abuse," she recounted incidents of abuse. *Id*. at 806. The father pled guilty and served five years in prison. The Ninth Circuit held that the father's interrogation was not coerced, explaining that "[o]ther cases finding coercion have been far more outrageous." *Id*. at 810.

Nina was not, in fact, coerced into giving a false statement. A coerced statement or confession is one that is later recanted or refuted with other evidence. For example, in *Crowe*, after the boys' confessed to murder, DNA evidence later proved that a transient was responsible for the murder.  In *Stoot*, the criminal court excluded all hearsay testimony about and from the alleged victim based on evidence that the victim

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

had a history of hallucinations and panic attacks for which she had received medical treatment. 582 F.3d at 917.

Nina admitted during the trial that she had told the officers she went to the poolhall in a car driven by Aaron and that she was not lying to the officers. She then testified about the events that happened at the poolhall that night. Plaintiffs point to the inconsistency and incoherence of Nina's statements in the police station as proof of coercion but have no sworn testimony or statement from Nina denying the truth of what she told the officers during her interview. Quite the opposite, she admitted she told the officers the truth and she maintained her "consistently inconsistent" version of events at the criminal trial. Plaintiffs have no evidence that Nina was, in fact, coerced into making a false statement.

The criminal court ruling finding no coercion is issue preclusive. It is well-established that rulings in criminal trials have collateral estoppel effects in civil cases. *Bagley v. CMC Real Estate Corp*., 923 F.2d 758, 762 (9th Cir. 1991) (A civil litigant may be estopped from re-litigating an issue that was "distinctly put in issue and directly determined in a previous criminal action."). On February 15, 2017, prior to Nina's testimony, Aaron's criminal defense attorney raised a challenge to Nina's statements to the police based on voluntariness. The trial judge was provided a copy of the transcript of Nina's police station interview. The court allowed Nina to testify about the diagram. (Ex. 73-24, P001416-P001460.) There has already been a judicial finding that Nina's interview at the police station was voluntarily made. The ruling was not appealed. (Ex. 73-41, P000004.)

Collateral estoppel should bar Plaintiffs from re-litigating the same issue that a competent judge already decided and that Aaron's defense attorney declined to appeal.

### 3)  **Lord did not violate *Brady***

There is no evidence that Lord failed to disclose exculpatory evidence. The Ninth Circuit discussed the standard for assessing a substantive due process violation in the context of a failure to disclose exculpatory evidence in *Tatum v. Moody*, 768

F.3d 806, 819 (9th Cir. 2014). There, law enforcement obtained "highly material" evidence that was "strongly indicative" and "nearly dispositive" of plaintiff's innocence just after plaintiff's arrest. They withheld and affirmatively misrepresented that evidence to prosecutors over the course of two years after plaintiff's preliminary hearing, during which time plaintiff remained incarcerated. Upon learning of the evidence, the prosecutor dismissed the charges against plaintiff. *Id*. at 818-820. In determining that law enforcement's failure to turn over exculpatory evidence to the prosecutor shocked the conscience and violated the plaintiff's due process rights, the Ninth Circuit emphasized, "the narrowness of the constitutional rule we enforce today, which is restricted to detentions of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks." *Id*. at 819-820.

The evidence shows that all the investigative materials were provided to the OCDA, who in turn provided it to Aaron's criminal defense counsel. It is immaterial that the police reports were not verbatim transcriptions of Nina's interview. Feldman testified that he does not rely on police reports because they are just summaries. He relies on, initially, the transcriptions and then the actual audio/video recordings, which is the evidence presented at trial. At bottom, all materials – including the video recordings that Plaintiffs rely on as proof of alleged fabrication – were promptly provided to Feldman and Aaron's defense counsel in compliance with *Brady*.

### B. **Plaintiffs fail to prove causation**

To establish causation, the plaintiff must show that the fabricated evidence was the cause in fact and the proximate cause of his injury. *Spencer*, 857 F.3d at 798. "Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury." *Caldwell*, 889 F.3d at 1115.

It is undisputed Lord's police report was delivered to the OCDA along with video recordings of the entirety of Nina's interview. In every instance in which Plaintiffs claim Lord's police report was inaccurate or fabricated, Plaintiffs cited to portions of the video recordings that were produced to the OCDA and ultimately to Aaron's defense counsel. Nowhere in Plaintiffs' separate statement do they cite to evidence of so-called fabrication by Lord with reference to something other than the videotaped interview of Nina. Plaintiffs simply do not like the way in which Lord described Nina's interview in his report. Plaintiffs have no evidence Lord withheld evidence from the OCDA or Aaron's defense counsel. Moreover, Feldman testified at deposition that he always treats police reports as summaries and relies instead on the videotapes of the interviews, and that he did so here.

## 4.  **LORD IS PROTECTED BY QUALIFIED IMMUNITY**

To the extent there is a finding that any of the above conduct resulted in a violation of Aaron's constitutional rights, Plaintiffs still would not be entitled to judgment in their favor because Lord is entitled to qualified immunity.

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019), citing *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018). Qualified immunity is a question of law and not a question of fact. *Torres v. City of Los Angeles*, 548 F.3d 1197, 1210 (9th Cir. 2008).

The qualified immunity defense involves two questions: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts . . . show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established" at the time of the officer's conduct. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The two step analysis is not required, however, when it is obvious that there was not a clearly established right at the time of the official's conduct and the court may "elect[] to 'bypass *Saucier's* first step and decide only whether [the alleged

1795067.1

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1   right] was clearly established.'" *Pearson v. Callahan*, 555 U.S. 223, 238 (2009). The

2   *Saucier* "rule does not - and obviously cannot - specify the sequence in which judges

3   reach their conclusions in their own internal thought processes. Thus, there will be

4   cases in which a court will rather quickly and easily decide that there was no violation

5   of clearly established law before turning to the more difficult question whether the

6   relevant facts make out a constitutional question at all." *Id*. at 239.

7       Importantly, the Supreme Court of the United States has repeatedly held that

8   "the clearly established right must be defined with specificity" and "not . . . at a high

9   level of generality." *City of Escondido, Cal*., 139 S.Ct. at 503, citing *Kisela*, 138 S.Ct.

10  at 1152. "The precedent must be clear enough that every reasonable official would

11  interpret it to establish the particular rule the plaintiff seeks to apply." *D.C. v. Wesby*,

12  138 S.Ct. 577, 590 (2018). "Otherwise, the rule is not one that 'every reasonable

13  official' would know." *Id*.

14      Further, Plaintiffs would have the burden to show that the rights allegedly

15  violated by Lord were clearly established in 2011, when he interviewed Nina and

16  prepared his report. See *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1118 (9th

17  Cir. 2017). Plaintiffs cannot meet this burden.

18      In *Tobias v. Arteaga*, 996 F.3d 571 (9th Cir. 2021), the Ninth Circuit had an

19  opportunity to consider whether coercion techniques used on a 13-year-old suspect,

20  similar in kind to those found in *Crowe* and *Cooper*, but for less than two hours, were

21  clearly established as "psychological torture" sufficient to establish a substantive due

22  process violation and overcome qualified immunity. In *Tobias*, officers were

23  investigating what was believed to be a gang shooting that occurred in 2012. Using

24  security video footage, gang enforcement officers identified Tobias as the shooter.

25  Tobias was brought in for questioning. Early in the interrogation, Tobias requested an

26  attorney, which was ignored. *Id*. at 577. Detectives lied to him, saying that someone

27  had given him up as the murderer, cursed at him, and told him that failing to confess

28  would make him appear a "cold-blooded killer." *Id*. Detectives told him that his mom

24

was in the building crying and that she had identified him in the video. *Id*. Detectives told Tobias that he would likely receive a harsher punishment if he continued to "lie" about not being the person in the video, and the judge would get him help if he confessed. *Id*. A detective told Tobias that "when we take the case to court they're going to think you're a big time gang killer who didn't want to tell the truth, who is down for the hood …. [that] you're so down for the hood that you didn't want to speak. So they might throw the book at you." *Id*. at 578. Tobias eventually confessed. Still in the police station after his confession, Tobias told his mother that he wasn't the person in the video, had no involvement in the murder and that the detectives forced him to confess. His mother went to the detectives and reported what her son had told her – that he only confessed because the officers told him he must. She also told the police that Tobias was crying and "scared to shit." *Id*.

At the criminal trial, Tobias moved to suppress his confession as unconstitutionally coercive, but the trial court denied the motion and the case went to trial. A jury convicted Tobias of murder. The Court of Appeal reversed the trial court's ruling on the motion to suppress, concluding that the detectives failed to respect his unambiguous request for an attorney.

Tobias brought a substantive due process claim under the Fourteenth Amendment. The district court denied the defendant officers motion for summary judgment raising qualified immunity. The Ninth Circuit reversed, holding that although "[t]his extended, overbearing interrogation of a minor, who was isolated from family and his requested attorney, comes close to the level of 'psychological torture' that we have held is not tolerated by the Fourteenth Amendment," Tobias's mistreatment was much shorter in duration than the type found in earlier cases. *Id*. at 585-586. The court held that the interrogation techniques used against Tobias did violate his substantive due process rights; however, the officers remained entitled to qualified immunity because the unconstitutionality of the use of such techniques on a 13-year-old for a two-hour period was not clearly established as of 2012. *Id*. at 586.

1795067.1

Lord submits that nothing he did violated Aaron's constitutional rights. But even if he did, at a minimum, Plaintiffs are not entitled to judgment because Lord is entitled to qualified immunity under *Tobias* because the aggressive interview techniques employed against a minor there were held not to be clearly unconstitutional as of 2011, the date of the events giving rise to this action.

## 5.    <u>CONCLUSION</u>

Based on the foregoing, Plaintiffs' motion should be denied in its entirety.

DATED:  October 20, 2023           WOODRUFF & SMART, APC


By: */s/Meredith D. Stewart*
CAROLINE A. BYRNE
MEREDITH D. STEWART
Attorneys for Defendants CITY OF GARDEN GROVE, a public entity; SERGEANT MARK LORD, an employee of City of Garden Grove, a public entity; DETECTIVE MICHAEL REYNOLDS, a former employee of City of Garden Grove, a public entity; and SERGEANT MIKE MARTIN, a former employee of City of Garden Grove, a public entity

///
///
///

1795067.1

1    The undersigned, counsel of record for Defendant SERGEANT MARK LORD,

2  an employee of Defendant City of Garden Grove, a public entity, certifies that this

3  brief contains 6,916 words, which complies with the word limit of L.R. 11-6.1.

4  DATED: October 20, 2023          WOODRUFF & SMART, APC

5

6

7                              By: */s/Meredith D. Stewart*_____
                                   CAROLINE A. BYRNE
8                                  MEREDITH D. STEWART
9                                  Attorneys for Defendants CITY OF
                                   GARDEN GROVE, a public entity;
10                                 SERGEANT MARK LORD, an employee of
                                   City of Garden Grove, a public entity;
11                                 DETECTIVE MICHAEL REYNOLDS, a
                                   former employee of City of Garden Grove, a
12                                 public entity; and SERGEANT MIKE
13                                 MARTIN, a former employee of City of
                                   Garden Grove, a public entity
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1795067.1

**PROOF OF SERVICE**

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On October 20, 2023, I served the foregoing document(s) described as **DEFENDANT MARK LORD'S OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

☐    by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐    **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒    **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐    **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐    **(BY PERSONAL SERVICE)** I delivered such envelope(s) by hand to the offices of the addressee(s).

☒    (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on October 20, 2023, at Costa Mesa, California.

*/s/Vilay Lee*_____
Vilay Lee

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1795067.1

1

## AARON NGUYEN v. CITY OF GARDEN GROVE, et al.

2

### USDC, CENTRAL DISTRICT OF CALIFORNIA
### CASE NO. 8:21-cv-01775-JVS (ADSx)

3

4

### ASSIGNED FOR ALL PURPOSES TO
### HONORABLE JAMES V. SELNA
### COURTROOM 10C
### MAGISTRATE JUDGE AUTUMN D. SPAETH
### COURTROOM 6B

5

6

### SERVICE LIST

7

8    Barrett S. Litt, Esq.                           Attorneys for Plaintiffs
     David McLane, Esq.                              **AARON NGUYEN, NGOC LE THI**
9    Lindsay Battles, Esq.                           **PHAN,    AND    HOANG    MINH**
     Rodrigo Padilla, Esq.                           **NGUYEN**
10   McLANE, BEDNARSKI & LITT, LLP
     975 East Green Street
11   Pasadena, CA 91106
     Telephone: (626) 844-7660
12   Facsimile: (626) 844-7670
     Email:  blitt@mbllegal.com
13           dmclane@mbllegal.com
             lbattles@mbllegal.com
14           rpadilla@mbllegal.com
             mbolanos@mbllegal.com

15

16   7/2023

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

29

1795067.1