BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
LINDSAY BATTLES, SBN 262862
Email: lbattles@mbllegal.com
RODRIGO PADILLA, SBN 339523
rpadilla@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660, Fax: (626) 844-7670

*Attorneys for Plaintiffs* AARON NGUYEN, NGOC LEE THI PHAN, AND HOANG MINH NGUYEN

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON NGUYEN, et al.<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF GARDEN GROVE, et al.<br><br>Defendants. | Case No.: 8:21−cv−01775−JVS (ADSx)<br><br>[Hon. James V. Selna]<br><br>**PLAINTIFFS' OPPOSITION TO CITY OF GARDEN GROVE MOTION FOR SUMMARY ADJUDICATION (DKT. 70)**<br><br><br>COMPLAINT FILED:    Oct. 26, 2021 |

# **TABLE OF CONTENTS**

I.   Introduction ...................................................................................................... 1

II.  Overview of Suppressed Exculpatory Information ..................................... 2

III. Substantial Evidence Supports Plaintiffs' §1983 Monell Theories ..................... 4

   A.  § 1983 Monell Liability Is Established by the Absence of Policies and Training Regarding Brady Obligations, Inclusion of Brady Material in Police Reports, and Necessity of Truthful Reporting ................................................. 4

      1.  *Monell Liability Exists Where a Police Agency Fails to Implement Training and Policies Regarding Disclosure of Brady Information* ............................. 4

      2.  *Garden Grove's Lack of Policies and Training on Brady Obligations Reflects a Gross Departure from Nationally Recognized Standards* ............. 5

      3.  *GGPD's Lack of Brady Policies & Training Were the Moving Force Behind the Pervasive Brady Errors in this Case* ........................................................ 7

      4.  *Deposition Testimony Reveals Widespread Misunderstanding of Brady Requirements* ...................................................................................................... 9

      5.  *Disclosure of Interview Recordings Does Not Permit Concealing Exculpatory Information from Reports* ......................................................... 11

   B.  GGPD Lacked Policies Concerning the Contents of Police Reports (and Requiring Truthful and Accurate  Reports) ..................................................... 14

   C.  GGPD Had No Mechanism for Review of Police Reports to Ensure Truthfulness, Accuracy and Inclusion of Brady Information .......................... 15

   D.  GGPD Entirely Lacked Training on Juvenile Interrogations .......................... 16

      1.  *GGPD Entirely Lacked Training on Juvenile Interrogations* ..................... 16

      2.  *The Absence of Training on Juvenile Interrogation Reflects a Departure from National Standards* ................................................................................. 18

   E.  Training for Academy Recruits  Does Not Negate the Responsibility to Implement Appropriate Policies and Training ................................................. 19

   F.  GGPD Had No Meaningful Oversight of Homicide Investigations ................. 20

IV. Conclusion ...................................................................................................... 22

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Brady v. Maryland*,
  373 U.S. 83 (1963) ........................................................................................4

*Carillo v. County of Los Angeles*,
  798 F.3d 1210 (9th Cir. 2015) ..............................................................4, 10

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ....................................................................................4

*Connick v. Thompson*,
  563 U.S. 51 (2011) ......................................................................................4

*Costanich v. Dep't of Soc. & Health Servs.*,
  627 F.3d 1101 (9th Cir. 2010) ..................................................................14

*Crews v. County of Nassau*,
  996 F.Supp.2d 186 (E.D.N.Y. 2014) ..........................................................5

*Cristini v. City of Warren*,
  2012 WL 5508369 (E.D.Mich. 2012) ..................................................5, 19

*Davis v. Clark Cnty., Wash.*,
  966 F.Supp.2d 1106 (W.D.Wash. 2013) ....................................................5

*Ferguson v. Short*,
  2014 WL 3925512 (W.D. Mo. Aug. 12, 2014) ..........................................5

*Giglio v. United States*,
  405 U.S. 150 (1972) ....................................................................................4

*Gregory v. City of Louisville*,
  444 F.3d 725 (6th Cir. 2006) ................................................4, 5, 6, 11

*Kirkpatrick v. County of Washoe*,
  843 F.3d 784 (9th Cir. 2016) ......................................................................4

*Liston v. Cnty. of Riverside*,
  120 F.3d 965 (9th Cir. 1997) ....................................................................13

*Manning v. Miller*,
  355 F.3d 1028 (7th Cir. 2004) ....................................................................7

*Montoya v. City & Cnty. of Denver*,
  2021 WL 1244264 (D. Colo. Mar. 4, 2021) ............................................16

*Newsome v. McCabe*,
  256 F.3d 747 (7th Cir. 2001) ....................................................................8

*Spencer v. Peters*,
  857 F.3d 789 (9th Cir. 2017) ..................................................................14

*Tennison v. City & Cnty. of San Francisco*,
  570 F.3d 1078 (9th Cir. 2009) ................................................................11

*United States v. Skilling*,
  554 F.3d 529 (5th Cir. 2009) ..................................................................11

*Williams v. Ryan*,
  623 F.3d 1258 (9th Cir. 2010) ................................................................10

# I.    Introduction

Defendant City of Garden Grove inappropriately seeks summary judgment on § 1983 *Monell* liability. Despite the City's assertions, there are significant disputes of fact as to whether Garden Grove implemented appropriate training and policies regarding: (1) disclosure of *Brady* material in police reports; (2) the requirement for truthful, objective and accurate reporting; and, (3) interrogation techniques known to yield involuntary, unreliable admissions from juvenile witnesses. The fact that detectives received basic training decades prior as new recruits, does not negate Garden Grove's responsibility to implement constitutionally adequate policies for detectives, particularly where there is no evidence to show the content of academy training/continuing education. It is impossible to know whether such training addressed the issues in this case, and even if so, what such training taught. (AMF-160-166, 174-182).

Plaintiff's prosecution and conviction hinged entirely on the statements of his former girlfriend, 17-year-old Nina Nguyen, which were extracted using coercive and abusive techniques that officers knew or should have known would yield false and unreliable admissions. During the interrogation, Lord directed Nina to draw a diagram, which he distorted by instructing her to write "Westminster" even though she indicated, while drawing, that it depicted a location 3.6 miles from the crime scene. Beyond coercing Nina's false statements and diagram, Detective Lord fabricated a police report affirmatively misrepresenting Nina Nguyen's first interrogation – stating she confessed to being at the Phi Hong (crime scene) and confirmed she was there when shown a photo of the Phi Hong building/sign. The opposite occurred. In viewing the photo, Nina emphatically denied being present, and denied it a total of 10 times during the first interview. (AMF-44-49, 54-63, 68-69). In addition to this critical, affirmative misrepresentation, Lord's report omitted material exculpatory information, as detailed in Section II, below.

Plaintiffs assert §1983 due process claims against Defendant Officers for deliberate fabrication of evidence and failure to disclose material, exculpatory evidence. Plaintiffs assert *Monell* liability on the basis that GGPD entirely lacked policies and

training regarding the inclusion of *Brady* information in police reports. GGPD also lacked policies and training on the contents of reports, including policies requiring officers to truthfully and accurately summarize witness interviews, and make reference to all *Brady* information. GGPD had no mechanism for supervisory review of reports and effectively failed to supervise homicide investigators. (AMF-12-14, 106-112, 114-124).

Plaintiffs also assert *Monell* liability on the basis that GGPD lacked constitutionally sufficient training on juvenile interrogations. GGPD did not train detectives that juveniles are at risk greater risk for false confession, or to exercise caution in interrogating juveniles. GGPD provided no training on how to avoid involuntary confessions (in any context), nor did it train detectives on the limits of deception during interrogations. (AMF-125-152).

## II.    Overview of Suppressed Exculpatory Information

We provide a brief overview of the facts most relevant to Plaintiffs' *Brady* claims. The facts concerning Nina's interrogation and mischaracterizations in Detective Lord's report are more fully explicated in Plaintiffs' Motion for Partial Affirmative Summary Adjudication and Plaintiff'' Opposition to the Individual Officers' MSJ.

The exculpatory information omitted from Lord's report falls into several categories: First, Lord omitted information that critically impeached Nina's short-lived admission: (1) Nina described the Sergeant yelling in her face, pointing and cursing during an off-camera confrontation between sessions; (2) Nina denied being present at the Phi Hong at least 16 separate times, including 12 times before making any admission; (3) over six hours, a team of four detectives applied highly coercive interrogation techniques including relentlessly lying to Nina about purportedly incontrovertible GPS and video evidence placing them at the crime scene (no such evidence existed), incessantly accusing her of lying (20x), promising she could just go home if she would tell "the truth," and threatening worse trouble if she didn't tell "the truth"; (4) Nina's first admission was not until 1:02 p.m., six hours after detectives pulled her from bed and 5 hours after the first interview began; (5) Nina unequivocally and repeatedly

recanted her short-lived admissions; and (6) in very significant ways, Nina's admissions – both oral and her diagram – contradicted the known facts of the case, indicating that she did not, in fact, have a memory of being at the crime scene. (AMF-45-48, 54-67).

Second, Lord omitted details that created a materially misleading description of Nina's statements: (1) Lord directed her to write "Westminster" on her diagram, mischaracterizing it as an admission of being present at the scene and failing to state it was written at his direction; (2) Nina told Lord that the diagram showed where they pulled off to "the restaurant" a location 3.6 miles from the crime scene; (3) Lord's report gave the impression that Nina/Aaron participated in trapping a car when she twice, clearly denied that they played any role in trapping a car. Due to these omissions, the prosecutor lacked the information necessary to understand that Lord transformed the diagram into a false admission of guilt. (AMF-68-70).

Third, Lord's report omitted significant information demonstrating that Aaron and Nina had a social relationship with people in the victim group, confirming the absence of any gang affiliation and undercutting any theory that they intended to participate in a gang attack: (1) Nina described playing pool with Aaron and three members of the *victim* group at a different pool hall (2000), on a different day, indicating a social relationship and thus lack of motive to join an attack; (2) Aaron described learning about the shooting from Jenny Do, the girlfriend of someone in the victim group (also indicating a social relationship with the victims). This was classic *Brady* material because it was necessary to understanding Nina's description of being at a different poolhall (on a different day), and because it negated any motive. (AMF-71-77).

Finally, Lord misleadingly stated that three eyewitnesses placed Aaron at the Phi Hong while excluding exculpatory information undermining the purported identifications. (AMF-78-80, 83-87).

### III.   Substantial Evidence Supports Plaintiffs' §1983 Monell Theories

**A.      § 1983 Monell Liability Is Established by the Absence of Policies and Training Regarding Brady Obligations, Inclusion of Brady Material in Police Reports, and Necessity of Truthful Reporting**

A municipality's failure to train and/or promulgate constitutionally adequate policies gives rise to §1983 liability if the deficiency is closely related to the ultimate injury and reflects deliberate indifference to civil rights. Deliberate indifference requires disregard for a "known or obvious consequence of [its] action." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). It exists where the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers…can reasonably be said to have been deliberately indifferent." *Id*. (quoting *City of Canton v. Harris*, 489 U.S. 378, 390 (1989)). Though deliberate indifference "ordinarily" requires a pattern of similar constitutional violations, *Connick*, 563 U.S. at 52, it also exists where a violation of rights is "a highly predictable consequence" of a failure to equip law enforcement officers with specific skills or training to handle *recurrent* situations. *Id.* at 52; *Canton,* 489 U.S. at 390; *Kirkpatrick v. County of Washoe* , 843 F.3d 784, 794, 796-797 (9th Cir. 2016); Model Civ. Jury Instr. 9th Cir. 9.7 (2007) (no requirement of recurrent pattern included).

**1.      *Monell Liability Exists Where a Police Agency Fails to Implement Training and Policies Regarding Disclosure of Brady Information***

The constitutional right to be free from prosecution or conviction on the basis of undisclosed, material exculpatory evidence was established with the U.S. Supreme Court's 1963 landmark decision, *Brady v. Maryland*, 373 U.S. 83 (1963); *Giglio v. United States*, 405 U.S. 150 (1972) (exculpatory evidence includes impeachment evidence). Since at least as early as 1984, clearly established law provided that *Brady* obligations applied to police officers. *Carillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015).

The failure to train police officers in the handling of exculpatory information supports *Monell* liability, even absent a pattern of prior violations. *Gregory v. City of*

*Louisville*, 444 F.3d 725, 753 (6th Cir. 2006); *Ferguson v. Short*, 2014 WL 3925512 (W.D. Mo. Aug. 12, 2014); *Crews v. County of Nassau*, 996 F.Supp.2d 186, 210 (E.D.N.Y. 2014); *Davis v. Clark Cnty., Wash.*, 966 F.Supp.2d 1106, 1137 (W.D.Wash. 2013); *Cristini v. City of Warren*, 2012 WL 5508369 at *12-13 (E.D.Mich. 2012).

As these decisions recognize, failure to train on this significant "constitutional component" of officers' job carries the highly "predictable consequence" of due process violations. While officers will routinely encounter exculpatory information during investigation, there is no reason to assume they understand *Brady* obligations when they join the police force. *Gregory*, 444 F.3d 725, 753 (6th Cir. 2006) ("Widespread officer ignorance on the proper handling of exculpatory materials would have the 'highly predictable consequence' of due process violations."); *Cristini*, 2012 WL 5508369 (need for training is "obvious" because: (1) investigators will assuredly encounter evidence contradicting their working theory and/or exonerating a suspect, (2) officers are "not generally familiar with *Brady's* principles or equipped to do the necessary legal research to become familiar with those principles," and (3) failure to disclose carries potentially "serious consequences, such as the conviction of an innocent person.").

### 2. Garden Grove's Lack of Policies and Training on Brady Obligations Reflects a Gross Departure from Nationally Recognized Standards

GGPD had no policies or formal training addressing *Brady* disclosure requirements, and therefore no guidance defining "exculpatory evidence," providing examples of exculpatory evidence, or explaining officers' duty to memorialize and relay exculpatory information. GGPD had no policies or training requiring the inclusion of Brady information in police reports. (AMF-2, 12-14, 106). Instead of adopting appropriate policies, GGPD relied on officers' decades-old, basic academy training and non-standardized, continuing education courses. There is no evidence that basic training received by the detectives in this case addressed *Brady*, nor is there any evidence of *what* they learned about *Brady* in continuing education courses. (AMF-160-165, 174-182).

GGPD's complete absence of policies and training on Brady obligation reflects a gross departure from national standards.[1] (AMF-16-17); *See Gregory* 444 F.3d at 753 (6th Cir. 2006) (genuine issue of fact where deposition testimony supported the inference that officers generally did not receive training on handling exculpatory evidence coupled with expert testimony that police department's training on exculpatory evidence was non-existent). As policing expert Andrew Boan explains, at a minimum, an effective Brady policy summarizes the constitutional rule, explains the agency's affirmative duty to report material of possible Brady significance, and defines key terms (e.g. "exculpatory") according to the law. (AMF-4).

Most major police departments belong to the International Association of Chiefs of Police ("IACP") and use their guidelines and training recommendations. With regard to *Brady* policies, the IACP has explained:

> "Law enforcement has… an 'affirmative duty' to report information that may impact the determination of a court or a jury as to a defendant's guilt or sentencing. This means simply that a department must take positive steps or demonstrable measures to uncover and reveal *Brady* material. Failure to take such steps, or in the worst-case scenario, suppression of evidence or information that is favorable to the accused, is a violation of due process."

(IACP, Concepts and Issues Paper re Brady Disclosure Requirements). The IACP's Model Brady policy defines the term "exculpatory" and provides examples, including "information that casts doubt on the credibility or accuracy of a witness or evidence" and statements in whatever form that contradict any statement of a proposed government witness. (AMF-6-7).

Successful implementation requires department wide training, which must not only address the procedure for compliance, but also the factors that tend to undermine

---

[1] As recognized by the Commission on Accreditation for Law Enforcement Agencies (CALEA), it is the responsibility of police departments to ensure that officers understand and comply with constitutional rules. Police agencies are therefore responsible for implementing constitutional requirements through department policy and training. (AMF-1).

compliance, including officers' tendency to discount evidence that does not fit their theory of guilt. As the IACP explains:

> This training should be designed to ensure not only a full understanding of the *Brady* rules, but also an awareness of the so-called "tunnel vision" phenomenon.[2] This phenomenon tends to cause some investigators to ignore information that does not support their theory of a case. This type of information is often likely to be exculpatory as defined under the *Brady* rules. Unfortunately, it is also the type of evidence that, being considered "irrelevant" by investigators, is often discarded or even destroyed.

(AMF-8-9).

Lastly, the IACP emphasizes supervisory oversight and accountability. The IACP model policy provides that "[s]upervisory officers are equally responsible for ensuring that they act with due diligence in identifying any potential *Brady* material connected with any criminal proceeding for which they have oversight and for bringing such material to the attention of the prosecutor in a timely manner through established reporting procedures." (AMF-11.).

### 3. GGPD's Lack of Brady Policies & Training Were the Moving Force Behind the Pervasive Brady Errors in this Case

GGPD's lack of policies and training were the moving force behind the pervasive omissions of exculpatory information from Lord's report as detailed in Section II, above. Lord created a materially misleading description of Nina's statements while depriving the prosecutor of critical impeachment evidence, including information concerning the coercive tactics used to extract her admissions. (AMF-44-77). *Brady* requires officers to disclose when they have presented false statements, fabricated evidence or have undermined the integrity of evidence through investigatory misconduct. *Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (FBI agents failed to tell prosecutors they

---

[2] Michael Reynolds, in his deposition, testified that tunnel vision has no meaning in the context of, and is not a concern for, homicide investigations. Reynolds Tr., pp. 276:24 – 277:24. (AMF-10).

induced false witness statements and submitted false written reports); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (failure to disclose officers' coaching of witnesses violated *Brady*).

Failure to implement policies leaves employees in the dark, with the expectation that they will intuitively divine the expected course of action. (AMF-18).. Deposition testimony adduced in this case confirms that, in the absence of formal policies and training, GGPD homicide detectives decided for themselves what information to memorialize. Their testimony reflects an astonishing misunderstanding of their *Brady* obligations. Detectives believed they had discretion to omit exculpatory information where they did not find it persuasive or believed it was outweighed by inculpatory information. For example, detectives believed they were not required to report information they subjectively disbelieved, even where such information held obvious exculpatory value. (AMF-19-42).

Sgt. Lord, testifying in his capacity as a 30(b)(6) witness, could not say whether detectives (1) are trained and expected to include all relevant information in their police reports; (2) are required to include in their reports exculpatory information (including, for example, both supporting and conflicting information or both positive/negative information) (3) must include exculpatory witness statements that detective subjectively disbelieves; (4) must include both denials/admissions; (5) required to include information that tends to undermine the reliability of an eyewitness identification. (AMF-22-37). Lord could not say whether a police report that included a witnesses' admissions regarding presence at a crime scene, yet omitted their denials on the same topic, was an objective or accurate description of the interview. Lord could not say whether "information that undermines the reliability of an eyewitness identification constitutes exculpatory information." As the current CAP sergeant, responsible for supervising all homicide detectives, Sgt. Lord was not sure if he would have concerns about a report that included admissions, yet excluded denials. (AMF-27, 33-34).

Other GGPD detectives testified they could choose to exclude material, exculpatory information from police reports depending on their own, subjective

8

assessment of whether the information was persuasive, true, or outweighed by other information. Defendant Mike Reynolds, lead homicide detective on the Phi Hong shooting case, testified that he had "no concerns" that Detective Lord's police report entirely omitted Nina Nguyen's multiple references to the 2,000 club, even though Nina clearly explained that her memory of being at a pool hall was playing pool at 2,000, on a different day, with a group including three individuals from the victim's SUV. According to Reynolds, omitting the nine refences to 2,000 was excusable because "she might be lying," indicating that Reynolds believed detectives could choose to exclude obvious *Brady* material based on subjective determinations of the witness's credibility. Remarkably, Reynolds testified he would not have expected the police report to include Nina's repeated denials that she had been at the Phi Hong. (AMF-38-40, 71).

Sgt. Martin was the supervisor in charge of CAP in 2011. He testified he had no concerns with Lord's brazen mischaracterization that Nina viewed the photo of the Phi Hong and admitted being present, when Nina denied being present immediately upon viewing it. Martin explained the discrepancy was not concerning because the report is a synopsis, and because "Lord is an honest person and I don't think Nina was being honest." (AMF-41). This testimony reflects a profound misunderstanding, even on the part of supervising officers, of the obligation to include critical, exculpatory evidence, regardless of the officer's subjective belief of the witness's credibility. [3]

### 4. *Deposition Testimony Reveals Widespread Misunderstanding of Brady Requirements*

*Brady* errors also pervaded the reports of other detectives. Detective Peter Vi's report summarizing his interview of Leesa Huynh indicated that she placed Aaron at the Phi Hong parking lot, but omits that she did **not see** Aaron's car; rather, she assumed he

---

[3] This testimony contradicts <u>2009</u> POST academy training (effective in 2011), which trains officers to prepare true, unbiased, unprejudiced, complete, accurate and objective reports, providing a factual and objective accounting of the relevant facts, and carefully, precisely and impartially documenting all relevant information. 2009 POST LD 18, p. 1-12. . Complete reports necessarily include "both supporting and conflicting" information." (AMF-102-105).

was present because she saw him later, "in the neighborhood," after the shooting. The report incorrectly stated Aaron's gang affiliation was "unk," when Leesa in fact stated that Aaron could hang out with any group, indicating he was **not** a gang member. (AMF-79-80, 83-84).

Detective Loffer's report summarizing his interview of TRG John Nguyen, indicated John identified Aaron's car in the parking lot. Loffler omits that John told detectives he did *not* see Aaron's car when cars pulled onto Westminster; John assumed Aaron left before everything happened. This statement undercut John Nguyen's identification and held obvious exculpatory value. It was omitted from Det. Loffler's report.[4] (AMF-85). *See Carillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015) (failure to disclose information undermining an eyewitness identification's reliability – including hesitancy, incorrect details and identification of two people – violates police officers' obligations under *Brady*); *Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) (alternate suspect evidence is classic *Brady* material). (AMF-86-87).

Detective Vaicaro described that Anthony Nguyen said he saw Aaron's *Camry* parked at the McDonald's (near the Phi Hong). Anthony later identified the only potential Camry in the surveillance video as "the girls car," an exculpatory detail that was omitted from Vaicaro's report. Detectives knew two girls drove a metallic 2005 Camry and Aaron drove a 2001 Honda Accord.

Officer Farley wrote that Nina described Aaron and others blocking in another vehicle. This statement is misleading. Though Nina said she thought they were supposed to trap another car, she unequivocally stated – twice – that Aaron played no part in any such effort. She described a white Honda (belonging to a TRG-member) being "chased." Detectives knew they could not have been chasing/trapping the white Honda, and must have been following it, because it belonged to "their" group, not the victims.. Farley also

---

[4] When asked if it was acceptable to omit the statement, Det. Loffler, did not testify that it wasn't; he stated that his report was a synopsis of the interview, which all gets discovered to the DA's office. (AMF-83).

omits that Nina could not say whether they turned from the Phi Hong onto Harbor or Westminster, that she said she "was bad at her streets" when he asked whether she "even knew where Westminster is", indicating she did not know.[5] (AMF-81-82).

### 5. Disclosure of Interview Recordings Does Not Permit Concealing Exculpatory Information from Reports

Because a prosecutor can only disclose exculpatory information of which they are aware, *Brady* necessarily requires police officers to notify the prosecutor of any potentially exculpatory evidence, so that the prosecutor can make appropriate disclosures.

During depositions, GGPD detectives repeatedly testified that because police reports are merely a synopsis, *Brady* obligations are satisfied where the entire recorded interview is provided to the prosecutor, even where the report misrepresents facts or omits exculpatory information. (AMF-20, 39-41, 85). This position is unfounded in law.

Detectives must disclose *Brady* material in a way that reasonably ensures the prosecutor will be alerted. They may not assume that prosecutors will happen across exculpatory information buried in dozens of hours of video, handwritten notes or some other repository. *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358 (2010) ("it should go without saying that the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Tennison v. City & Cnty. of San Francisco,* 570 F.3d 1078, 1090 (9th Cir. 2009) ("Placing … notes … in the police file did not fulfill the Inspectors' duty to disclose exculpatory information to the prosecutor. [Exculpatory evidence indicating police identified the wrong person] …should not have been buried in a file, but should have been made known to the prosecutor"). *See Gregory* 444 F.3d at 754 (6th Cir. 2006) (genuine issue of material fact despite evidence officers were trained to document and turn over all evidence to the

---

[5] When he described other businesses in the parking lot, she agreed "yeah," but didn't indicate whether she was agreeing to being present or indicating familiarity with the intersection. (AMF-80.)

prosecutor). Consistent with these decisions, the IACP recognizes police must relay exculpatory information in a manner that guarantees it is actually brought to the attention of the prosecutor. Because police reports are the primary means by which police communicate information to prosecutors, relaying exculpatory information means submitting it through "established reporting procedures." (AMF-88, 96-100).

As Professor Heidi Rummel explains, this is particularly critical in a complex homicide investigation, such as here. The file in this case included dozens of witness interviews. Over 60 were taped, generating 90+ hours of audio and video. Because it may not be feasible for prosecutors to review complete recordings until months or years after charging decisions have already been made and criminal proceedings instituted, prosecutors rely on police officers to provide in reports exculpatory evidence generated through interviews to ensure they have made a correct charging decision. (AMF-97-98.).

Prosecutors rely exclusively on police reports for accurate descriptions of witness interviews that were not recorded at all –including, here, Sgt. Martin's unrecorded interview of Nina Nguyen. Sgt. Martin did not video or audio record the interview (even on his cell phone), or summarize the interrogation or his statements in a police report. Det. Lord's police report omitted that Nina reported (on the same day as the interrogation), that Sgt. Martin terrifyingly and aggressively confronted her, leaving her inconsolably in tears. At the time of the charging decision (~4/20/11), the only record of Nina Nguyen's description Sgt Martin's confrontation was buried in the video of her second recorded interview with Det. Lord (and Aaron Nguyen). On the video, she explains she was crying because the sergeant was in her face, pointing his finger and cursing at her. No interview transcript was prepared until September 2012. DDA Feldman would have had to review hours of video to discover it. (AMF-47-48, 100-101, 93-101).

Because Lord's report concealed Nina's statements about the aggressive confrontation, DDA Feldman was provided only with an account of the confrontation that utterly conflicts with Nina Nguyen's account and the tearful circumstances in which she gave it. Det. Lord's report states Sgt. Martin spoke to her and that she admitted to

12

him that she had not told the entire truth, completely omitting the aggressive and coercive nature of the interaction (and potentially manufacturing a statement Nina did not make). (AMF-47-50) .[6]

Even if exclusion of Brady evidence from police reports were considered permissible because the information is available elsewhere, it is entirely unacceptable for reports to communicate false and misleading descriptions by excluding Brady information. *E.g. Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997); ("material omission" a form of false evidence). Lord's report falsely represented that Nina admitted being at the Phi Hong during the first interview, and that she confirmed being there when shown a photo. The opposite happened. She emphatically denied being present when shown the photo, and again **9** times thereafter. Lord's report conceals that Nina made no admission until 1:02 p.m., five hours after the first interrogation began, and after Martin's aggressive confrontation left her crying. It conceals her unequivocal recantation within 40 minutes and her repeated statements that she had only admitted being present because officers pressured her. Critically, the report mischaracterizes her diagram as a depiction of the shooting on Westminster, when Nina stated it depicted where they pulled over at the "restaurant" (3.6 miles away) after losing CJ near Miles Square Park. The report states Nina wrote "Westminster," yet omits Detective Lord directed Nina to write Westminster. It suggests Nina described participating in a plan to trap cars when she, twice, clearly denied that Aaron helped "box" or trap a car. The report entirely omits detectives' coercive tactics. (AMF-44--70).

---

[6] During her deposition, Nina Nguyen testified that she did not make admissions about being at the Phi Hong parking lot to Sgt. Martin. (AMF-50) ("All that was said was him screaming at me saying that I'm lying and you better start telling the truth. I didn't say anything, I just started crying because he was in my face.")). Nina's testimony and her suppressed contemporaneous statements support that Lord and Martin manufactured Nina's purported statement that she had not told the entire truth to undermine the exculpatory evidence from her first interview.

**B.    GGPD Lacked Policies Concerning the Contents of Police Reports (and Requiring Truthful and Accurate Reports)**

The Constitution prohibits police officers from knowingly submitting false evidence for use in a criminal prosecution or trial. *Spencer v. Peters*, 857 F.3d 789, 802 (9th Cir. 2017). False evidence includes any evidence creating a *materially misleading impression of the facts*. This precept makes police officers responsible for the integrity of their investigation results. It prohibits outright falsification and advancing evidence they know or should know is false or unreliable due to the technique by which it was obtained (e.g. evidence obtained with coercive interrogation methods, suggestive eyewitness identification procedures and manipulation of witnesses' testimony). *Id.*

At the most basic level, this constitutional protection requires police officers to submit complete, truthful and accurate police reports. *See Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010) ("…an interviewer who deliberately mischaracterizes witness statements in her investigative report [] commits a constitutional violation."). Beyond reporting, police officers must notify the prosecutor should false or unreliable evidence come to light at any time during a prosecution or trial. Here, reports were unequivocally misleading given the distortions of Nina's statements and significant omissions.

GGPD entirely lacked policies and training regarding the content of police reports (i.e. that they must be truthful, accurate and complete, objectively summarize all relevant details, and include exculpatory information. GGPD's 30(b)(6) witness confirmed that, in 2011, GGPD had no such formal policies (i.e. what information is significant enough to include in police reports, including information that undermines identifications, contradicts a witness statement, etc.). (AMF-2, 12-15, 17, 20-25, 106-112).

Deposition testimony reveals a fundamental misunderstanding among homicide detectives regarding the importance of truthful and accurate reports. Sgt. Lordtestified: (1) did not "know" whether GGPD permits dishonesty in any aspect of an officer's job; (2) did "not "understand" whether GPPD requires truthful and accurate reporting; (3) did not "know" whether GGPD requires police officers to "report their investigatory

activities and findings truthfully and accurately,"; (4) did not "understand" whether GGPD "prohibits officers from advancing evidence they know or should know is false,"; and (5) did not "understand" *if outright falsification is permitted in police reports*. (AMF-19-42, 107-111). He could not say whether district attorneys rely on the accuracy and completeness of police reports. Sgt. Martin, supervisor of the CAP Unit in 2011, testified he had no concerns with the "truthfulness and accuracy" of Lord's report, including Lord's affirmative misrepresentation regarding Nina's response when shown a photo of the Phi Hong, because "Detective Lord is an honest person…". (AMF-112, 123).

### C.    GGPD Had No Mechanism for Review of Police Reports to Ensure Truthfulness, Accuracy and Inclusion of Brady Information

Supervisory review of police reports is essential to ensure investigations are conducted competently and with integrity. Without supervisory review of reports, sergeants cannot determine whether detectives have adhered to constitutional standards governing the conduct of criminal investigations. (AMF-113).

CAP had no procedure to ensure that any investigator – much less a supervisor – reviewed police reports to ensure completeness, accuracy, inclusion of exculpatory information, and identification of all leads warranting follow-up investigation. As a 30(b)(6) witness, Sgt. Lord testified that there is no policy, process or mechanism for review of homicide detectives' police reports. (AMF-114-124). He is unaware of anyone responsible for reviewing homicide investigation police reports (and it is **not** currently his job as the CAP Sergeant to review reports prepared by homicide detectives). Sergeant Martin, the CAP supervisor in 2011, concurred there was no mechanism for supervisory review of reports. (AMF-114-117).The lead investigator on this case, Detective Michael Reynolds, testified that no person within GGPD was responsible for reviewing homicide investigation police reports. (AMF-118).

Supervisory review of Lord's report should have raised significant concerns. The report indicates Nina was held for hours after purportedly confessing by 9:11 a.m., without adequately explaining why she needed to continue to be held until 3:00 p.m.,

eight hours after she and Aaron were pulled from bed, and six hours after she had purportedly confessed. (AMF-62). A reviewing supervisor would want to know why she remained at the police station and whether she had ever been *Mirandized*. Nina's prolonged detention, and repeated rounds of un-*Mirandized* questioning, would have alerted a competent supervisor to closely scrutinize her interview.[7] Had supervisor scrutinized by reviewing the interview video, they would have realized that Lord's report was materially misleading and omitted significant exculpatory information, including the coercive tactics used to secure Nina's involuntary and unreliable confession.

Absent a procedure for supervisory review of reports, GGPD blindly relied on detectives' practice of disclosing interview videos, without any way to ensure reports accurately summarized information and meaningfully alerted the prosecutor to exculpatory evidence.

**D.    GGPD Entirely Lacked Training on Juvenile Interrogations**

**1.    GGPD Entirely Lacked Training on Juvenile Interrogations**

Constitutional violations are a highly predictable consequence of failing to train officers in proper interview techniques for youth. *Montoya v. City & Cnty. of Denver*, 2021 WL 1244264, at *24 (D. Colo. Mar. 4, 2021), *aff'd,* 2022 WL 1837828 (10th Cir. June 3, 2022) (As detectives, the officers "likely had to interview all types of individuals;" if not adequately trained to do so, "the potential to violate citizens' constitutional rights was high."). GGPD's sole policy addressing coerced confessions, General Order 6.2, prohibits "obtaining involuntary confessions or admissions through coercion or other illegal means." This policy does not define coercion, address coercive techniques, or any factors – such as youth – that increase the risk for involuntary confessions; it provides no guidance for avoiding or decreasing the risk of involuntary confessions.  (AMF-125-127).

---

[7] Lord's report omits start/stop times of the on and off-camera interrogations (except that he arrested Aaron at 2:50 p.m.). The omission of times was a red flag to supervisors that  the duration of questioning.

GGPD's 30(b)(6) witness, Sgt. Mark Lord, did not seem to understand the order's requirements (he could not say whether deception becomes impermissible if it causes an innocent person to confess). He also confirmed that GGPD had no other policies or training addressing juvenile interrogations, involuntary confessions or how to avoid involuntary confessions. Sgt. Martin also testified he was not aware of GGPD providing any training whatsoever on how to avoid involuntary confessions. (AMF-128-134, 138, 145)..

Deposition testimony reveals detectives lacked any meaningful understanding of factors that contribute to involuntary confessions. As a 30(b)(6) witness, Sgt. Lord testified he did not know whether coercion could include overbearing psychological pressure (contrary to current POST-academy training). Sgt. Lord was unable to provide any example – whatsoever – of an interrogation technique that could result in psychological pressure, or any factors that contribute to the risk of an involuntary confession. (AMF-139-146, 181). He could not say whether psychological pressure might include accusing witnesses of lying, telling them they could just go home if they were to tell the truth, or deceiving them about the evidence. Sgt. Lord could not say whether GGPD trains detectives that deception during interrogations is impermissible where it causes an innocent person to confess. He did not agree—contrary to academy POST training and General Order 6.2—that using deception/subterfuge during an interview becomes impermissible if it causes an innocent person to confess.[8] Defendants agreed it is acceptable to lie to witnesses about evidence against them—even juvenile witnesses – without limitation. (AMF-134, 141-147, 149-152***-***).

In his 30(b)(6) capacity, Sgt. Lord could not identify any training, policies or guidelines specific to juvenile interrogations. He could not say whether **youth** can increase the risk of an involuntary confession, nor could he remember if he had ever been trained to handle juvenile interrogations differently than adult interrogations. He could not say whether suggestive techniques contribute to the risk of an involuntary

[8] POST guidelines provide that subterfuge in an interrogation is impermissible where likely to cause an innocent person to confess. (AMF-147).

juvenile confession. Reynolds was not trained that juveniles are more susceptible to coerced confessions. He agreed it was okay to tell juvenile witnesses they can expect more lenient outcomes or just go home if they "tell the truth." (AMF-142, 148-153).

When shown the video of Nina sobbing, Lord could not say whether he had any concern interviewing Nina in such an emotionally distraught state ("A: I don't know what you mean; I'm not sure exactly what you mean"). Shown the video, Reynolds was unconcerned and saw no reason to treat juveniles differently than adults ("Not at all."). (AMF-154-155).Detectives' misunderstanding regarding the risks inherent to coercive juvenile interrogations cannot be attributed to evolving standards. Confessions expert, Dr. Saul Kassin explains, that even "[i]n 2011, the problem of false confessions was not a secret." (AMF-156).

### 2. The Absence of Training on Juvenile Interrogation Reflects a Departure from National Standards

Constitutionally adequate training would have prevented the violations in this case. The IACP's Training Key # 652 (published 2011 and citing pre-2011 sources) states, a "threatening, accusatorial, or antagonistic questioning style… can make children shut down – or, worse… make them offer up false information in an effort to bring an uncomfortable interview to an end… [exposing] officers … themselves to later claims of coercion…" This case exemplifies the threatening, accusatorial and antagonistic questioning style the IAC discourages, and the identified risks of eliciting false information ). (AMF-157). As IACP guidance emphasize, an interviewing officer must *never* use leading question during juvenile interviews: "[L]eading questions are those that suggest the answer to the child, as in 'Weren't you standing close to the porch?' or 'You had just come from the party, right?' … When an interview is contaminated in this way, it becomes impossible to know whether the information provided during the interview ultimately came from the child or from the questioner." (AMF-158).  Nina's interview was permeated with leading questions that served to confuse and disorient Nina, while contaminating the interview with officers' own assumptions. IACP guidance also cautions against guilt-presumptive questioning, such

as the questioning here: although "officers can and should preserve a healthy skepticism with respect to a child suspect's claims of innocence, they must also keep an open mind as to the possibility that the child may actually be innocent. Studies have shown that even experienced detectives are no better than the average person at telling when someone is lying." (AMF-159). To the extent such guidance cautions against accusatorial, antagonistic and leading questions, it would firmly discourage even more coercive tactics such as subterfuge and the elaborate use of physical props to reinforce deception of a witness.

> ### E.    Training for Academy Recruits  Does Not Negate the Responsibility to Implement Appropriate Policies and Training

GGPD insists that its officers receive police academy training, field training for new hires (first 14 weeks on the job), continuing education seminars, and videos provided by the OCDA. This argument is meritless. GGPD has submitted no evidence regarding the contents of any of the supposed training officers received, much less sufficient evidence to determine whether GGPD detectives received constitutionally-sufficient training. (AMF-167-169).As federal courts recognize, police agencies' responsibility to provide constitutionally adequate training goes beyond merely ensuring that new officers complete academy training and  continuing education courses. *Cristini v. City of Warren*, 2012 WL 5508369, at *12-13 (E.D. Mich. Nov. 14, 2012) ("that *Brady* standards are not taught in any formalized training but are discussed in the police academy and legal updates and may have been mentioned in some training sessions" insufficient to meet the *Canton* standard). CALEA and IACP also caution that police departments must ensure compliance with constitutional obligations through policies, training and supervision. (AMF-1, 8-9)

Here, any basic, academy training was remote in time and tailored to new-hires. Defendants completed academy training years before the Phi Hong investigation (1983, ~28 years for Sgt. Martin; 1990, ~21 years for Reynolds and 1994, ~17 years for Lord), and long before they became detectives, at which point their investigatory responsibilities changed profoundly from their responsibilities as patrol officers. Even

if academy training had addressed the issues in this case, it would not absolve GGPD from providing constitutionally-adequate training over the course of their career, and tailored to their evolving responsibilities. Whether academy training in 1983, 1990 and 1994 addressed the issues in this case is speculation. GGPD submitted no evidence that academy training provided in the 1980's and 1990's addressed involuntary confessions, juvenile confessions, or *Brady* disclosure requirements (including vis-à-vis police reports). Instead, Defendants submit irrelevant academy training standards from 2008. (AMF-174-182).

Defendants assert that various continuing education seminars touched on Brady disclosure, interview techniques, and juvenile interrogations. Defendants have failed to establish the content of any of the courses. With no evidence of the course content, it is impossible to know whether officers were in fact trained on issues relevant to this case, and if so, what specifically they were taught about Brady disclosure or interrogations. GGPD's 30(b)(6) witness could not identify any specific post-academy training that officers receive on: (1) Brady disclosure requirements; (2) report-writing; (3) involuntary confessions or (4) juvenile interrogations. Any training on these topics is **not** reflected on the training records produced in this case. (AMF-12, 160-165). .

According to GGPD, officers received continuing education through videos provided by the OCDA. Defendants produced a list of video titles; they produced no evidence regarding the content of any single video. Without the video content, we can only speculate as to *what* these videos taught regarding interrogations or Brady disclosure and whether such training was constitutionally-sufficient. They have produced no evidence that Defendants viewed the videos. ██████████████ ████████████████████████████ (AMF-166-173).

## F. GGPD Had No Meaningful Oversight of Homicide Investigations

Deposition testimony demonstrates that GGPD failed to meaningfully oversee homicide investigations, eliminating an important safeguard against constitutional violations, leaving detectives with undue discretion in how they conducted and documented investigations. (AMF-183-195).

GGPD's oversight failure was a moving force behind the constitutional violations sustained by Aaron. A competent supervisor assessing the thoroughness of the investigation against Aaron would have identified grave concerns with Nina's interview, the reliability of her statements, and the role of tunnel-vision. These concerns were underscored by exonerating video footage and the absence of evidence (no gang membership, no reliable eyewitness identifications, no phone evidence, and no evidence from searches of Aaron's home/car). Had a competent supervisor scrutinized Nina's interrogation, they would have directed follow-up investigation including investigating the Thanh My restaurant alibi, interviewing Aaron's other passengers, and analysis of cell phone information related to his other passengers.

No GGPD supervisor was responsible for assessing the thoroughness and integrity of the investigation supporting an arrest. As a 30(b)(6) witness, Sgt. Lord, testified that, in 2011, the sergeant's responsibilities in a homicide investigation included calling detectives into work, notifying the lieutenant of the investigation, and obtaining logistical support. The sergeant was not responsible for reviewing police reports for accuracy or examining the underlying evidence. (AMF-187). CAP sergeants were not responsible for identifying leads to pursue or additional investigation necessary to evaluate a theory of guilt (i.e. confirming/disproving alibis). No supervisor was responsible for identifying leads to pursue or follow-up investigation to conduct. (AMF-188-189). There was no requirement for supervisory consultation on homicide arrests (in non-exigent circumstances). Between 2009 and 2017, the **sergeant** of CAP did **not** expect homicide detectives to consult with him before arresting someone on murder charges. (AMF-190-191).

With no person responsible for assessing the thoroughness of the investigation, approving the arrest, or directing further investigation, GGPD lacked any mechanism to prevent detectives from initiating prosecutions based on unreliable and fabricated evidence.

**IV.  Conclusion**

Because there are material disputes of fact as to whether Defendant City of Garden Grove is liable under *Monell* for constitutionally-deficient policies and training, the City's motion for summary judgment should be denied.

DATED:      October 20, 2023          McLane, Bednarski & Litt, LLP

                                    By: /s/ *Lindsay Battles*
                                    Barrett S. Litt
                                    Lindsay Battles
                                    Attorneys for Plaintiffs
                                    AARON NGUYEN, NGOC LEE THI PHAN,
                                    and HOANG MINH NGUYEN

## **L.R. 11-6.2 – CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,933 words, which complies with the word limit of L.R. 11-6.1.

DATED:      October 20, 2023          McLane, Bednarski & Litt, LLP

                                    By: /s/ *Lindsay Battles*
                                    Barrett S. Litt
                                    David S. McLane
                                    Lindsay Battles
                                    Rodrigo Padilla
                                    Attorneys for Plaintiffs
                                    AARON NGUYEN, NGOC LEE THI PHAN,
                                    and HOANG MINH NGUYEN