1  WOODRUFF & SMART, APC
   CAROLINE A. BYRNE – State Bar No. 196541
2  cbyrne@woodruff.law
   MEREDITH D. STEWART – State Bar No. 217212
3  mstewart@woodruff.law
   555 Anton Boulevard, Suite 1200
4  Costa Mesa, California 92626-7670
   Telephone: (714) 558-7000
5  Facsimile: (714) 835-7787

6  Attorneys for Defendants CITY OF GARDEN GROVE, a public
   entity; SERGEANT MARK LORD, an employee of Defendant City
7  of Garden Grove, a public entity; DETECTIVE MICHAEL
   REYNOLDS, a former employee of Defendant City of Garden Grove,
8  a public entity; and SERGEANT MIKE MARTIN, a former employee
   of Defendant City of Garden Grove, a public entity
9

10              UNITED STATES DISTRICT COURT

11              CENTRAL DISTRICT OF CALIFORNIA

12

13  AARON NGUYEN, NGOC LE THI          CASE NO.: 8:21-cv-01775-JVS (ADSx)
    PHAN, AND HOANG MINH NGUYEN,
14                                     BEFORE THE HONORABLE
                                       JAMES V. SELNA; CTRM. 10C
15         Plaintiffs,
                                       **DEFENDANTS LORD, REYNOLDS**
16  v.                                 **AND MARTIN'S REPLY TO**
                                       **PLAINTIFFS' OPPOSITION TO**
17  CITY OF GARDEN GROVE, MARK         **DEFENDANTS' MOTION FOR**
    LORD, MICHAEL REYNOLDS,            **SUMMARY JUDGMENT, OR**
18  SERGEANT MIKE MARTIN, AND          **ALTERNATIVELY PARTIAL**
    DOES 1-10, INCLUSIVE,              **SUMMARY JUDGMENT**
19
           Defendants.                 [*Filed Concurrently with Response to
20                                      Plaintiffs' Additional Facts; Response to
                                       Plaintiffs' Statement of Genuine
21                                      Disputes; Objections to Plaintiffs'
                                       Evidence; and Compendium of Evidence*]
22
                                       HEARING DATES PENDING:
23                                     Type:  Defendants' Motion for Summary
                                              Judgment
24                                     Date:  December 11, 2023
                                       Time:  1:30 p.m.
25
                                       Type:  Final Pre-Trial Conference
26                                     Date:  January 2, 2024
                                       Time:  8:30 a.m.
27
                                       Type:  Trial
28                                     Date:  January 30, 2024
                                       Time:  8:30 a.m.

1    Defendants SERGEANT MARK LORD ("Lord"), DETECTIVE MICHAEL

2    REYNOLDS ("Reynolds"), and SERGEANT MIKE MARTIN ("Martin")

3    (sometimes collectively "Officers") submit the following memorandum of points and

4    authorities in reply to the opposition filed by Plaintiffs AARON NGUYEN[1], NGOC

5    LE THI PHAN, and HOANG MINH NGUYEN (sometimes collectively "Plaintiffs")

6    to the Officers' motion for summary judgment/partial summary judgment.

7    DATED: November 3, 2023          WOODRUFF & SMART, APC

8

9                                    By: /s/Meredith D. Stewart
                                         CAROLINE A. BYRNE
10                                       MEREDITH D. STEWART
                                         Attorneys for Defendants CITY OF
11                                       GARDEN GROVE, a public entity;
                                         SERGEANT MARK LORD, an employee of
12                                       Defendant City of Garden Grove, a public
                                         entity; DETECTIVE MICHAEL
13                                       REYNOLDS, a former employee of
                                         Defendant City of Garden Grove, a public
14                                       entity; and SERGEANT MIKE MARTIN, a
                                         former employee of Defendant City of
15                                       Garden Grove, a public entity
16

17

18

19

20

21

22

23

24

---

25    [1] Many of the witnesses have the same last name as Plaintiff Aaron Nguyen and
26    witness Nina Nguyen. Because of this and because they both are repeatedly identified
      in the evidence and referred to by witnesses by their first names, they will be referred
27    to in this motion as "Aaron" and "Nina," respectively. Certain other witnesses also
      will be referred to by their first names, or where applicable their gang monikers, for
28    clarity and ease of identifying them because that is what they are called by the
      witnesses in their interviews. No disrespect is intended by these designations.

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1796813.1

# TABLE OF CONTENTS

**Page**

1. INTRODUCTION ...................................................................................... 6

2. REYNOLDS IS ENTITLED TO JUDGMENT ON PLAINTIFFS' FIRST CLAIM FOR RELIEF ........................................................................ 6

3. LORD AND MARTIN ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM ........................... 6

    A. Lord did not Conceal *Brady* Evidence or Falsify His Report .............. 7

    B. Plaintiffs Have No Evidence to Support Deliberateness ................... 11

    C. The Interviews Were Not Unconstitutionally Coercive .................... 13

    D. The Officers were not Required to Look For or Find Exculpatory Evidence ................................................................................................. 22

    E. Plaintiffs Cannot Establish Causation ................................................. 22

4. THE SUPERVISOR LIABILITY CLAIM HAS NO MERIT ..................... 23

5. THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY ........... 24

6. CONCLUSION ......................................................................................... 26

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Amaya-Ruiz v. Stewart*, 121 F.3d 486 (9th Cir.1997)....................................................18

*Billington v. Smith*, 292 F.3d 1177 (9th Cir.2002) ......................................................24

*Bradford v. Scherschligt*, 803 F.3d 382 (9th Cir.2015)..................................................7

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ....................................................7

*Brewster v. Shasta Cty.*, 27 F.App'x 908 (9th Cir.2001) ...............................................20

*Broam v. Bogan*, 320 F.3d 1023 (9th Cir.2003) ..........................................................22

*Caldwell v. City and Cty. of San Francisco*, 889 F.3d 1105 (9th Cir.2018) ....18, 22, 23

*Carrillo v. County of Los Angeles*, 798 F.3d 1210 (9th Cir.2015) ...............................26

*City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500 (2019) .........................................24

*Cooper v. Dupnik*, 963 F.2d 1220 (9th Cir.1992)....................................................17, 25

*Costanich v. Dep't of Soc. & Health Services*, 627 F.3d 1101  (9th Cir.2010)11, 12, 13

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ....................................................7

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir.2010) ................................14, 25

*Cunningham v. City of Wenatchee*, 345 F.3d 802 (9th Cir.2003) ...........................13, 18

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir.2001) .................................................7, 18

*Fare v. Michael C.*, 442 U.S. 707 (1979) .....................................................................16

*Gallegos v. Colorado*, 370 U.S. 49 (1962)........................................................14, 15, 16

*Gregory v. City of Louisville*, 444 F.3d 725 (6th Cir.2006) ........................................24

*Hansen v. Black*, 885 F.2d 642 (9th Cir.1989) ............................................................24

*Henry v. Kernan*, 177 F.3d 1152 (9th Cir.1999) .........................................................19

*Hurt v. Wise*, 880 F.3d 831 (7th Cir.2018) ...............................................................6, 20

*Hyung Seok Koh v. Graf*, 307 F.Supp.3d 827 (N.D. Ill.2018) ...........................6, 18, 19

*Kisela v. Hughes*, 138 S.Ct. 1148 (2018) .....................................................................24

*Lewis v. City of Chicago*, 914 F.3d 472 (7th Cir.2018)...................................................6

*Spencer v. Peters*, 857 F.3d 789 (9th Cir.2017) .......................................7, 11, 13, 22

*Starr v. Baca*, 652 F.3d 1202 (9th Cir.2011)...............................................................23

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1796813.1

1

# **TABLE OF AUTHORITIES**

2
<u>**Page**</u>

3
# **FEDERAL CASES**

4
*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir.2009) ........................................7, 13, 17

5
*Tatum v. Moody*, 768 F.3d 806 (9th Cir.2014) ............................................................10

6
*Tekoh v. County of Los Angeles*, 2018 WL 9782523, *10 (C.D.Cal. Mar. 8, 2018)....13

7
*Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078 (9th Cir.2009)..............8, 9

8
*Tobias v. Arteaga*, 996 F.3d 571 (9th Cir.2021)....................................................24, 25

9
*United States v. Estate of Parsons*, 367 F.3d 409 (5th Cir.2004)................................8

10
*United States v. Miller*, 984 F.2d 1028 (1993) ...........................................................18

11
*United States v. Mmahat*, 106 F.3d 89 (5th Cir.1997)..................................................8

12
*United States v. Preston*, 751 F.3d 1008 (9th Cir.2014) ...........................................18

13
*United States v. Skilling*, 554 F.3d 529 (5th Cir.2009)................................................8

14
*United States v. Wolf*, 813 F.2d 970 (9th Cir.1987) ...................................................18

15

16

17

18

19

20

21

22

23

24

25

26

27

28

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1796813.1

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

## MEMORANDUM OF POINTS AND AUTHORITIES

### 1.    INTRODUCTION

Plaintiffs ignore their only claim is for Fourteenth Amendment due process violation. Plaintiffs spend most of their opposition trying to show that coercive interview techniques were used on Nina. But that is not the issue to be decided, which is whether the techniques were *so coercive* that they *shock the conscience* – an "extraordinarily high" bar. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir.2018) *overruled in part on other grounds* by *Lewis v. City of Chicago*, 914 F.3d 472, 475 (7th Cir.2018), and *Hyung Seok Koh v. Graf*, 307 F.Supp.3d 827 (N.D. Ill.2018), two cases Plaintiffs rely on. Plaintiffs have adduced no evidence to show the interview techniques used on Nina shock the conscience. Indeed, the undisputed evidence shows the Officers' interview techniques do not come close to that high bar, entitling them to judgment.

### 2.    REYNOLDS IS ENTITLED TO JUDGMENT ON PLAINTIFFS' FIRST CLAIM FOR RELIEF

In their opposition, Plaintiffs mention Reynolds name once, at p. 21, and only in relation to their supervisory liability claim. Thus, it appears Plaintiffs are no longer contending Reynolds violated Plaintiffs' Fourteenth Amendment rights with regard to the interviews of Nina, of Leesa Huynh or of any other witness/suspect or with regard to the preparation of any police reports. Accordingly, Reynolds is entitled to judgment on Plaintiffs' first claim for relief.

### 3.    LORD AND MARTIN ARE ENTITLED TO JUDGMENT ON PLAINTIFFS' FOURTEENTH AMENDMENT CLAIM

Plaintiffs argue Lord and Martin fabricated evidence in multiple ways, including by: (1) Lord falsifying his police report regarding the interview of witness Nina Nguyen; (2) using coercive interview techniques, including using psychological coercion on a minor, lying about what evidence they had such as cell phone evidence, videos/photos of involved vehicles and witness statements implicating Nina's

boyfriend Aaron; (3) hiding or suppressing *Brady* evidence in Lord's report; (4) Martin interviewing Nina and yelling at her, all without recording the encounter either via videotaping or in a police report; and (5) Lord forcing Nina to make a diagram that was used against Aaron at the criminal trial. These claims are meritless.

"The standard for showing a Fourteenth Amendment substantive due process violation … is quite demanding." *Stoot v. City of Everett*, 582 F.3d 910, 928 (9th Cir.2009). "[O]nly the most egregious official conduct" is "arbitrary in the constitutional sense," and constitutes a violation of substantive due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation and quotations omitted). A Fourteenth Amendment claim is cognizable only if the abuse of power "shocks the conscience" and "violates the decencies of civilized conduct." *Id*. To establish this claim, a plaintiff "must first point to evidence he contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir.2015). Then, he must prove the fabrication was deliberate. *Id*. The "deliberate" element can be shown by: (1) direct evidence, *Spencer v. Peters*, 857 F.3d 789, 793 (9th Cir.2017); or one of two types of circumstantial evidence showing that (2) officers continued their investigation despite the fact they knew or should have known the plaintiff was innocent; or (2) officers used investigative techniques that were so coercive and abusive they knew or should have known the techniques would yield false information. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). Plaintiffs' fail to make the requisite showing.

## A.    Lord did not Conceal *Brady* Evidence or Falsify His Report

Plaintiffs argue Lord's report concealed exculpatory/*Brady* evidence. While Plaintiffs' acknowledge all of the interview videos were provided to the Orange County District Attorney ("OCDA"), they argue this was not enough – all of the information in the 109 interview videos/evidence CDs should have been included in the police reports. Plaintiffs do not explain how putting exculpatory evidence in hundreds of pages of police reports would have been better than providing it in 90 or

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

more hours of video interviews. Plaintiffs cite to two cases: *United States v. Skilling*, 554 F.3d 529 (5th Cir.2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358 (2010), and *Tennison v. City & Cnty. of San Francisco*, 570 F.3d 1078 (9th Cir.2009). Neither case helps Plaintiffs.

Plaintiffs cite *Skilling* for the proposition the government may not hide exculpatory material of which it is aware in a huge file, give the defense attorney access to the file, and hope they do not find it. Opposition-17. *Skilling* actually held that giving a defense attorney open access to a file with hundreds of millions of pages of documents did not violate *Brady*. The court held, "[a]s a general rule, the government is under no duty to direct a defendant to exculpatory evidence within a larger mass of disclosed evidence. 554 F.3d at 576. The court cited *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir.1997), which held "there is no authority for the proposition that the government's *Brady* obligations require it to point the defense to specific documents within a larger mass of material that it has already turned over." *Overruled in part on other grounds* by *United States v. Estate of Parsons*, 367 F.3d 409 (5th Cir.2004) (en banc). *Skilling* held that providing access to even hundreds of million pages of documents satisfied any *Brady* obligation when the access was electronic and the database was indexed and searchable. 554 F.3d at 576-577.

Here, the OCDA gave Aaron's defense attorney approximately 109 CD's containing such things as witness interviews, cell phone records, background reports, photographs, records of 911 calls and police dispatch, and crime lab photos. Dkt. 77-4, Declarations of Reynolds and Schriver (pp. 15-17 of the Officers compendium); Dkt. 73-14, Plaintiffs' Exhibit 68. The CD's were labeled with their content, including witness names, and each interview recording was transmitted on a separate CD. *Id.* Nina's interviews were labeled as interview #1 and #2; they could be viewed in their entirety in just a few hours.

Plaintiffs' reliance on *Tennison* also is misplaced. In *Tennison*, police officers took conflicting statements from two 14-year-old alleged witnesses to a murder, some

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

8

1796813.1

of which were recorded, most of which were not. One witness switched her story several times, first stating Tennison committed the crime, then that he didn't, and then again that he did. The officers concluded the murder was committed by Tennison. The interview tapes were not produced to Tennison's criminal defense attorney. 570 F.3d at 1084.

The witness who kept changing her story submitted to a polygraph, which yielded inconclusive results. The inspector who administered the polygraph told the district attorney about the results, but did not provide him with a copy of the report, which was placed in the inspector's file. The district attorney did not get a copy of the report until Tennison filed a habeas petition. The report was not provided to Tennison's defense attorney. *Id.* at 1084.

Both before and after Tennison's criminal trial, the officers got detailed statements from a witness who said Tennison did not commit the crime, identifying the person who did. A month after Tennison was convicted, other officers investigating a separate crime interviewed the second suspect, who provided a tape-recorded confession. Those officers immediately gave the taped confession to the officers investigating Tennison. Tennison's criminal defense attorney, who kept a record of documents he got from the district attorney, stated he never received any police notes or recordings of interviews of the witness who identified the suspect who later confessed. *Id.* at 1086. When the district attorney asked one of the investigating officers about the confession, he denied any knowledge of it. *Id.* at 1085.

Unlike *Tennison*, it is undisputed that all of the tape-recorded interviews were turned over to the OCDA – they were not simply placed in a police file where they might or might not have been found by the district attorney. Moreover, again unlike in *Tennison*, all of the tape recorded interviews were turned over to Aaron's defense attorney years before the criminal trial. Dkt. 77-4, Declarations of Reynolds and Schriver (pp. 15-17 of the Officers compendium).

///

*Tatum v. Moody*, 768 F.3d 806, 819 (9th Cir.2014), discussed the standard for assessing a substantive due process violation in the context of a failure to disclose exculpatory evidence. There, just after plaintiff's arrest, law enforcement obtained "highly material" evidence that was "strongly indicative" and "nearly dispositive" of plaintiff's innocence. They withheld and affirmatively misrepresented that evidence to prosecutors over the course of two years after plaintiff's preliminary hearing, during which time plaintiff remained incarcerated. Upon learning of the evidence, the prosecutor dismissed the charges against plaintiff. *Id*. at 818-820. In determining that law enforcement's failure to turn over exculpatory evidence to the prosecutor shocked the conscience and violated the plaintiff's due process rights, the court emphasized, "the narrowness of the constitutional rule we enforce today, which is restricted to detentions of (1) unusual length, (2) caused by the investigating officers' failure to disclose highly significant exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that the officers understood the risks to the plaintiff's rights from withholding the information or were completely indifferent to those risks." *Id*. at 819-820.

Plaintiffs argue Lord's report was falsified because it failed to report Nina's "denials" of being at Phi Hong and it incorrectly stated Nina admitted to being at Phi Hong. But the evidence shows that Nina did admit to being at Phi Hong, even after claiming she didn't remember being there. Even the appellate court noted, "[A]t times [Nina] said they were not there that night *and other times she said they were* or that she had confused that pool hall with another one when she said they were there." Dkt. 77-44, Appellate Opinion, Exhibit B, p. 25 (p. 71 of the officers' compendium) (emphasis added). Lord's statement in his report that Nina admitted being at Phi Hong was neither false nor fabricated. But in any case, both the admissions and statements that she did not remember were provided to the OCDA via the videotaped interviews. Even if the Court were to find some discrepancies between Lord's report and the videorecording, such discrepancies would not rise to the level required under the case

10

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1  law to prove deliberateness. Lord's report was not admitted into evidence at the

2  criminal trial, nor did it form the basis for DDA Feldman's charging decision.

3      The evidence also shows that – contrary to Plaintiffs' assertions – Nina's

4  unrecorded conversation with Martin also was disclosed. First, it was mentioned in

5  Lord's report. Second, it was discussed with Nina during her second interview. And

6  third, she was asked about it at Aaron's criminal trial by Aaron's defense attorney.

7  Officers' Facts ("OF")-84-87.

8      All the investigative materials were provided to the OCDA, who in turn

9  provided it to Aaron's criminal defense counsel. It is immaterial that the police reports

10  were not verbatim transcriptions of Nina's interview. Feldman testified he does not

11  rely on police reports because they are just summaries. He relies on, initially, the

12  transcriptions and then the actual audio/video recordings, which is the evidence

13  presented at trial. OF-113,114,115. At bottom, all materials – including the video

14  recordings that Plaintiffs rely on as proof of alleged fabrication – were promptly

15  provided to Feldman and Aaron's defense counsel. Nothing was concealed from either

16  the prosecutor or Aaron's defense counsel.

17      **B.**    **Plaintiffs Have No Evidence to Support Deliberateness**

18      Alleged discrepancies or misstatements in Lord's police report cannot be the

19  basis for Plaintiffs' deliberate fabrication claim because it was never evidence.

20  Plaintiffs cite *Spencer*, 857 F.3d at 793, and *Costanich v. Dep't of Soc. & Health*

21  *Services*, 627 F.3d 1101, 1111 (9th Cir.2010), for the proposition that false statements

22  in police reports amount to direct evidence of deliberateness. Plaintiffs miss a key

23  distinction. Opposition-6. In both cases, unlike in this case, the reports themselves

24  were the evidence that caused the loss of a liberty or property right.

25      In *Spencer*, Investigator Krause investigated reports of sexual abuse made by

26  the plaintiff's daughter and prepared reports of her interviews. 857 F.3d at 793-794.

27  "The interviews took place almost entirely in Krause's motel room and her rental car,

28  without anyone else present." *Id*. at 795. Krause prepared multiple reports describing

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1796813.1

1    in detail sexual abuse by the plaintiff of his two biological children and stepson. *Id*. at
2    796. The plaintiff pled guilty to statutory rape under a law allowing a defendant to
3    maintain his innocence where there is apparent evidence of guilt. In the civil action,
4    the plaintiff alleged that were it not for the contents of Krause's reports, he never
5    would have pled guilty and spent nearly 20 years in prison. *Id*. at 802.

6         At the civil trial, the plaintiff submitted evidence contradicting Krause's
7    reports. Krause "attributed many quotations to Matthew," but at trial, Matthew
8    testified that many of those quotations were fabricated. *Id*. at 795. Krause's report also
9    "contain[ed] scores of specific, explicit quotations attributed to Kathryn," and again at
10   trial, Kathryn testified that the substantive quotations were all fabrications and that she
11   had denied to Krause that anyone had sexually abused her." *Id*. The court affirmed the
12   jury's finding in favor of the plaintiff, holding that the plaintiff had introduced
13   evidence of deliberate fabrication that the jury was permitted to credit. *Id*. at 799. In
14   sum, the investigator's reports contained what were identified as direct quotations
15   from the alleged victims that the victims later recanted in the civil trial, and those
16   reports were the reason for the injury.

17        In *Costanich*, the state revoked the plaintiff's foster care license and initiated
18   guardianship termination proceedings based on an investigation undertaken by social
19   worker Duron. Duron submitted a report and a declaration in support of the
20   guardianship termination, both of which contained "deliberately falsified statements."
21   627 F.3d at 1111. The court listed the false evidence: "Duron's report indicated that
22   she had interviewed thirty-four people. She later admitted that she had made only brief
23   contact with eighteen of the individuals listed. .... The suggestion that she interviewed
24   three of the therapists and received reports from a fourth lent credibility to her report,
25   but, as Duron testified at the ALJ hearing, she did not actually speak to '[m]edical
26   professionals.' … Other witnesses pointed out that the report contained evidence or
27   statements they never made. … Duron purposely used quotation marks around many
28   of the purported witness statements in her investigative report," including statements

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

that were unequivocally refuted by those witnesses. *Id*. at 1112.

Like in *Spencer*, Duron's declaration and report, containing what were represented as direct quotations or nearly so, were the evidence that was used by the state to terminate the plaintiff's guardianship. *Id*. at 1105-1106.

Relying on *Spencer* and *Costanich* Plaintiffs argue that false statements in police reports is proof enough to support a deliberate falsification claim. Opposition-6. Plaintiffs misread and misapply these cases. First, *Spencer* and *Costanich* recounted repeated instances where the investigator purportedly quoted a witness who later denied saying as much. Both also involved repeated instances where the investigator claimed to have conducted an investigatory step or met with a particular witness and then later denied ever having done so. At best, all Plaintiffs can point to here is that Lord's report should have been more akin to a word-for-word transcription of everything Nina said. No case law holds officers to such a standard, or that failing to do so would rise to the level of a constitutional violation.

Another important distinction is that in both *Spencer* and *Costanich*, the document containing misstatements was the evidence that caused the harm. Here, the opposite is true. Feldman's charging decision was his own; he affirmed that he considered the police reports summaries that sometimes contain discrepancies and that he relied on the videos. OF-113,114,115.

## C.    The Interviews Were Not Unconstitutionally Coercive

Whether an interrogation is coercive is determined based on the totality of the circumstances. *Cunningham v. City of Wenatchee*, 345 F.3d 802, 810 (9th Cir.2003) ("A coercive interrogation exists when the totality of the circumstances shows that the officer's tactics undermined the suspect's ability to exercise his free will."). Importantly, however, ***mere coercion is not sufficient to prove a violation of substantive due process***. *Stoot*, 582 F.3d at 928-929; *Tekoh v. County of Los Angeles*, 2018 WL 9782523, *10 (C.D.Cal. Mar. 8, 2018).

///

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

Plaintiffs make various claims to support their position Nina's interviews were coercive. These include her age (which they argue the Officers failed to take into account); the Officers lying to her about the evidence they have, i.e., cell phone evidence, video evidence of cars, statements of Aaron and possibly other witnesses and calling her a liar; and the Officers raising their voices and (in the case of Martin) yelling and pointing his finger at her.

Plaintiffs cite to *Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir.2010) and *Gallegos v. Colorado*, 370 U.S. 49 (1962), to support their claim that juvenile interrogations are judged by a higher standard and that greater care is needed to make sure any admission is voluntary. Plaintiffs argue that Lord and Martin did not meet this higher standard or take care to ensure Nina's statements were voluntary. Opposition-8. Plaintiffs are incorrect.

*Crowe* discussed what would constitute "psychological torture" sufficient to support a Fourteenth Amendment claim. While the *Crowe* interrogation met the high threshold for a Fourteenth Amendment claim, its facts bear no resemblance to Nina's interviews.

In *Crowe*, three 14- and 15-year-old boys, Michael, Aaron and Joshua, were accused of murdering Michael's 12-year-old sister, who was stabbed to death in her bedroom while the family slept. Michael was interrogated four times. The third interview lasted more than three hours and took place at the police station. Michael asked to see his parents and expressed how stressful the days since his sister's murder had been. Michael repeatedly denied murdering his sister. The detective told Michael the police knew he killed her and that perhaps Michael doesn't remember doing it. Michael was interviewed a fourth time for more than six hours. 608 F.3d at 420. Throughout the six-hour interview, Michael repeatedly said he did not remember killing his sister. During that interview, the detectives offered to help him remember. *Id*. at 421. The detectives told Michael that if he confessed, he would get help rather than go to jail. *Id*. at 422. Michael then told the officers he would be lying if he were

14

1796813.1

to tell them he murdered his sister and his story would be wrong. The detectives latched onto Michael's statement as a confession. *Id*.

The detectives employed similar tactics in their interviews of the other two boys, who they claimed supplied the knife. They interrogated Aaron three times: the first time for 30-45 minutes, the second for about 2 hours, and the third for 9.5 hours at the police station. *Id*. at 423-424. Joshua was interrogated three times: the first lasted one hour; the second lasted 13.5 hours, during which they denied Joshua's requests for sleep; and the third lasted approximately 12 hours with a two-hour break. *Id*. at 424-425. After charging the boys with murder, DNA testing confirmed a transient had murdered the sister. *Id*. at 417.

The court held the detectives' conduct "shock[ed] the conscience" noting Michael and Aaron "were isolated and subjected to hours and hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by teams of police officers." *Id*. at 432. The court held the boys' interrogations were fairly described as "[p]sychological torture." *Id*.

Similarly, in *Gallegos*, youth was a factor in the Court concluding the suspect had been subjected to psychological torture. But a myriad of other factors – including that the 14-year-old minor was essentially kept in isolation for five days – also played into that conclusion, Importantly, *Gallegos* did not involve a civil case brought under the Fourteenth Amendment but arose from a petition to overturn the minor's conviction for murder.

In *Gallegos*, the 14-year-old petitioner and another youth followed, assaulted and robbed an elderly man who eventually died from his injuries. The petitioner was arrested on January 1, at which time the victim was still alive. On January 2, the petitioner's mother tried to see him but was denied. From January 1 through January 7, the petitioner was held in Juvenile Hall, where he was kept in security. He was examined by the police in Juvenile Hall January 2, and made a confession. 370 U.S. at 50. The petitioner eventually was convicted of murder. In overturning the conviction,

15

the U.S. Supreme Court stated:

> There is no guide to the decision of cases such as this, except the totality of circumstances that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested was obtained in violation of due process. *Id.* at 55 (internal citations omitted).

*Gallegos* did not involve a civil Fourteenth Amendment claim, so the Court did not assess whether the conduct shocked the conscience or constituted a civil due process violation.

While Plaintiffs focus on Nina's age to support their claim the Officers used coercive interview techniques, the U.S. Supreme Court held that age is not the only factor to be used in determining how to question a minor. Officers should also consider "experience, education, background, and intelligence" to determine a minor's capacity to understand the warnings and consequences. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979). Plaintiffs' don't do this.

On April 20, 2011, one month after the shooting, Nina and Aaron were among many individuals interviewed by GGPD. Nina was 17 at the time. She had been involved in a year-long sexual relationship with Aaron, who was 10 years her senior. She also regularly and knowingly hung out with gang members, went to parties most weekends, drank alcohol and sometimes used drugs. In April 2011, Nina was staying alone in her apartment with a 20-year-old cousin while her mom was out of the country. OF-25,80; Plaintiffs' Additional Facts ("PAF")-61,74,80,452. The totality of the circumstances show the Officers' interview techniques were appropriate.

1796813.1

Plaintiffs also assert Lord and Martin improperly used psychological coercion. Citing to *Stoot* and *Cooper v. Dupnik*, 963 F.2d 1220, 1245 (9th Cir.1992) (en banc), Plaintiffs assert that psychological coercion can be enough to support a Fourteenth Amendment claim. Opposition-7. While that statement is correct as a general proposition, the law shows that Nina's interviews do not rise to the level of psychological coercion necessary to state a Fourteenth Amendment claim.

*Stoot* noted a claim that coercive interrogation techniques violated a plaintiff's right to substantive due process "is cognizable only if the alleged abuse of power 'shocks the conscience' and 'violates the decencies of civilized conduct.'" 582 F.3d at 928. *Stoot* then discussed and distinguished *Cooper v. Dupnik*:

> *Cooper*, for example, involved a calculated plan to ignore the suspect's Constitutional right to remain silent as well as any request he might make to speak with an attorney …, to hold the suspect incommunicado, and to pressure and interrogate him until he confessed, in full recognition that such actions were unlawful under *Miranda* and would render any confession inadmissible at trial. This court described the officers' techniques as sophisticated psychological torture designed to extract a confession after hours of mistreatment, the twentieth-century inquisitorial version of the Star Chamber.

582 F.3d at 929 (internal citations and quotations omitted).

The *Stoot* court held the interrogation did not meet that high threshold. *Stoot* involved the interrogation of a 14-year-old suspect, Paul, for two hours in the school principal's office. Officers suspected Paul of sexual abuse of a 4-year-old girl. Near the end of the interrogation, Paul confessed to the molestation.

Investigator Jenson did not contact Paul's parents before the interview. *Id*. at 914. Jenson questioned Paul for "close to two hours," during which Paul denied any wrongdoing. Paul claimed that Jenson threatened "heightened punishment if Paul

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

17

1796813.1

denied guilt, and impermissible promises of leniency if he admitted guilt." *Id*. at 915. Paul's parents also claimed he was a developmentally delayed young boy who could not comprehend the promises and threats made by Jenson. *Id*. at 928-929. Paul's confession was excluded by the criminal trial court and the charges dropped. *Id*. at 912. The court held that "[w]hile these allegations might be relevant to the question of whether Paul's confession was in fact voluntary and therefore admissible, … they fall below what is required to state a claim under the Fourteenth Amendment." *Id*. at 929.

Plaintiffs' other arguments regarding coercion are equally meritless. Telling a witness to speak truthfully is not police coercion. *Devereaux*, 263 F.3d at 1076-1077; *Amaya-Ruiz v. Stewart*, 121 F.3d 486, 494 (9th Cir.1997), *overruled on other grounds* in *United States v. Preston*, 751 F.3d 1008, 1019-1020 (9th Cir.2014). Nor are accusations that the witness is lying. *Cunningham*, 345 F.3d at 810; *United States v. Wolf*, 813 F.2d 970, 975 (9th Cir.1987). Deception by the police is permitted and does not render a confession involuntary. *United States v. Miller*, 984 F.2d 1028, 1031 (1993). Police officers may constitutionally tell witnesses they do not believe them, that they must tell the truth, and that they can go home sooner if they tell the truth. *Devereaux*, 263 F.3d at 1076-77; *Amaya-Ruiz*, 121 F.3d at 494; *Cunningham*, 345 F.3d at 812. Police officers may promise police protection or even pay a witness for testifying. *Caldwell v. City and Cty. of San Francisco*, 889 F.3d 1105, 1120 (9th Cir.2018). Police are not required to stop an interview when a witness becomes emotional, and failing to stop the interview does not make the interview coercive. *Cunningham*, 345 F.3d at 810.

Plaintiffs cite to a large number of cases to support their coercion argument but provide no details, simply pulling certain words out of the opinions without providing context. A deeper look into a few of Plaintiffs' cases shows their coercion argument is meritless.

Citing *Hyung Seok Koh* ("*Koh*"), a coerced confession case, Plaintiffs argue an officer's physical proximity and "touching" could be interpreted as threats of violence.

1    Significantly, the *Koh* court dismissed the part of the claim for a due process violation

2    under the Fourteenth Amendment, stating:

3              The substantive due process claim is readily rejected. As the

4              Seventh Circuit recently noted, the bar for 'conscience-

5              shocking' conduct is *extraordinarily high*.

6    307 F.Supp.3d at 850 (emphasis added, citation omitted).

7         *Koh* noted: "Detective Graf used coercive … physical tactics throughout the

8    interviews. He … approached Mr. Koh, and occasionally touched Mr. Koh on his

9    arms and legs. … It is also worth noting that Officer Kim's gun was visible

10   throughout the entirety Mr. Koh's interviews." *Id.* at 853. The court succinctly

11   summarized the interrogation tactics used in *Hyung Seok Koh* as including, "verbally

12   and physically intimidating a suspect, as well as manipulating him, lying to him, and

13   coaching him on the details of the confession, all while knowing he was not fluent in

14   English and was operating without food, medications, or sleep." *Id.* at 855. This

15   conduct was not conscious shocking.

16        *Henry v. Kernan*, 177 F.3d 1152, 1157 (9th Cir.1999) *opinion amended and*

17   *superseded,* 197 F.3d 1021 (9th Cir.1999), a habeas case not a civil Fourteenth

18   Amendment case, involved a confession obtained in violation of *Miranda*. The *Henry*

19   court looked at the totality of the circumstances, noting Henry gave a "long, often

20   incoherent, and confused statement which … included not only information about …

21   divorce, his property, his automobile accident and head injury, his job, his guns, his

22   children, deer hunting, an old vehicle his brother-in-law was fixing, his experiences in

23   Vietnam, taking his trailer up in the woods, and his frustrated ambition to be a

24   highway patrolman. As evidenced by the transcript, Henry's statements were

25   rambling, disjointed, often unresponsive to the questions asked by the officers,

26   occasionally inaudible, and sometimes virtually incoherent. Throughout his

27   interrogation, petitioner was shaken, confused, and frightened, crying in parts and

28   frequently asking for forgiveness. *Id.* at 1027. Nina did not display any of these signs

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

19

of psychological confusion.

In *Hurt v. Wise*, officers threatened to extend the two suspects' interrogations until they gave the "right" answer (meaning "inculpatory"). The officers "basically drafted the entire confession" by feeding the suspects "every critical fact" and refusing to accept their denials until they finally agreed to the version proposed by the interrogators. The officers applied interrogation tactics designed to increase psychological pressure to confess, such as minimizing moral guilt to prime them for a confession, and telling one suspect that the other had already implicated her. 880 F.3d at 847-48. One suspect was told her whole family was going to jail. *Id.* at 838. And even with all this, the court rejected the Fourteenth Amendment claim, stating:

> We can be brief about the substantive due process argument: it should have been winnowed from the case. The bar for "conscience-shocking" is very high; these interviews may have been abusive, but nothing extreme enough to invoke substantive due process occurred.

880 F.3d at 844.

Plaintiffs cite *Brewster v. Shasta Cty.*, 27 F.App'x 908, 912-13 (9th Cir.2001) for the broad proposition that "'suggestive procedures with the intent of obtaining an identification' of a suspect, 'irrespective of whether he was in fact guilty,' qualifies as a coercive investigative technique." Opposition-12. *Brewster* didn't involve a police interview but involved an unnecessarily suggestive photo identification and live lineup. *Id.* at 911. The plaintiff did not bring a Fourteenth Amendment due process claim against the detectives, so the *Brewster* court was not called on to determine if the conduct shocked the conscience.

The evidence shows the interview techniques relating to Nina do not reach the extraordinarily high bar for "conscience-shocking" conduct. Nina was questioned for a little over two hours. OF-54. Nina understood if she needed to use the restroom or to get something to eat or drink, and if at any time she wanted to stop talking, she could,

20

and was told if at any time she wanted to talk to her parents, she could and they would arrange it but Nina never asked to call her mother. Dkt. 77-44, Ex.AA2--8:09, OF-80,82. Finally, Plaintiffs' claim that Martin threatened to charge Nina with conspiracy to commit murder is false. Martin never used the word murder when he mentioned conspiracy and he never threatened to charge her. Dkt. 77-44, Exhibit W, transcript of interview #2, pp. 70-71 (pp.741-742 of the Officers compendium).

The evidence also shows the diagram was not coerced. Plaintiffs assert Lord "directed" Nina to draw the picture and to write Westminster. The evidence, shows, however, was asked, not directed, to draw a picture. The following exchange occurred:

| GGPD: | I want you to do me a favor. |
| NGUYEN: | Uh-huh. |
| GGPD: | I want you to draw me a picture. |
| NGUYEN: | Uh-huh. |
| GGPD: | Of the way that you saw the cars |
| NGUYEN: | Uh-huh. |
| GGPD: | Trapping in the car. |
| NGUYEN: | Uh-huh. Okay, so. |
| GGPD: | Draw Westminster, just draw a street, |
| NGUYEN: | Uh-huh. And then, ah, so this is CJ's car, and then, Aaron car was over here. And then. |
| GGPD: | Are these the lanes? |
| NGUYEN: | Yeah, sorry. |

Dkt. 77-44, Exhibit W, transcript of Nina's interview #2, p. 37 (p. 708 of the Officers compendium).

In her deposition Nina admitted she held the pen and paper and no one at the police station held her hand on a pen and no one made her draw anything specific. Dkt. 73-2, Ex.401, Nina depo, 131:11-20.

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

Plaintiffs' claim that this diagram was coerced is meritless. While Lord asked Nina to draw a picture, she immediately agreed. And while Lord said, "draw Westminster," he also said, "just draw a street" and Nina then wrote Westminster on the diagram. Plaintiffs' claim that the diagram drawn by Nina was coerced is not supported by the evidence.

## D. The Officers were not Required to Look For or Find Exculpatory Evidence

Plaintiffs allege that the Officers violated the Fourteenth Amendment by not following up on potentially exculpatory alibi evidence. Plaintiffs have suggested that the Officers should have checked for video evidence from the Vietnamese restaurant where Nina and Aaron claim they were waiting at when the shooting occurred. Opposition-16. Not only have Plaintiffs submitted no evidence to show such video recordings existed, but they also cite to no legal authorities to support a claim the Officers were required to go out and look for exculpatory evidence. Plaintiffs also have not addressed the case law cited in the Officers' moving paper, including *Broam v. Bogan*, 320 F.3d 1023, 1032 (9th Cir.2003) (police had no constitutional duty to investigate claims of innocence once probable cause for an arrest is established) and *Cameron v. Craig*, 713 F.3d 1012, 1019 (9th Cir.2013) (reaching the same holding in connection with probable cause for a search warrant).

Here, there is no evidence that the evidence Plaintiffs claim the Officers failed to obtain even existed or that the Officers were aware it existed. There simply is no basis for a Fourteenth Amendment claim premised on an alleged failure to look for potentially exculpatory evidence.

## E. Plaintiffs Cannot Establish Causation

To establish causation, the plaintiff must show that the fabricated evidence was the cause in fact and the proximate cause of his injury. *Spencer*, 857 F.3d at 798. "Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury." *Caldwell*, 889

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

1    F.3d at 1115.

2        In every instance in which Plaintiffs claim Lord's police report was inaccurate

3    or fabricated, they cite to portions of the video recordings produced to the OCDA and

4    to Aaron's defense counsel as proof of the fabrication. Nowhere in their papers do

5    Plaintiffs cite to evidence of so-called fabrication by Lord with reference to something

6    other than the videotaped interview of Nina as proof of the truth. All of the evidence

7    Plaintiffs claim were omitted or fabricated is evidence that appears in the video, which

8    the Officers produce to the OCDA, who in turn provided it to Aaron's defense

9    attorney. There was no concealment of the interview techniques used or of Nina's

10   inconsistent statements. Plaintiffs' claim the Officers withheld evidence from the

11   OCDA or Aaron's defense counsel is meritless.

12       Moreover, Feldman testified he always treats police reports as summaries and

13   relies instead on videotapes of the interviews, which he did here. And it was Feldman

14   who made the decision as to what evidence to present at the preliminary hearing and

15   at the trial and was the one who made the decision to present Nina's drawing as

16   evidence. Citing to *Caldwell*, 889 F.3d at 1116-1117, Plaintiffs' argue that any

17   presumption of prosecutorial independence is overcome if a plaintiff establishes that

18   officers either presented false evidence to or withheld crucial information from the

19   prosecution. Opposition-19. Here, there is no evidence the Officers presented false

20   evidence to DDA Feldman or that they withheld crucial information from him. He was

21   provided with the full videos of all of the interviews conducted by the police in this

22   matter, including the videos of both of Nina's interviews. There is no basis for

23   denying prosecutorial independence in this case.

24   **4.    THE SUPERVISOR LIABILITY CLAIM HAS NO MERIT**

25       To establish supervisor liability, a plaintiff must show either (1) personal

26   involvement in the constitutional deprivation, or (2) a sufficient causal connection

27   between the supervisor's wrongful conduct and the constitutional violation. *Starr v.*

28   *Baca*, 652 F.3d 1202, 1207 (9th Cir.2011) (quoting *Hansen v. Black*, 885 F.2d 642,

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

23

646 (9th Cir.1989)). While a supervisor may be negligent and not paying attention, such negligence is not enough to establish a constitutional violation. *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir.2002). A plaintiff must prove a supervisor did more than play a passive role in the constitutional violation or show mere tacit approval. A plaintiff must show the supervisor somehow encouraged or condoned the actions of an inferiors. *Gregory v. City of Louisville*, 444 F.3d 725, 751 (6th Cir.2006). In *Gregory*, the plaintiff presented evidence only that the supervisors failed to review their subordinates' work. *Id.* This was held to be insufficient to support a supervisor liability claim. *Id.* at 752.

Plaintiffs have no evidence to support their supervisor liability claim. Negligence is not enough. A failure to review subordinates' work is not enough. Here, while Reynolds was designated as the lead investigator for the shooting, he was considered an equal to the other detectives involved in the investigation and was not a supervisor. OUF-116. As to Martin, in 2011 he was the sergeant in charge in the Crimes Against Persons unit and was tasked with supervising the detectives assigned to that unit. He testified that for this investigation, he was tasked with making sure everyone was safe, keeping abreast of what was going on and keeping the lieutenant and captain informed, making sure the others had what they needed that day, and making sure everything was going smoothly. OUF-127. Plaintiffs have no contrary evidence. Finally, because the evidence shows none of the officers engage in unconstitutional conduct, there can be no supervisor liability.

## 5.    THE OFFICERS ARE ENTITLED TO QUALIFIED IMMUNITY

Plaintiffs define the qualified immunity too broadly.  The Supreme Court has repeatedly held that "the clearly established right must be defined with specificity" and "not . . . at a high level of generality." *City of Escondido, Cal. v. Emmons*, 139 S.Ct. 500, 503 (2019), citing *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018).

In *Tobias v. Arteaga*, 996 F.3d 571 (9th Cir.2021), the court had an opportunity to consider whether coercion techniques used on a 13-year-old suspect, similar in kind

1796813.1

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

to those found in *Crowe* and *Cooper*, but for less than two hours, were clearly established as "psychological torture" sufficient to establish a substantive due process violation and overcome qualified immunity. In *Tobias*, officers were investigating a possible gang shooting that occurred in 2012. Using security video footage, gang enforcement officers identified Tobias as the shooter and brought him in for questioning. Early in the interrogation, Tobias requested an attorney, which was ignored. *Id*. at 577. Detectives lied to him, saying someone had given him up as the murderer, cursed at him, and told him that failing to confess would make him appear a "cold-blooded killer." *Id*. Detectives told him his mom was in the building crying and that she had identified him in the video. *Id*. Detectives told Tobias he would likely receive a harsher punishment if he continued to "lie" about not being the person in the video, but he would get help if he confessed. *Id*. Tobias was told, "when we take the case to court they're going to think you're a big time gang killer who didn't want to tell the truth, who is down for the hood …. [that] you're so down for the hood that you didn't want to speak. So they might throw the book at you." *Id*. at 578. Tobias eventually confessed. Still in the police station after his confession, Tobias told his mother he wasn't the person in the video, had no involvement in the murder and the detectives forced him to confess. His mother went to the detectives and reported what her son had told her and that Tobias was crying and "scared to shit." *Id*.

After Tobias's murder conviction was reversed, he brought a Fourteenth Amendment claim. The court denied the officers' summary judgment motion on qualified immunity and the Ninth Circuit reversed, holding that although "[t]his extended, overbearing interrogation of a minor, who was isolated from family and his requested attorney, comes close to the level of 'psychological torture' that we have held is not tolerated by the Fourteenth Amendment," Tobias's mistreatment was much shorter in duration than the type found in earlier cases. *Id*. at 585-586. The court held that the interrogation techniques used against Tobias did violate his substantive due process rights; however, the officers remained entitled to qualified immunity because

1796813.1

the unconstitutionality of the use of such techniques on a 13-year-old for a two-hour period was not clearly established as of 2012. *Id*. at 586.

Finally, the Officers are entitled to qualified immunity on Plaintiffs' *Brady* claim. Plaintiffs' cite to *Carrillo v. County of Los Angeles*, 798 F.3d 1210 (9th Cir.2015) to support their argument that the Officers are not entitled to qualified immunity for suppression of evidence. In *Carrillo*, the officers did not dispute that evidence they admittedly withheld from the prosecutor fell within *Brady*. They instead argued only that it was not clearly established in 1984 that police had an obligation under *Brady* to turn exculpatory information over to the prosecutor, which claim was rejected. *Id*. at 1218-19. The officers admittedly did not turn over all evidence to the prosecutor, withholding such things as notes demonstrating witnesses picked other individuals out of photo lineups before picking the police suspects, a statement by a lone eye-witness that he only saw the suspect in profile but was not shown any profile photos, a statement by that same witness that the person he saw did not have a mustache while all of the men in the photo lineup had mustaches, and evidence of another possible suspect who had previously tried to kill the victim.

*Carrillo* is not relevant. All *Brady* material was provided to the OCDA who in turn provided it to Aaron's defense attorney. Instead, Plaintiffs are disputing the method by which the *Brady* information was provided to the OCDA, i.e., not in written police reports but in video evidence. Plaintiffs have cited to no cases supporting this position as to how the *Brady* evidence was produced. The Officers know of no case law that requires them to turn over *Brady* evidence in that way. As such, they are entitled to qualified immunity on the *Brady*/suppression of evidence claim.

## 6. **CONCLUSION**

For the reasons stated here and in the moving papers, the Officers are entitled to judgment in their favor on Plaintiffs' second amended complaint.

///

1796813.1

DATED: November 3, 2023       WOODRUFF & SMART, APC

By: */s/Meredith D. Stewart*
    CAROLINE A. BYRNE
    MEREDITH D. STEWART
    Attorneys for Defendants CITY OF GARDEN GROVE, a public entity; SERGEANT MARK LORD, an employee of Defendant City of Garden Grove, a public entity; DETECTIVE MICHAEL REYNOLDS, a former employee of Defendant City of Garden Grove, a public entity; and SERGEANT MIKE MARTIN, a former employee of Defendant City of Garden Grove, a public entity

    The undersigned, counsel of record for Defendants SERGEANT MARK LORD, an employee of Defendant City of Garden Grove, a public entity; DETECTIVE MICHAEL REYNOLDS, a former employee of Defendant City of Garden Grove, a public entity; and SERGEANT MIKE MARTIN, a former employee of Defendant City of Garden Grove, a public entity, certifies that this brief contains 6,967 words, which complies with the word limit of L.R. 11-6.1.

DATED: November 3, 2023       WOODRUFF & SMART, APC

By:*/s/Meredith D. Stewart*
    CAROLINE A. BYRNE
    MEREDITH D. STEWART
    Attorneys for Defendants CITY OF GARDEN GROVE, a public entity; SERGEANT MARK LORD, an employee of Defendant City of Garden Grove, a public entity; DETECTIVE MICHAEL REYNOLDS, a former employee of Defendant City of Garden Grove, a public entity; and SERGEANT MIKE MARTIN, a former employee of Defendant City of Garden Grove, a public entity

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

27

1796813.1

## **PROOF OF SERVICE**

## **STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am over the age of 18 and not a party to the within action; I am employed by WOODRUFF & SMART in the County of Orange at 555 Anton Boulevard, Suite 1200, Costa Mesa, CA 92626-7670.

On November 3, 2023, I served the foregoing document(s) described as **DEFENDANTS LORD, REYNOLDS AND MARTIN'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY PARTIAL SUMMARY JUDGMENT**

☐ by placing the true copies thereof enclosed in sealed envelopes addressed as stated on the attached mailing list;

☐ **(BY MAIL)** I placed said envelope(s) for collection and mailing, following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for deposit in the United States Postal Service. I am readily familiar with the practice of WOODRUFF, SPRADLIN & SMART for collection and processing correspondence for mailing with the United States Postal Service, and said envelope(s) will be deposited with the United States Postal Service on said date in the ordinary course of business.

☒ **(BY ELECTRONIC SERVICE)** by causing the foregoing document(s) to be electronically filed using the Court's Electronic Filing System which constitutes service of the filed document(s) on the individual(s) listed on the attached mailing list.

☐ **(BY OVERNIGHT DELIVERY)** I placed said documents in envelope(s) for collection following ordinary business practices, at the business offices of WOODRUFF, SPRADLIN & SMART, and addressed as shown on the attached service list, for collection and delivery to a courier authorized by _____ to receive said documents, with delivery fees provided for. I am readily familiar with the practices of WOODRUFF, SPRADLIN & SMART for collection and processing of documents for overnight delivery, and said envelope(s) will be deposited for receipt by _____ on said date in the ordinary course of business.

☐ **(BY PERSONAL SERVICE)** I delivered such envelope(s) by hand to the offices of the addressee(s).

☒ (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. I declare under penalty of perjury that the above is true and correct.

Executed on November 3, 2023, at Costa Mesa, California.

*/s/Vilay Lee*_____
Vilay Lee

1796813.1

## AARON NGUYEN v. CITY OF GARDEN GROVE, et al.

### USDC, CENTRAL DISTRICT OF CALIFORNIA
### CASE NO. 8:21-cv-01775-JVS (ADSx)

### ASSIGNED FOR ALL PURPOSES TO
### HONORABLE JAMES V. SELNA
### COURTROOM 10C
### MAGISTRATE JUDGE AUTUMN D. SPAETH
### COURTROOM 6B

### SERVICE LIST

| | |
|---|---|
| Barrett S. Litt, Esq.<br>David McLane, Esq.<br>Lindsay Battles, Esq.<br>Rodrigo Padilla, Esq.<br>McLANE, BEDNARSKI & LITT, LLP<br>975 East Green Street<br>Pasadena, CA 91106<br>Telephone: (626) 844-7660<br>Facsimile: (626) 844-7670<br>Email: blitt@mbllegal.com<br>dmclane@mbllegal.com<br>lbattles@mbllegal.com<br>rpadilla@mbllegal.com<br>mbolanos@mbllegal.com | Attorneys for Plaintiffs<br>**AARON NGUYEN, NGOC LE THI PHAN, AND HOANG MINH NGUYEN** |

7/2023

WOODRUFF & SMART
ATTORNEYS AT LAW
COSTA MESA

29

1796813.1