BARRETT S. LITT, SBN 45527
Email: blitt@mbllegal.com
DAVID S. McLANE, SBN 124952
Email: dmclane@mbllegal.com
LINDSAY BATTLES, SBN 262862
Email: lbattles@mbllegal.com
RODRIGO PADILLA, SBN 339523
rpadilla@mbllegal.com
McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660, Fax: (626) 844-7670

*Attorneys for Plaintiffs* AARON NGUYEN, NGOC LEE THI PHAN, AND HOANG MINH NGUYEN

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| AARON NGUYEN, et al.<br>Plaintiffs,<br><br>v.<br><br>CITY OF GARDEN GROVE, et al.<br><br>Defendants. | Case No.: 8:21-cv-01775-JVS (ADSx)<br><br>[Hon. James V. Selna]<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR AFFIRMATIVE PARTIAL SUMMARY ADJUDICATION**<br><br>Hearing Date: 11/20/2023<br>Time: 1:30 p.m.<br>Crtm: 10C |

# **TABLE OF CONTENTS**

I.     Introduction..........................................................................................1

II.    No Genuine Dispute that Lord Fabricated Evidence and Suppressed Brady Evidence from His Report ....................................................................3

A. False Reports Support a Deliberate Fabrication Claim............................3

B. Defendants Cannot Dispute that Lord's Report Mischaracterized Nina's Interrogation & Omitted Brady Information.............................................4

1. Defendants Do Not Dispute that Lord's Report Omitted Exculpatory Details, Resulting in a Materially Misleading Description of the Interview ...........................................................4

2. Defendants Cannot Dispute that Lord Falsely Reported that Nina Admitted to Being at the Phi Hong During the First Video-Taped Session – And Falsely Reported Her Response When Shown a Photo ...................................................................................8

C. There is No Genuine Dispute That Aaron's Deprivation of Liberty Was Caused by False Statements and Suppressed Brady Material in Lord's Report .....................................................................................................11

1. There is no Genuine Dispute That DDA Feldman Relied on the Fabrications in Lord's Report and Nina's Diagram .....................13

2. Unrebutted Expert Testimony Establishes that Prosecutors Rely on the Truthfulness and Accuracy of Police Reports in Complex Investigations ...............................................................................15

III.   Liability for Defendants' Coercive Interrogation............................................17

A. Conscience-Shocking Behavior Includes Deliberate Indifference or the Conscious or Reckless Disregard of the Consequences of One's Acts.........................................................................................................17

B. Qualified Immunity is Unavailable for Coercive Interview Techniques that Yield False and Unreliable Statements .............................................19

C. The Criminal Court Did Not Decide Whether Nina's Statements Were Involuntary, and Such a Decision Would Not Be Preclusive ..................22

IV.    Conclusion .........................................................................................22

1

## <u>TABLE OF AUTHORITIES</u>

2  *Bagley v. CMC Real Est. Corp.*,

3      923 F.2d 758 (9th Cir. 1991) ...............................................................22

4  *Banks v. Dretke*,

5      540 U.S. 668, 124 S.Ct. 1256, 157 L.Ed.2d 1166 (2004)......................1, 12

6  *Carillo v. County of Los Angeles*,

7      798 F.3d 1210 (9th Cir. 2015) .............................................................20

8  *Costanich v. Dep't of Soc. & Health Servs.*,

9      627 F.3d 1101 (9th Cir. 2010) ...............................................................3

10  *Crowe v. County of San Diego*,

11      608 F.3d 406 (9th Cir.2010) .........................................................7, 13, 20

12  *Devereaux v. Abbey*,

13      263 F.3d 1070 (9th Cir. 2001) .............................................................20

14  *Donges v. USAA Fed. Sav. Bank*,

15      391 F. Supp. 3d 907 (D. Ariz. 2019) .....................................................10

16  *Gantt v. Roe*,

17      389 F.3d 908 (9th Cir. 2004) ..............................................................1, 12

18  *Gantt v. City of Los Angeles*,

19      717 F.3d 702 (2013)............................................................................17

20  *Goudy v. Cummings*,

21      922 F.3d 834 (7th Cir. 2019) ...............................................................20

22  *Gregory v. City of Louisville*,

23      444 F.3d 725 (6th Cir. 2006) ..........................................................11, 12

24  *Higazy v. Templeton*,

25      505 F.3d 161 (2nd Dist. 2007).........................................................11, 12

26  *Jones v. Slay*,

27      61 F.Supp.3d 806 (E.D. Mo. 2014)........................................................13

*Liston v. Cnty. of Riverside*,

  120 F.3d 965 (9th Cir. 1997) ...................................................................16

*Manning v. Miller*,

  355 F.3d 1028 (7th Cir. 2004) ...................................................................7

*Mellen v. Winn*,

  900 F.3d 1085 (9th Cir. 2018) .............................................................3, 19

*Newsome v. McCabe*,

  256 F.3d 747 (7th Cir. 2001) .....................................................................7

*People v. Wilson*,

  14 Cal. 5th 839, (Cal.2023)........................................................................1

*Richardson v. United States*,

  468 U.S. 317, 104 S. Ct. 3081 (1984)........................................................1

*Spencer v. Peters*,

  857 F.3d 789 (9th Cir. 2017) ...............................................................3, 17

*Stoot v. Everett*,

  582 F.3d 910 (9th Cir. 2009) ...................................................................11

*Tennison v. City & Cnty. of San Francisco*,

  570 F.3d 1078 (9th Cir. 2009) ...........................................................12, 17

*Tobias v. Arteaga*,

  996 F.3d 571 (9th Cir. 2021) ...........................................................20, 21

*U.S. v. Kin–Hong*,

  110 F.3d 103 (1st Cir. 1997).....................................................................7

*United States v. Skilling*,

  554 F.3d 529 (5th Cir. 2009) ...................................................................12

*United States v. Weems*,

  49 F.3d 528 (9th Cir. 1995) .....................................................................22

*Wilkinson v. Torres*,

610 F.3d 546 (9th Cir. 2010) ........................................................................17

## I.    Introduction

Defendants cannot contest that Lord submitted a report that was replete with mischaracterizations and omissions, which Lord expressly requested be used for the prosecution of Aaron Nguyen. This report – along with the fabricated diagram and Nina's coerced statements – set in motion a chain of events leading to Aaron's prosecution and 9-year incarceration. The absence of any reliable evidence of guilt against Aaron underscores the crucial role of the false report in initiating Aaron's prosecution. Ultimately, even with Nina's coerced diagram, there was insufficient evidence to support a valid conviction. *Richardson v. United States*, 468 U.S. 317, 325, 104 S. Ct. 3081 (1984) (reversal for insufficiency of evidence is tantamount to acquittal). *See also, e.g., People v. Wilson*, 14 Cal. 5th 839, 853, (Cal.2023) ("When the evidence is legally insufficient, it means that ' "the government's case was so lacking that it should not have even been *submitted* to the jury.") (citation omitted; original emphasis).

Defendants cannot dispute many of the mischaracterizations in the report. Defendants' position is essentially that police officers may write whatever they wish in reports, without regard for the truth, and then expect prosecutors to disentangle their lies by sifting through mountains of underlying evidence.[1] This position is unfounded in the law. The Ninth Circuit has held that a framework wherein prosecutors hide, and defendants must seek, is not "tenable in a system constitutionally bound to accord defendants due process." *Gantt v. Roe*, 389 F.3d 908, 912–13 (9th Cir. 2004) (citing *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004). Less tenable still, is a framework wherein police officers submit misleading reports to prosecutors and criminal defendants, expecting them to divine how much of what the police conveyed is a lie.

---

[1] In Lord's May 2023 deposition, he could not say whether police officers are required to submit truthful and accurate police reports. #518.

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

1

No prosecution would have moved forward without the fabricated police report, diagram, and coerced statements. Defendants had no cell phone data placing Aaron at the Phi Hong. The surveillance evidence was exonerating: Aaron's car was not among the caravan traveling on Westminster. Ultimately the prosecution was unable to produce any eyewitnesses placing Aaron at the scene (the prosecution's eyewitnesses indicated they did **not** see Aaron's car). GGPD's own gang expert testified that his investigation turned up no evidence that Aaron was a gang member. His lack of gang affiliation should have presented a red-flag to detectives that Aaron had no reason to joint the conflict and was separated from the group.

Plaintiffs' affirmative motion focuses exclusively on direct evidence of fabrication via Lord's false report; it does not address claism arising from Nina's false, coerced statements. Defendants nonetheless devote approximately nine pages of their brief to the issue of whether qualified immunity applies to the coercion of Nina's admissions. Because they have raised the issue, we briefly address their arguments. Plaintiffs' Opposition to the Officers' MSJ, Dkt. 84, contains a more detailed discussion of the coercion claims.

Defendants are not entitled to qualified immunity based on the totality of the interview tactics including: (1) the outrageous intimidation exerted by Martin during the off-camera confrontation in which he put his foot on Nina's chair, screaming, cursing and pointing; (2) elaborate false evidence ploys in which detectives lied to Nina that they had Aaron's car on surveillance footage and cell phone GPS evidence, involving the use of physical props in which detectives showed her car photos and GPS maps; (3) prolonged, guilt-presumptive, suggestive questioning in which they repeatedly accused Nina of lying; and (4) repeated promises that she could go home if she would only endorse their version of events. These tactics, when used against a juvenile witness,

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

2

shock the conscience under clearly established law, particularly viewed in light of a deliberate, calculated plan to "flip" Nina.

## II.    No Genuine Dispute that Lord Fabricated Evidence and Suppressed Brady Evidence from His Report

### A.    False Reports Support a Deliberate Fabrication Claim

The focus of Plaintiffs' affirmative motion is direct evidence of fabrication, rather than circumstantial evidence (i.e. coercive and abusive investigation techniques). False statements in police reports constitute direct evidence of fabrication. *Spencer v. Peters*, 857 F.3d 789, 799-800 (9th Cir. 2017) (citing *Costanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1111 (9th Cir. 2010) ("deliberately mischaracterize[ing] witness statements" in investigative reports is "a constitutional violation."). Circumstantial evidence is unnecessary in cases involving direct evidence. *Spencer*, 857 F.3d at 799; *Costanich*, 627 F.3d at1113 (9th Cir. 2010). [2]

Mischaracterization of an interview constitutes direct evidence of deliberate falsification. *Costanich*, 627 F.3d at 1112 (9th Cir. 2010) (report suggested officer interviewed witness, when in reality she only held up a referral, and the witness said everything in it was true, without looking at the referral); *Mellen v. Winn*, 900 F.3d 1085, 1102–03 (9th Cir. 2018) (comparing officer's written statement to the video recorded witness statement; holding that discrepancies between the two suggested detective modified the written statement to conform to the physical evidence the police had found and to feed the witness information she did not originally offer to investigators—"Detective Winn should have known how important these details were, particularly when she had also collected information from various other sources that indicated three other men had committed the crime.").

---

[2] Defendants appear to misunderstand the *Spencer/Costanich* direct evidence standard. Direct evidence refers to demonstrably false statements in a police report that can be used to prove evidence was deliberately fabricated, not evidence used at trial.

### B.   Defendants Cannot Dispute that Lord's Report Mischaracterized Nina's Interrogation & Omitted Brady Information

##### 1.   *Defendants Do Not Dispute that Lord's Report Omitted Exculpatory Details, Resulting in a Materially Misleading Description of the Interview*

###### a)  Lord's Report Omits Nina's Denials of Being at the Phi Hong and Her References to 2,000

Defendants cannot dispute that Lord omitted information that critically impeached Nina's short-lived admissions and mischaracterized the meaning of her words:

1) Lord's report omits that Nina denied being present at the Phi Hong at least **16 separate times**, including 10 times during the first interview, 2 more times during the second interview before 1:02 p.m., and 4 times when she unequivocally recanted. (#505, 498). These 16 denials do not include the denials she made in Aaron's presence (#408-410).

**Nina's denials provided critical impeachment:** Lord's report creates the false impression that Nina confessed during the first video session and consistently admitted to being at the Phi Hong for the rest of the day. He does not explain that she repeatedly (12x) denied being at the Phi Hong until 1:02 p.m. (5 hours after the first interview began), then fully recanted by 1:42 p.m., and maintained her recantation through 3:25 p.m. when the second tape ends. *See* #323, 408, 505. Lord not only concealed her denials, but also concealed that she remained at the police station from 8:08 a.m. until at least 3:25 p.m. Inclusion of the times would have raised serious questions about why she was subjected to such prolonged questioning had she had confessed during the first session.

2) Lord's report entirely omits that Nina told detectives **seven** times during the first interview that her only memory of a poolhall was a memory of being at 2,000

Club, on a day other than the shooting. (Reply Facts 492, 493). Nowhere in Lord's report do the words "Two Thousand" or 2,000 appear. (#492, 493).

**Omission of References to 2,000 Transformed Nina's Statements:** Instead of accurately reporting Nina's reference to 2,000 during the first interview, Lord falsely reported that that Nina described being at the Phi Hong where she saw Puffy/Skylar in the parking lot. (Nina clearly stated she was referring to 2,000, not the Phi Hong, on a different day). (See #183, 493, 506). His report transformed her statement about the unrelated 2,000 club into an admission of guilt. Lord also omits that she described being at the 2,000 club with Aaron, playing pool inside with three people, who were in the victims' SUV (Thai, Jimmy, and John Nguyen). (#492-494).

### b) Lord's Report Omitted Information Relevant to the Location the Diagram Depicted

Defendants cannot contest that Lord's report created a materially misleading description of Nina's statements about what she perceived as a car chase. Defendants do not dispute that Lord's report (1) omits that Lord told her to write "Westminster" on her diagram (#503), while emphasizing, in the report, that Nina had to have intended the diagram to depict events on Westminster since she was the one who wrote it;[3] (2) omits that Nina told Lord that the diagram showed where they pulled off to "the restaurant" a location 3.6 miles from the crime scene (#504); and (3) falsely implies that Nina/Aaron participated in trapping a car when Nina twice clearly denied they played any role in trapping a car. Due to these omissions, it was not apparent that Lord transformed the diagram into a false admission of guilt (#502). These misrepresentations played a key role in falsely placing Aaron's group as participants in a trapping on Westminster (that

---

[3] See Ex. 51 (Lord 4/20/11 Supp. Report), p. 16 ("I explained to her that was impossible because she had written on the map Westminster Ave…").

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

5

never happened), bolstering Lord's mischaracterization of Nina's diagram as depicting events at the crime scene rather than near the restaurant near Miles Square Park.

### c) Lord's Report Concealed Evidence of Coercion

Second, it cannot be disputed that Lord's report conceals/omits the highly coercive tactics used against Nina.

1) Lord's report omits that Nina described the sergeant (Martin) yelling in her face, pointing and cursing during an off-camera confrontation. (#495, 496) This was critical Brady information, necessary for understanding why Nina was crying, and for assessing both the voluntariness and reliability of Nina's statements. Because there was no report or video of Martin's off-camera confrontation, the prosecutor necessarily relied on Lord's description, which in this case, was one-sided to the point of flagrantly mischaracterizing the information available to him.(#541)

2) Lord's report omits detectives' relentless lies to Nina that they had incontrovertible cell phone GPS evidence and video surveillance footage placing Aaron (and his car) at the crime-scene (when no such evidence existed). Defendants acknowledge that they **falsely** represented to Nina they had video and GPS evidence (#415-430-431-432); defendants falsely represented to Nina that Aaron had confessed to being at the Phi Hong (#106,333). They acknowledge that they showed Nina photos and cell phone maps in elaborate ruses to persuade her that they had evidence placing them at the Phi Hong (#172). None of these false evidence ploys were disclosed in their report. Defendants do not dispute that they falsely represented to Nina 7x that they had video surveillance (#464) and 10x that they had cell GPS evidence (#463).

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

6

3) Lord's report indicates he told Nina she wasn't being honest, but nonetheless omits the detectives accused Nina of dishonesty more than 20x when she refused to admit to being at the Phi Hong, including calling her a "ridiculous" "liar" and lecturing her about the importance of tell the whole truth (#459).

Failure to disclose the tactics by which Nina's admissions were extracted creates a materially misleading description of the interview and presents a standalone *Brady* violation. Coercion is relevant to both voluntariness and reliability. *Crowe v. County of San Diego*, 608 F.3d 406, 433 (9th Cir.2010) ("[C]oerced confessions are legally insufficient and unreliable and thus cannot factor into the probable cause analysis."); *U.S. v. Kin–Hong*, 110 F.3d 103, 121 (1st Cir. 1997) ("[A] confession obtained by duress is inherently unreliable.")). *Brady* requires officers to disclose when they have presented false statements, fabricated evidence or have undermined the integrity of evidence through investigatory misconduct. *Manning v. Miller*, 355 F.3d 1028, 1032 (7th Cir. 2004) (FBI agents failed to tell prosecutors they induced false witness statements and submitted false written reports); *Newsome v. McCabe*, 256 F.3d 747 (7th Cir. 2001) (failure to disclose officers' coaching of witnesses violated *Brady*).

### d) Lord Omitted Exculpatory Information re Aaron's Social Relationship with the Victims

Defendants do not contest that Lord's report omitted significant information demonstrating that Aaron and Nina had a social relationship with people in the victim group, confirming the absence of any gang affiliation and undercutting any theory that they intended to participate in a gang attack: (1) Nina described playing pool with Aaron and three members of the *victim* group at a different pool hall (2000), on a different day, indicating a social relationship and thus lack of motive to join an attack (#149, 151 494); (2) Aaron described learning about the shooting from Jenny Do, Thai's girlfriend (further indicating a social relationship with the victims). (#217). This was classic *Brady*

material because it was necessary to understanding Nina's description of being playing pool at 2,000 – and because it tended to negate any motive.

### 2. Defendants Cannot Dispute that Lord Falsely Reported that Nina Admitted to Being at the Phi Hong During the First Video-Taped Session – And Falsely Reported Her Response When Shown a Photo

Lord claims that Nina admitted to being at the Phi Hong during the first videotaped session, in an apparent effort to escape the damning conclusion that his report contained outright lies. These claims are entirely disingenuous. It is clear that Lord knew Nina did *not* admit to being at the Phi Hong during the first session, as evidenced by his own statements during the inadvertently recorded hallway meeting, in which Lord tells Sgt. Martin and DDA Feldman that Nina, like Aaron, said they lost the group and waited in the parking lot of a Vietnamese restaurant. (#232).

At no point during the first session did Nina admit to being at the Phi Hong. At 8:14 a.m., Lord asks Nina: "Where were you guys at *before* you went to the poolhall." (8:14:47). Confused, Nina responds: "Sir, I have a really bad memory, do you know what pool hall? **Two Thousand**, right?"? (8:14:50 – 8:14:54 a.m.). Lord responds: "at Harbor and Westminster," to which Nina replies (8:14:58) "Two Thous..?" (Two Thousand Club was a different poolhall, not *located at Harbor and Westminster*).[4] When asked about a poolhall, Nina's *two* immediate references Two Thousand were a red flag that her memory of a poolhall concerned Two Thousand Club, not Phi Hong. (#91-94).

Prior to 8:42, Nina had not indicated she was at any poolhall. At 8:42, Lord interjects – a fifth time – that they were at a pool hall: "So tell me what happened when you went over to the pool hall. Cause I know you guys went over there. I know you did." Between 8:42 and 8:53, confusion ensues as Nina describes a memory of being at a poolhall. She observed Puffy and Skylar in the parking lot. But she also includes details

---

[4] The transcript omits Nina's references to the Two Thousand Club at 8:14 a.m.

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

8

inconsistent with the night of the shooting (e.g. she says Dice was in the car; Dice wasn't with them on the shooting night; she also says Julie was not in the car whereas she had earlier placed Julie in the car on the shooting night). At 8:45, when detectives express confusion, she tells them she's "mixing up" the day they were at a poolhall with the day of the shooting, indicating two separate events ("I think...I think I'm getting these...these things all mixed up. The things that I remember...I think I'm getting that day mixed up with another...the day of the shooting."). (#140-147)

Detectives instruct her to focus on her memory of the "pool hall" and she clarifies that she's talking about a day at **2,000**, explain that "Thai" was there. (#149) As the conversation unfolds, she references Two Thousand and mentions *playing pool inside of the poolhall with* Thai and "his cousins," a scenario that could never have happened on the night of the shooting. At 8:51, Detectives accused her of lying and changing her story. At 8:52, she states unambiguously, that she is describing Two Thousand in Koreatown Plaza (miles from the Phi Hong). While there has been discussion of a "poolhall," at his point (8:52), there has been no discussion of "Phi Hong." (#148-160). By the end of session one, Nina says **Two Thousand 7 times;** the words "Two Thousand" do not appear in Lord's report. (#492, 493).

Whatever confusion existed, it was resolved at **8:53** a.m., when Lord showed Nina a photo of the Phi Hong building/sign (attached to his report) and asked – directly – if that was the poolhall to which she was referring. (#164-166). The moment she is shown a picture of the Phi Hong is crucial because it is the first time the words "Phi Hong" enter the conversation, and the first moment Nina is oriented to the fact that the officers are not asking her about the 2000 club, but the Phi Hong. Once shown the photo, she emphatically denied having any memory of being present, and denied being there repeatedly thereafter. (#164).

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

9

<u>In viewing the photos, she stated twice that she was **not** at the Phi Hong</u>. She also makes clear that her earlier mention of Puffy referred to the Two Thousand, not Phi Hong, on a different day. Between 8:53 and 9:11, Nina tells detectives **10** times she had **no** memory of being at the Phi Hong on the night of the shooting. As Defendants concede, all 10 denials are omitted from Lord's police report, as are each of her references to 2,000. (#196, 506). Lord's false statement that Nina viewed the photos and admitted to being at the Phi Hong is a flagrant lie. In *Costanich*, the Ninth Circuit explained that "[r]eporting that a witness said something she did not cannot" be characterized as a mere "misstatement." *Costanich* at 1113.

Lord attempts to dispute this "discrepancy" in his report—his statement that Nina said she was at the Phi Hong when shown a picture – by insisting that he accidentally placed the word "and" between the two clauses of the sentence. This is precisely the kind of "threadbare conclusory statement" that is insufficient to create a genuine dispute of fact. *Donges v. USAA Fed. Sav. Bank*, 391 F. Supp. 3d 907, 910 (D. Ariz. 2019), aff'd, 809 F. App'x 406 (9th Cir. 2020). Defendant Lord's arguments are preposterous in any context, but particularly here, in light of the overwhelming evidence reflecting Lord's deliberate indifference to the truth. Defendant does not raise a genuine dispute that this was merely a misstatement, or attributable to "poor draftsmanship". No reasonable jury would find that he *accidentally* placed the word "and" between the two clauses of this sentence, or that he *accidentally* placed the sentence in the same paragraph that included Nina's references to parking next to the shooter's car (**falsely** stating she said it was the Phi Hong) and omitting that she said she was inside the poolhall playing pool with members of the victim group.

The reality of Nina's interrogation was that she made no inculpatory admissions until five hours after being brought in for questioning, after Martin aggressively confronted her, off camera, and that, within 45 minutes, she repeatedly recanted her

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

10

short-lived admissions, telling officers that they had pressured her into saying she was at the Phi Hong. Lord replaced this reality with a narrative conveying that Nina knew detectives were asking her about the Phi Hong from the beginning and that she admitted to being present during her first recorded interrogation session. The lies in his report reflect a calculated effort to discredit Nina's exculpatory statements, to obscure detectives' coercive tactics, to ensure exculpatory and impeaching information useful to the defense stayed buried, and to wholly fabricate several inculpatory statements.

**C. There is No Genuine Dispute That Aaron's Deprivation of Liberty Was Caused by False Statements and Suppressed Brady Material in Lord's Report**

Aaron's prosecution, deprivation of liberty, and invalid conviction were precisely the consequences that detectives should have foreseen in coercing Nina's admissions, fabricating her diagram and submitting a false report. *E.g., Stoot,* 582 F.3d at 926–27 (police officer could "reasonably have foreseen that a coerced confession would be used against [the suspect] and would lead to [] detention.") (internal quotation omitted); *Higazy*, 505 F.3d at 177 ("[E]ven if the intervening decision-maker … is not misled or coerced" chain of causation exists "where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty."). Causation is solidified by Lord's express request that his false report be used to support Aaron's prosecution. *See Gregory v. City of Louisville*, 444 F.3d 725, 740–41 (6th Cir. 2006) (forensic report "affected the course of the criminal proceedings independent of [expert's] testimony to its contents.").

Defendant Lord's position is basically that police reports can make any number of misrepresentations because prosecutors do not rely on police reports being truthful, let alone accurate or complete. The suggestion that police may forward false reports to prosecutors on the assumption that prosecutors will simply disregard the report flies in

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

11

the face of actual prosecutorial practice – particularly in complex homicide investigations – while contravening fundamental principles of principles of integrity within the criminal justice process.

In *Gantt*, the court opined, with respect to the disclosure of information from prosecutors to Defendants, that "[a] rule ... declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." *Gantt*, 389 F.3d at 912–13 (9th Cir. 2004) (citing *Banks v. Dretke*, 540 U.S. 668, 124 S.Ct. 1256, 1275, 157 L.Ed.2d 1166 (2004)). A rule declaring police may affirmatively deceive, and prosecutors and defendants must disbelieve and disprove their lies is also not tenable "in a system constitutionally bound to accord defendants due process." *Id*.[5]

Detectives must disclose *Brady* material in a way that reasonably ensures the prosecutor will be alerted. They may not assume that prosecutors will happen across exculpatory information buried in dozens of hours of video, handwritten notes or some other repository. *See, e.g. United States v. Skilling*, 554 F.3d 529, 577 (5th Cir. 2009), *aff'd in part, vacated in part, remanded,* 561 U.S. 358 (2010) ("it should go without saying that the government may not hide *Brady* material of which it is actually aware in a huge open file in the hope that the defendant will never find it"); *Tennison v. City & Cnty. of San Francisco,* 570 F.3d 1078, 1090 (9th Cir. 2009) ("Placing … notes … in the police file did not fulfill the Inspectors' duty to disclose exculpatory information to the prosecutor. [Exculpatory evidence indicating police identified the wrong person] …should not have been buried in a file, but should have been made known to the prosecutor"). *See Gregory* 444 F.3d at 754 (6th Cir. 2006) (genuine issue of material

---

[5] *Gantt*, 389 F.3d at 912–13 (9th Cir. 2004) (stronger argument for disclosure applied where the prosecution not only suppressed exculpatory information, but also made affirmative representations that it was keeping the defense apprised of investigation.

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

12

fact despite evidence officers were trained to document and turn over all evidence to the prosecutor).

### 1. There is no Genuine Dispute That DDA Feldman Relied on the Fabrications in Lord's Report and Nina's Diagram

Defendant fails to create a genuine dispute as to whether DDA Feldman relied on the accuracy, completeness and truthfulness of Lord's report. DDA Feldman unambiguously testified that he would have relied on the representations of police officers, in a case of this magnitude, to determine if sufficient evidence supported the filing of a complaint. In deposition, he was asked if, in a case of this magnitude, he would have relied on detectives' representations to determine if sufficient evidence supported the filing of a complaint. He answered: "**Precisely**." He also would have specifically relied upon detectives' false oral and written representations (during the hallway conversation) that three witnesses placed Aaron at the Phi Hong. (#526, 527) Given Feldman's reliance, there is no question that Lord's misrepresentations set in motion the chain of events that led to Aaron's deprivation of liberty. *See Crowe*, 608 F.3d 406 at 432; *Jones v. Slay*, 61 F.Supp.3d 806, 832 (E.D. Mo. 2014) (officers' false representation to prosecutor supports due process claim for manufacture of evidence where the prosecutor relied on officers statements in deciding to prosecute).

Lord argues that DDA Feldman had access to the videos of Nina's interrogation.[6] Feldman's access to the videos does nothing to prove that Feldman wasn't relying on police reports summarizing the interrogation. Feldman's access to the videos is wholly insufficient to great a genuine dispute of fact.

Additionally, Defendants can point to **no** evidence that DDA Feldman actually *reviewed* the video of Nina's interrogation in this case. The only evidence that DDA Feldman reviewed either the transcripts or the videos are DDA Feldman's statements

---

[6] No transcript was prepared until October 18, 2012. Ex. 2(b).

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

13

that, pursuant to his *ordinary practice*, he *would have* reviewed them at some point before trial. Defendants entirely fail to show that he actually reviewed the videos of Nina's interrogation in this case, much less when he reviewed them during the **six years** that Aaron awaited trial. Whatever DDA Feldman's *ordinary* practice was; it is not probative of what Feldman actually did in a case of such *extraordinary* magnitude. DDA Feldman testified in deposition "I don't know of a case of this magnitude" and that this was "probably the largest" case he was worked on as a prosecutor. Battles Decl., ¶2. DDA Feldman also testified in deposition that while he would have ordinarily reviewed the interrogation transcripts for errors and corrections, "due to the sheer volume of this case," he delegated review of the transcripts to detectives working on the case. Feldman in fact emailed Defendant Reynolds, the lead detective on this case, requesting his help reviewing a transcript, explaining that while he usually reviews interview transcripts himself, there was **just too much volume** in this case. Dkt. 84-21, #121.

DDA Feldman's conduct at trial establishes that he remained deceived by the misrepresentations in Lord's report. First, Lord falsely testified during trial that he did not tell Nina to write anything on her diagram, even though the video shows Lord directing Nina to write Westminster. (#38, 365) Had Feldman watched the video and been aware of the discrepancy, he would have been obligated to correct Lord's perjured testimony. Second, Feldman testified in deposition that he would never prepare a witness to testify with a report containing material misrepresentations, yet he nevertheless directed his investigator to provide Nina with a copy of the police report to "refresh her recollection" in advance of her testimony. (#30) He also used the report to refresh Lord's recollection during his trial testimony. Battles Decl., ¶2. Had Feldman understood that the report was replete with mischaracterizations, he would have had a professional responsibility to avoid using the report to refresh their memories.

DDA Feldman made Nina's diagram the centerpiece of his case. (#42, 43) He never addressed Nina's statement, while drawing the diagram, that placed it at the location where they lost CJ and pulled over to the restaurant parking lot, 3.6 miles away from the crime scene. (#11, 59, 370). Had Feldman watched the video, he would presumably would have understood that Nina placed the diagram at a different location and wrote Westminster because Lord directed her to do so. Finally, had DDA Feldman known about Lord's fabrications, Defendant Lord and other officers would also have been subject to impeachment, as would the integrity of the entire investigation.

### 2. *Unrebutted Expert Testimony Establishes that Prosecutors Rely on the Truthfulness and Accuracy of Police Reports in Complex Investigations*

Plaintiffs have submitted unrebutted expert testimony establishing that disclosure of interview videos does not constitute meaningful disclosure of *Brady* information where exculpatory details are buried in 90+ hours of video, and where the reports create a materially misleading impression of fact. Prosecution expert Heidi Rummel, explains that prosecutors necessarily rely on the accurate representations of police officers, as communicated in reports and verbal statements. Because reports are the primary means by which prosecutors access information required to initiate and pursue criminal prosecutions, prosecutors assume the information contained in reports is truthful, accurate and reasonably complete. (#546)

Even if police reports constitute summaries, rather than verbatim transcripts, the reports are expected to be truthful, accurate, objective summaries that capture all relevant facts, to ensure that all important facts relevant to an assessment of the case are communicated to the prosecutor. It is particularly important, and required, that reports highlight or call attention to exculpatory information relayed in such interviews. (#538, 553)

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

15

Here, Lord's false report omitted every piece of material, exculpatory information, deceiving DDA Feldman and undermining his ability to evaluate the evidence. In a complex homicide investigation, it is especially important for prosecutors to be able to rely on the accuracy and completeness of police reports. This investigation generated over 60 taped interviews totaling 90+ hours of interview footage. Because prosecutors cannot be expected to sift through dozens of hours of videos to ensure they have made a correct charging decision, they rely on officers to flag exculpatory evidence generated in interviews. (#539-540).

It goes without saying that prosecutors rely exclusively on police reports for accurate descriptions of witness interviews that were not recorded at all – including, for example, the unrecorded interview of Nina by Sgt. Martin. (#541) Lord's police report does not document Nina's statements about what transpired with Sgt. Martin. At the time of the charging decision (~4/20/11), the only record of Nina's description of Martin's confrontation existed on the video of her second recorded interview, where she explains she was crying because he was in her face, pointing his finger and cursing. (#495, 496)

Finally, even if the exclusion of exculpatory evidence from police reports (including the diagram) were considered permissible because information is available elsewhere (i.e. a video), that is not the case when, by excluding the exculpatory information, and including affirmative misrepresentations, the report and diagram communicate a false and misleading description of events. *E.g. Liston v. Cnty. of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997); ("material omission" a form of false evidence). Falsity by omission is equally egregious as falsity by affirmative misrepresentation. And while prosecutors have an independent obligation to assess the evidence they present at trial, when prosecutors receive police reports, particularly in the context of serious and complex cases, their default assumption is that the information

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

16

contained within the report is truthful, accurate and reasonably complete.  (#542-546, 547-555).

## III.    Liability for Defendants' Coercive Interrogation

Defendants devote approximately nine pages of their brief to the issue of whether Defendants are liable for coercing Nina's admissions. This is not the focus of Plaintiffs' motion, but we briefly address their arguments. Plaintiffs provide a more detailed legal analysis of the coercion applied against Nina in their Opposition to the Individual Officers' Motion for Summary Judgment. Dkt. 84.

### A. Conscience-Shocking Behavior Includes Deliberate Indifference or the Conscious or Reckless Disregard of the Consequences of One's Acts

The interview tactics used against Nina involved conscious or reckless disregard for the truth and Aaron's rights. That is easily sufficient to satisfy the "conscience-shocking" standard required for due process fabrication claims.

In the deliberate fabrication context, including coercion of third-party statements, where actual deliberation is possible, proof of conscience-shocking conduct specifically includes "[d]eliberate indifference," defined as "the conscious or reckless disregard of the consequences of one's acts or omissions." *Spencer*, 857 F.3d at 802; *Gantt*, 717 F.3d at 702, 707-708 (deliberate indifference standard applied to coercion of third-party statement) (citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *see also, Tennison*, 570 F.3d at 1089 (acting with "deliberate indifference to or reckless disregard for an accused's rights" was "consistent with the standard imposed in the substantive due process context, in which government action may violate due process if it 'shocks the conscience.'").

The evidence in this case easily establishes conscious and reckless disregard for the consequences of detectives' actions. Any reasonable officer would have understood

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

17

that interrogations of juvenile witnesses must be undertaken with the greatest of care. Detectives exercised no measure of caution. Instead, they subjected Nina, four days after her 17th birthday, to an hours long interrogation, without a parent, with no Miranda warnings, in which they relentlessly pressured her into providing their narrative of what happened on the night of the shooting. When she repeatedly told them they lost the group near Miles Square Park and pulled over to a Vietnamese Restaurant they continuously accused her of lying.

What makes the interrogation tactics especially shocking in this case is that detectives subjected Nina to unrelenting false evidence ploys including telling her – over and over – that they had Aaron's car on video, even going so far as to show her photos and falsely represent they depicted photos of Aaron's car at the crime scene. They pulled the same tricks with maps of cell phone GPS evidence, insisting that the little dots on the map conclusively established Aaron's presence at the Phi Hong. These oral and visual lies disoriented Nina and left her struggling to understand why she couldn't remember the narrative advanced by the detectives.

Beyond the false evidence tricks, Martin subjected her to a n aggressive off-camera confrontation where he put his leg on her chair and screamed in her face. Most adults would have been intimidated by such a confrontation – it was especially coercive to a 17-year-old. Even more shocking is that defendants encountered significant red flags that Aaron was not at the Phi Hong: they knew his phone did not place him there, they knew Aaron, Alex and Nina provided the same alibi, and they could see his car was not captured on the video surveillance.

Lord knew they had engaged inappropriately coercive behavior with Nina, undermining the reliability of her admissions – his guilty knowledge is evidenced by the police report replete with omissions and mischaracterizations designed to conceal the fact that a team of four detectives (Lord, Martin, Danielson and Farley) subjected Nina

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

18

to hours of interrogation (8:08 a.m. – 3:00 p.m.) during which they extracted short-lived admissions using techniques that would cause many adults to confess. Had Lord believed Nina's admissions were reliable and legally obtained, there would have been no reason to draft a false police report covering up their actions.

The purposeful nature of defendants' conduct is further accentuated by the "hallway conversation," which demonstrates that the falsehoods in Lord's report of the first video session were no accident. The hallway conversation reveals that Lord unquestionably knew Nina had denied being at the Phi Hong, providing an alibi consistent with Aaron, and that detectives recognized they could not charge Aaron unless they "flip[ped]" someone.

Pursuant to deliberate and calculated plan, Sgt. Martin promptly initiated a threatening, off-camera confrontation where he pointed in Nina's face, calling her "fucking liar" and "Goddamned liar." (#227-271). The failure to record this conversation was purposeful and reflects reckless disregard for the truth (and bad faith). The evidence paints a picture of officers who would stop at nothing to obtain Aaron's conviction, and thereby put an innocent man behind bars. *Mellen*, 900 F.3d at 1103 (9th Cir. 2018) (evidence suggested detective "would have taken any means necessary to secure [the] conviction" in part "where he knowingly exceeded the scope of a search warrant, suppressed the content of her conversation, spoke with a suspect without counsel, and failed to investigate other credible witness accounts).

### B. Qualified Immunity is Unavailable for Coercive Interview Techniques that Yield False and Unreliable Statements

Defendants' qualified immunity argument concerning coercive interview techniques is irrelevant to this motion, but we address it nonetheless.[7] As the Ninth

---

[7] Qualified immunity is unavailable for Lord's false report and suppressed Brady evidence. *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001); *Carillo v. County of Los Angeles*, 798 F.3d 1210, 1223 (9th Cir. 2015).

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

19

Circuit recognizes, qualified immunity is unavailable for coercion of third-party admissions. *Crowe*, 608 F.3d at 432 (qualified immunity "manifestly inapplicable" where juveniles were subjected to hours-and-hours of interrogation during which they were cajoled, threatened, lied to, and relentlessly pressured by police officers; these techniques shocked the conscience under clearly established law in 1998, including *Cooper v. Dupnik*, and the U.S. Supreme Court's decision, *In re Gault*, directing that juvenile interrogations be conducted with "the greatest care"). [8]

Defendants' reliance on *Tobias v. Arteaga* is misplaced, 996 F.3d 571, 581-582 (9th Cir. 2021). *Tobias* held that police engaged in improperly coercive interrogation techniques where detectives threatened that, if juvenile continued to "lie," he would be viewed as a "cold-blooded killer," and the court "might throw the book at [him]." The court interpreted the detective's threat that court might "throw the book" at the juvenile if he continued to "lie" was a threat of serious consequences if juvenile did not confess. The Ninth Circuit found that the defendant was nonetheless entitled to qualified immunity on a 14th Amendment substantive due process claim because, although *Tobias* was pressured to confess to a crime he did not commit (including by being hammered with questions and cursed at), the interrogation lasted a little over an hour. The decision distinguished from *Crowe* and *Cooper*.  In *Tobias*, the Ninth Circuit was clear that conscience-shocking behavior does **not** require "hours and hours" of interrogation, provided the conduct is sufficiently coercive.

The coercion in this case goes far beyond what occurred in *Tobias*, and extended for a longer period of time. Unlike in *Tobias*, Nina was subjected to elaborate, false evidence ploys that involved the use of physical props to deceive and disorient her.

---

[8] It makes no difference that Lord did not directly participate in Martin's confrontation. There is no portion of the investigation significant to this case that Lord did not participate in. *Goudy v. Cummings*, 922 F.3d 834, 843 (7th Cir. 2019) (joint and several liability applies).

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

20

Detectives repeatedly told her they had GPS evidence and even went so far as to show her the "red book" with "all the proof" and cell phone maps, insisting that the maps conclusively placed Aaron at the Phi Hong. ("See these little maps. It shows everywhere and when….So are you going to tell me what's up or not? We already told you"). They falsely insisted that Aaron's car was caught on video surveillance footage, and repeatedly showed her photos, representing they depicted Aaron's car. They falsely told her Aaron had confessed, along with Alex, Tony and Julie. None of these people told police they were at the Phi Hong. This outrageous trickery was coupled with incessant accusations of lying and repeated assertions that she could go home (in five minutes) if she would start telling the truth (and if she didn't, she faced "serious crap" or even conspiracy charges).

Further, unlike *Tobias*, Nina's interrogation was not "just over an hour." Her questioning began at 8:08 a.m. and did not end until after 3:01 p.m. (the tape ends at 3:25). In analyzing the coercive interrogation, this entire period must be counted (not only the period of questioning that was recorded). Between videotaped sessions, Martin engaged in terrifying, unrecorded confrontation, standing with his foot on the seat of her chair, screaming "at the top of his lungs," with his mouth inches from her face, his finger pointing in her face, and calling her a "god damn liar," "fucking liar," and warning her that she had better not "fucking lie" to the officers. Videotaped questioning resumed at 12:39 p.m. with Nina crying inconsolably. When Lord found Nina in this emotionally distraught state, he doubled down on his earlier coercive tactics, and Nina's short-lived admissions followed shortly thereafter. Few adults could have withstood this intimidation and trickery.

No such aggressive confrontation occurred in *Crowe* or *Tobias*, nor did those cases involve elaborate false evidence ploys as extensive as the ones here. Since the

totality of the coercive tactics here were more coercive than those in *Tobias*, qualified immunity here is, as in *Crowe*, "manifestly inapplicable".

### C. The Criminal Court Did Not Decide Whether Nina's Statements Were Involuntary, and Such a Decision Would Not Be Preclusive

Defendants argue that *Bagley* establishes collateral estoppel for the question of voluntariness of Nina's statements. *Bagley* held that collateral estoppel does not exist unless the relevant issue was "distinctly put in issue and directly determined." *Bagley v. CMC Real Est. Corp.*, 923 F.2d 758, 762 (9th Cir. 1991). The voluntariness of Nina's statements were never distinctly put at issue, nor determined. During Aaron's underlying criminal trial, the court stated it would decline to set a hearing set on the voluntariness issue because, after reviewing the transcripts and videos of Nina's interrogation: "I don't know if those statements are involuntary or voluntary at this point. I just don't know. And it could very well be that there is a mixture of involuntary statements and voluntary statements." Dkt. 84-1, Ex. 115 (Transcript, pp. 210).

As far as can be determined, the transcript includes no motion to exclude Nina's statements, no briefing by counsel, no decision by the court, and no evidence the issue was actually litigated and decided. The transcript reflects that no voluntariness hearing was set and no decision made. Given the absence of any litigation or resolution, collateral estoppel cannot apply. *United States v. Weems*, 49 F.3d 528, 532 (9th Cir. 1995) (Collateral estoppel applies where "(1) the issue sought to be litigated is sufficiently similar to the issue present in an earlier proceeding and sufficiently material in both actions to justify invoking the doctrine; (2) the issue was actually litigated in the first case; and (3) the issue was necessarily decided in the first case.").

### IV.    Conclusion

Defendant cannot genuinely dispute that Lord's report both fabricated evidence and concealed *Brady* evidence, which caused Aaron Nguyen to be wrongfully charged,

Reply in Support of Plaintiffs' Motion for Partial Summary Adjudication on Liability for Procedural Due Process Claims (False Police Report)

22

incarcerated and invalidly convicted. Accordingly, summary adjudication is appropriate in Plaintiffs' favor with respect to their claims arising from Lord's report.

DATED:    November 3, 2023 MCLANE, BEDNARSKI & LITT, LLP

By: /s/ Lindsay Battles
Barrett S. Litt
Lindsay Battles
Attorneys for Plaintiffs

## L.R. 11-6.2 – CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,962 words, which complies with the word limit of L.R. 11-6.1.

DATED:    November 3, 2023    MCLANE, BEDNARSKI & LITT, LLP

By: /s/ Lindsay Battles
Barrett S. Litt
David S. McLane
Lindsay Battles
Rodrigo Padilla
Attorneys for Plaintiffs
AARON NGUYEN, NGOC LEE THI PHAN, and HOANG MINH NGUYEN